{5618 MEM A021347l.DOC}

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

In re:

J.S. II, L.L.C., *et al.*,

Debtors.

|  |  |
|---|---|
| J.S. II, L.L.C.; RIVER VILLAGE I, L.L.C.; and RIVER VILLAGE WEST, L.L.C., | |
| Appellants, | |
| v. | |
| THOMAS A. SNITZER and SNITZER FAMILY L.L.C., | |
| Appellees. | |

Case No. 08-C-03582

Hon. James B. Moran, District Judge

(Appeal from the United States
Bankruptcy Court for the Northern
District of Illinois in Case No. 07-03856,
Hon. Jacqueline P. Cox, Presiding)

## APPENDIX TO APPELLANTS' BRIEF

Steven B. Towbin
Janice A. Alwin
Shaw Gussis Fishman Glantz
Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60654
P: (312) 276-1333
F: (312) 275-0569

Attorneys for Appellants

{5618 MEM A021347l.DOC}

# TABLE OF CONTENTS

| Tab | | Page |
|---|---|---|

*Proceedings in the Bankruptcy Court*

| Tab | | Page |
|---|---|---|
| 1 | Memorandum Opinion and Order (Entered May 27, 2008) (Docket No. 676) . . . . . . . . . . . | AA1 |
| 2 | Proof of Interest by Thomas J. Snitzer and Snitzer Family LLC (Entered June 1, 2007) (Docket No. 188) . . . . . . . . . . . | AA27 |
| 3 | Debtors' Objection to Proof of Interest (without exhibit) (Entered November 1, 2007) (Docket No. 311) . . . . . . . . . . . | AA63 |
| 4 | Answer and Counterclaim of Thomas J. Snitzer and Snitzer Family LLC (Entered December 14, 2007) (Docket No. 406) . . . . . . . . . . . | AA93 |
| 5 | Motion to Dismiss to Dismiss Third-Party Complaint (Entered February 8, 2008) (Docket No. 509) . . . . . . . . . . . | AA188 |
| 6 | Reply in Further Support of Motion to Dismiss to Dismiss Third-Party Complaint (Entered March 21, 2008) (Docket No. 586) . . . . . . . . . . . | AA203 |
| 7 | Adversary case 08-00502. Complaint for Equitable Subordination and Other Relief by Thomas A Snitzer, Snitzer Family LLC against Kinsella Investments L.P., John J. Kinsella, Diamond Family, L.L.C., Sid Diamond. (Entered June 26, 2008) (Docket No. 712) . . . . . . . . . . . | AA222 |

AA1

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| I.S. II, L.L.C., *et al.*, | ) | Case No. 07-03856 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Hon. Jacqueline P. Cox |

**MEMORANDUM OPINION ON MOTIONS OF DEBTORS
AND KINSELLA AND DIAMOND TO DISMISS DEBTORS
THIRD-PARTY COMPLAINT FOR EQUITABLE SUBORDINATION**

On November 1, 2007, the debtors, consisting of I.S. II, L.L.C. ("IS II"); River Village I, L.L.C. ("River Village"); and River Village West, L.L.C. ("River Village West") (collectively referred to herein as the "Debtors")[1], filed their objection to the claim of Thomas A. Snitzer and Snitzer Family L.L.C. ("SFLLC") (collectively, "Snitzer") and filed a three-count counterclaim for breach of fiduciary duty, breach of contract, and equitable subordination of any Snitzer interests. In response, on December 14, 2007, Snitzer filed an Answer to the counterclaim and a third-party complaint against John Kinsella, Kinsella Investments L.P., and Diamond Family, L.L.C. (collectively referred to herein as "Kinsella and Diamond") seeking equitable subordination of their interests. The Debtors and Kinsella and Diamond, each move to dismiss Snitzer's third-party complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (made applicable by Federal Rule of Bankruptcy Procedure 7012). Kinsella and Diamond also move to dismiss Snitzer's third-party complaint under Federal Rule of Civil Procedure 14(a) (made applicable by Federal Rule of Bankruptcy Procedure 7014). For the following reasons, both motions to dismiss Snitzer's third-party complaint pursuant to Fed.R.Civ.P. 12(b)(6) are denied; the motion of Kinsella and Diamond

---

[1]An additional Debtor LLC, KND Investments, L.L.C., did not join the motions to dismiss.

AA2

to dismiss Snitzer's third-party complaint pursuant to Fed.R.Civ.P. 14(a) is granted.

## I. Jurisdiction

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (C), and (O).

## II. Background

The Debtors are a group of Illinois limited liability companies established to develop Bridgeport Village, a residential real estate project along the Chicago River in the Bridgeport neighborhood of Chicago, Illinois. The role of JS II in the project was to act as the owner of the project as well as nearby parcels of land held for future development. River Village was set up to develop Bridgeport Village, while River Village West acted as the rental agent for the parcels held by JS II for future development. Snitzer and SFLLC, of which Snitzer is the managing member, own a 50% interest in each of the Debtor companies. However, the Debtors dispute that SFLLC has any membership interest in JS II. Until he was removed by order of a Cook County, Illinois Chancery Court in June 2005, Snitzer also acted as the Debtors' manager and agent. Kinsella and Diamond are members and principals of JS II and have membership interests in River Village and River Village West.

The Bridgeport Village development project was the first phase in a multi-phase residential real estate development project with a goal of developing over 400 residences on approximately thirty-one acres of property. Phase 1 of the project, Bridgeport Village, consisted of 115 single-family homes on eleven acres of land. Bridgeport Village was the only phase of the development project completed before the project went awry, leaving approximately twenty acres of undeveloped

AA3

commercially zoned land that has not yet been rezoned for residential use.

The development project became inundated with serious problems. In May 2005, a dispute between Snitzer and both Kinsella and Diamond arose regarding Snitzer's management of the Debtors. Snitzer filed suit in the Circuit Court of Cook County seeking an injunction against Kinsella and Diamond to bar them from interfering with his management of the project. In response, Kinsella and Diamond filed a counterclaim seeking removal of Snitzer as manager and agent of the Debtors. In June 2005, the circuit court ruled for Kinsella and Diamond and removed Snitzer from management of the project, finding that Snitzer's conduct placed the integrity of the project in jeopardy. Kinsella and Diamond were subsequently appointed by the circuit court to take over management of the project. Snitzer kept his membership interests in the Debtors. Unfortunately, the Debtors could not overcome the project's problems and filed for relief under chapter 11 of the bankruptcy code on March 5, 2007. The Debtors, along with Kinsella and Diamond, blame Snitzer for the project's downfall. On the other hand, Snitzer argues that commingling, undercapitalization and mismanagement of the Debtors by Kinsella and Diamond after Snitzer's removal as manager and agent of the Debtors precipitated the bankruptcy.

*A. Allegations Against Snitzer*

The Debtors allege that gross misconduct and breach of fiduciary duty by Snitzer caused the project to go bankrupt. First, the Debtors argue that Snitzer, as manager, violated several City of Chicago ordinances regarding building code, permit, and customary construction requirements. These violations concern approximately ninety homes built during Snitzer's tenure as manager. During construction of these homes, the Debtors allege that Snitzer visited the construction site only once or twice a week for a few hours at a time. They also complain that Snitzer constructed the

3

AA4

homes without registering as a general contractor or using a properly licensed general contractor. It is also alleged that Snitzer failed to hire an architect or engineer to oversee construction of the project, and that many of the homes were built without providing contractors and subcontractors architectural drawings, detailed plans, and specifications. Also at issue is whether Snitzer changed many plans and specifications on the homes causing them to significantly differ from the plans submitted to obtain the building permits, resulting in several building code violations. The violations include homes built with lateral load shear walls that differed from the plans, homes that exceed height restrictions, porches built with combustible materials too close to adjacent structures, homes with third floors that exceed maximum square footage allowed under fire safety regulations, third floors without a required secondary means of egress, homes built lacking proper fire insulation, homes with unpermitted basements, garages with unpermitted roof-top decks, homes that encroach on properties owned by neighboring landowners, and homes that violate setback requirements of the City of Chicago. In sum, the Debtors assert that the City of Chicago found multiple violations in each of the ninety homes built, sold and occupied under Snitzer's stewardship. The Debtors also state that Snitzer is responsible for various punch-list repair items made on homes to remedy various defects. According to the Debtors, the total cost to remedy the violations and the punch-list items exceeds $3 million.

The Debtors also allege that Snitzer concealed building code violations and obstructed enforcement by the City of Chicago. This may have begun in 2003 when a disgruntled subcontractor began a public crusade challenging the project's construction practices. Snitzer is alleged to have represented to the other members of the Debtors, as well as the project's lender and the City of Chicago, that no material problems existed and that the homes were constructed according to the

4

AA5

plans submitted to the City of Chicago. In an attempt to rebut the claims of the disgruntled subcontractor, Snitzer hired an architect to inspect the plans submitted to the City of Chicago. At issue is whether the architect ever physically visited the homes and whether Snitzer told the architect that the homes differed significantly from the plans. Did the architect improperly opine that the plans complied with the requirements of the City of Chicago?

Did Snitzer obstruct the City's enforcement efforts regarding the violations? Seventy-eight stop work orders were issued against the project between May 2002 and November 2004, mostly for work done contrary to permits issued by the City. The problems crescendoed on November 5, 2004 after the City inspected the homes and issued a stop work order on the entire project. As a result of the number of violations found, Stanley Kaderbeck, head of the City's Building Department and a structural engineer, became personally involved in the project to resolve the construction issues. Snitzer met with Kaderbeck, promising to resolve the violations. Based upon Snitzer's promises, the City allowed construction to resume on the project. At issue is whether Snitzer failed to remedy the violations and, after repeated requests, failed to meet with Kaderbeck again. In January 2005, the City again inspected homes in Bridgeport Village and shut down the entire project. As a result of the shut down, the project's lender called in its loan.

The Debtors also allege other conduct on Snitzer's behalf amounting to recklessness, negligence and breaches of fiduciary duty. They allege poor accounting practices by Snitzer. Snitzer, although not an accountant, kept the project's books and records on a personal computer at his home. Did Snitzer have an independent accountant audit the project's books? Additionally, the Debtors allege that Snitzer used Debtors' assets for personal purposes. First, the Debtors allege Snitzer used Debtors' assets and a subcontractor working on the Bridgeport Village project to

5

A96

construct an addition to the home of Snitzer's brother-in-law. Snitzer was involved in actions in the Circuit Court of Cook County concerning Dearborn Park, a real estate development project in which the Debtors have no interest. Allegedly Snitzer directed the Debtors' attorney to represent him personally in the suits. At issue is whether Snitzer used $24,000 of the Debtors' funds for litigation expenses in connection with these cases.

The Debtors also allege additional breaches of fiduciary duty against Snitzer regarding an insider deal with a former long-time associate of Snitzer's named Michael Kennedy. Snitzer hired Kennedy to supervise construction work for the project. However, Kennedy was not licensed by the City of Chicago as a contractor. Additionally, in September 2001, Snitzer executed a contract with Banyan Distribution and Building Supplies, Inc. ("Banyan"), a company owned by Kennedy. The contract granted Banyan the exclusive right to provide all windows, millwork, hardware, and cabinetry to 414 homes of the project and designated Snitzer and Kennedy as the only persons authorized to act on the Debtors' behalf in regards to the contract.[2] Under the Debtors' operating agreement, according to Kinsella and Diamond, this type of contract required the consent of the non-managing members as well. According to the Debtors, none of the other members were aware of the contract. After its execution, both Snitzer and Kennedy began ordering materials under the contract well in advance of when the materials were needed, contrary to the customary business practice of just-in-time delivery of supplies practiced by the Debtors.[3] The materials were then

---

[2] At the time the contract was executed, only Phase I of the project had commenced. Phase I consisted of only 115 homes.

[3] Just-in-time delivery involves ordering supplies so they arrive as needed for a particular project. This avoids storage costs and allows the warranty to transfer to the homeowners rather than allow the warranty to expire while the supplies sit in storage.

AA7

deposited into a warehouse where they remained until they were needed. Subsequent design changes may have rendered these materials obsolete requiring the Debtors to purchase replacement materials. Additionally, warranties on many of the supplies began to run when they were shipped to the warehouse. By the time the materials were used, the warranties expired before sales on the residences closed. This made the subsequent homeowners look to the Debtors to remedy defects that should have been covered under the manufacturer's warranty.

The Debtors also allege that Snitzer violated his fiduciary duty to the Debtors by establishing an unauthorized deferred compensation agreement between River West and Kennedy, along with two other associates. These agreements may have required the vote of the non-managing members. Allegedly Kinsella and Diamond were not aware of this agreement. In May 2005, when Snitzer was involved in the litigation with Kinsella and Diamond in the circuit court, did Snitzer direct the custodian of the deferred compensation account to liquidate it? On the day Snitzer was removed from the Bridgeport Project, did the custodian wire funds from the account, totaling $395,000, to an account belonging to Kennedy? Did Snitzer transfer this money without seeking authority to do so from either Kinsella or Diamond or the circuit court?

The Debtors allege Snitzer committed them to another insider deal. It is alleged that without obtaining authorization from the other members as was required by the operating agreement, Snitzer gave Arthur Hershkowitz, a long-time associate of Snitzer's, an open-ended listing contract to sell industrial properties in Bridgeport Village. Did Snitzer then conceal this agreement from Kinsella and Diamond, even though Snitzer was involved in selecting a different agent to market the property? Hershkowitz has since filed a claim for $1 million against the Debtors for the agreement he made with Snitzer.

7

AA8

### B. Allegations Against Kinsella and Diamond

Snitzer disputes much of the Debtors' allegations and blames Kinsella and Diamond for the project's downfall, stating that the project and the Debtors became bankrupt due to the actions of Kinsella and Diamond after Snitzer was removed as manager and agent for the Debtor companies. According to Snitzer, the project was highly successful under his management. Supporting this, Snitzer states that the average selling price of a home in Bridgeport Village more than doubled between 2002 and early 2005, increasing from $469,000 to $963,000 and that approximately $16 million of debt was reduced to approximately $1 million, allowing Snitzer to return capital contributions of $2.5 million each to Kinsella and Diamond. Snitzer also points to several awards the project received while he was manager.[4] He also points to several parcels of real estate that he caused River Village West, through JS II, to acquire at favorable terms for future development. Included in these properties were the "Iron Street Property," "Holsum Property," and the "Gray Property." Snitzer contends that the project fell apart and entered bankruptcy protection due to mismanagement by Kinsella and Diamond after Snitzer was removed as manager.

According to Snitzer, he operated the Debtor companies as separate and distinct entities, following the formalities required by the Illinois Limited Liability Company Act and Illinois law generally.[5] Snitzer maintains that there was never any improper commingling of funds and assets while he controlled the accounting of the Debtors. Also, Snitzer alleges in detail the separate roles anticipated for each Debtor company. River Village was set up to function as the operating entity

---

[4] These awards were: Best City of Chicago Project, Chicago Association of Homebuilders (2002, 2003, and 2004); Best City Development, *Chicago Sun Times* (2003); Best City Development, *New Homes Magazine* (2003).

[5] The Illinois Limited Liability Company Act is 805 ILL. COMP. STAT. §§ 180/1-1, et al.

8

A9

for the development and sale of the homes in Phase I. River Village West was formed to act as the operating entity for the acquisition and management of several industrial rental properties. JS II was formed in connection with a prior development, Dearborn Village, that was managed by Dearborn Village, LLC. Snitzer, Kinsella, and Diamond each had membership interests in Dearborn Village, LLC, either individually or through entities they controlled. Snitzer contends that JS II was a "nominee for the benefit of Dearborn Village," holding legal title to Dearborn Village property. Were the Debtors' assets, liabilities, profits, and losses filed on the tax returns for Dearborn Village, not JS II? In connection with River Village and River Village West, JS II was allegedly also a nominee[6], holding title to properties owned by River Village and River Village West, with both those LLCs being the real parties in interest. According to Snitzer, Kinsella and Diamond were completely aware of this structure, as well as of the day-to-day management of the project by Snitzer.

After Snitzer was removed as manager of the Debtors in 2005, did Kinsella and Diamond disregard the formalities that Snitzer claims that he observed while managing the companies? Specifically, Snitzer contends that Kinsella and Diamond improperly used funds from one LLC to pay for the expenditures and liabilities of another. If so, was this done without seeking a majority vote of the members of each affected LLC?

Snitzer also states that undercapitalization led to the project's downfall. Under the River Village operating agreement, Kinsella and Diamond, and their related entities, were to contribute "an amount not to exceed [$8.5 million]." However, Snitzer states that the most they ever contributed was $2.5 million each, which Snitzer later returned when the project was more prosperous and its chances of success were brighter. According to Snitzer, any money Kinsella and Diamond

---

[6]The Debtors contend "alter-ego" is a more apt term.

9

AA10

contributed thereafter has been classified as loans, even though the operating agreement for River Village requires at least $8.5 million in capital contributions before future contributions could be classified as loans. In order to disregard this requirement, did Kinsella and Diamond need to obtain Snitzer's vote to classify these cash flows as loans? Snitzer claims he was never approached regarding classifying contributions as loans. According to Snitzer, had the project been properly funded through the required capital contributions, the project would not have descended into bankruptcy.

Snitzer also complains of additional mismanagement by Kinsella and Diamond. First, Snitzer notes that when the project was shutdown in 2005, there was an inventory of homes valued at approximately $6 million and that they could have been sold to bring money into the project, which could have avoided the subsequent financial problems. Second, Snitzer questions hiring and firing decisions Kinsella and Diamond made, particularly the hiring and subsequent termination of a new construction superintendent in 2006. To replace the construction superintendent, Kinsella and Diamond hired FCL Construction, who Snitzer contends is experienced primarily in commercial construction, not residential. Snitzer states that the fees for FCL Construction were three to four times higher than the previous superintendent's fees or any superintendent that Snitzer had hired. Third, Snitzer states Kinsella and Diamond made unreasonably excessive payments to subcontractors for work and materials. Fourth, Snitzer complains that Kinsella and Diamond spent too much money repairing warranty and punch-list items on completed homes. Fifth, Snitzer disagrees with the installation of the structural gates. The gates were required by the City of Chicago to remedy building code violations. Snitzer believes the Debtors should contest the gates requirement or seek reimbursement from the design professionals who were responsible for designing the homes with

10

AA11

the defect that now requires installation of the gates. Finally, Snitzer blames Kinsella and Diamond for the lagging sales of homes in the project since he was removed as manager and agent in June 2005.

Snitzer filed a third-party complaint in response to the Debtors' counterclaim seeking equitable subordination of the interests of Kinsella and Diamond under § 510(c) of the Bankruptcy Code. Both the Debtors and Kinsella and Diamond subsequently filed motions to dismiss.[7] The Debtors argue that Snitzer's claims are derivative claims belonging to the estate depriving Snitzer of standing to pursue such claims and that since Snitzer lacks standing, he is violating the automatic stay by pursuing the claims. The Debtors also argue that Snitzer's claims that relate to post-petition management of the Debtors by Kinsella and Diamond violate the *Barton* doctrine. There is also a *res judicata* issue because Snitzer raised similar capitalization allegations at a prior hearing. This Court overruled these objections in authorizing the sale of property. Kinsella and Diamond adopt the Debtors' arguments but add a procedural objection to the third-party complaint as improper under Fed.R.Civ.P. 14(a), made applicable by Fed.R.Bankr.P. 7014.

### III. Discussion

A Motion to Dismiss under Fed.R.Civ.P. 12(b)(6), made applicable by Fed.R.Bankr.P. 7012, tests the sufficiency of the complaint, not the merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). Well-pleaded allegations contained in the complaint are regarded as true and are to be read in a light most favorable to the plaintiff. *United Independent Flight Officers v. United*

---

[7] Kinsella and Diamond are jointly represented by Taber, DiVito & Rothstein, LLC ("TDR"). TDR was counsel for Kinsella and Diamond before the bankruptcy and was authorized by this Court on May 30, 2007 to continue to pursue claims against Snitzer in state court. Kinsella and Diamond are suing Snitzer therein on the Debtors' behalf.

11

AA12

*Air Lines*, 756 F.2d 1262, 1264 (7th Cir. 1985). If the complaint contains allegations of evidence from which a trier of fact may reasonably infer necessary elements of proof that will be addressed at trial, dismissal is improper. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 421 (7th Cir. 1994).

A. *Snitzer's Standing to Assert a Claim for Equitable Subordination Pursuant to 11 U.S.C. § 510(c)*[8]

The Debtors first attack Snitzer's third-party complaint arguing that he lacks standing to bring such a claim. According to the Debtors, Snitzer's allegations of commingling, undercapitalization, and mismanagement are derivative claims of the estate that may be brought only by them, acting as debtors-in-possession and that any attempt by Snitzer to bring these claims violates the automatic stay imposed when the case was initially filed. Consequently, the Debtors seek sanctions against Snitzer for violating the automatic stay.

Creditors generally have no standing to bring derivative claims such as undercapitalization or breach of fiduciary duty against directors, principals, or officers of a debtor corporation without prior court approval as these claims belong to the debtor. *See Chrysler Rail Transp. Corp. v. Indiana Hi-Rail Corp.*, 1996 WL 238788 at *3 (N.D. Ill. 1996) (dismissing claim by creditor seeking

---

[8] Section 510(c) states:

Not withstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

AA13

damages for undercapitalization of debtor corporation as claim property belonged to the trustee.); see also *Koch Ref'y v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1346 (7th Cir. 1987), *cert. denied*, 485 U.S. 906 (1988) (recognizing that claims against officers, directors, and shareholders are claims of the bankruptcy estate). However, the Seventh Circuit has held that creditors have direct standing to pursue an equitable subordination claim under § 510. *Matter of Vitreous Steel Products Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990); *In re SRJ Enterprises, Inc.*, 151 B.R. 189, 196-97 (Bankr. N.D. Ill. 1993). As *Vitreous Steel* stated:

> Equitable subordination is not a benefit to all unsecured creditors equally, at least where the creditor whose claim is objected to is at least partially unsecured; it is a detriment to the creditor whose debt is subordinated. Thus, when a party seeks equitable subordination, it is not acting in the interests of all the unsecured creditors. While the Trustee [or debtor-in-possession] may find that it is in the best interests of the estate to seek equitable subordination, individual creditors have an interest in subordination *separate and apart* from the interests of the estate as a whole. The individual creditor should have an opportunity to pursue its separate interest.

*Vitreous Steel*, 911 F.2d at 1231 (emphasis added).

To equitably subordinate a claim under § 510, the three-prong balancing test first enunciated in *Matter of Mobile Steel Co.*, 563 F.2d 692, 700 is utilized. *Vitreous Steel*, 911 F.2d at 1237. When applying the test, the court must consider whether "(1) the claimant creditor has engaged in some sort of inequitable misconduct; (2) the misconduct has resulted in injury to the other creditors or in unfair advantage to the miscreant; and (3) subordination of the debt is consistent with other provisions of the bankruptcy code." *Id.* This inquiry must be applied on a case-by-case basis focused on fairness to the other creditors with the court considering all relevant circumstances in deciding whether to subordinate a claim. *Id.*

In his third-party complaint, Snitzer alleges that Kinsella and Diamond engaged in inequitable conduct by disregarding corporate formalities with regard to the Debtor LLCs,

13

AA14

undercapitalization by failing to capitalize the project as required under the operating agreements of the LLCs, and gross mismanagement, citing several examples. Taken as true for the purposes of this motion under Fed.R.Civ.P. 12(b)(6), these allegations support a finding that the first prong of the *Mobile Steel* test, that the creditor has engaged in equitable misconduct, has been satisfied. Snitzer further alleges that this inequitable conduct led to the Debtors' descent into bankruptcy, thereby injuring Snitzer as a member of the Debtor LLCs, satisfying the second prong of the test that the alleged misconduct results in injury to the other creditors. Further, if Snitzer succeeds in asserting his subordination claim, it would be consistent with the Code's general good faith requirements, meeting the third prong. He would be placed ahead of Kinsella and Diamond when distributions, if any, are made as a matter of fairness. Since Snitzer has standing to pursue a claim for equitable subordination under § 510 of the bankruptcy code as indicated in *Vitreous Steel* and has pled an adequate claim, the motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for lack of standing, is denied.

Since Snitzer has standing to bring his claim for equitable subordination, he has not violated the automatic stay in seeking this relief. As such, sanctions against Snitzer are inappropriate and will not be granted.

### B. The Barton Doctrine

The Debtors next argue that Snitzer's third-party complaint violates the *Barton* doctrine by bringing an action against Kinsella and Diamond for acts related to their post-petition management of the Debtors. To support this contention, the Debtors point to paragraphs 41-45, 67, 72, 78, and 87(1)-(l) of Snitzer's third-party complaint. These paragraphs state:

41. Since taking over management from Snitzer in June 2005, Kinsella and Diamond have not been observing corporate formalities and have improperly commingled (and have stated

14

AA15

that they intend to continue commingling) funds and assets of the separate LLCs.

42. In particular, Kinsella and Diamond have used revenues from River Village West's industrial properties to pay for expenditures of River Village to perform work on Bridgeport Village Phase I.

43. Additionally, Kinsella and Diamond used the equity from River [Village] West's industrial properties as collateral for loans whose proceeds were used to pay for expenditures of River Village to perform work on Bridgeport Village Phase I.

44. Kinsella and Diamond also started using JS II as an operating company and have purported to have that company assume liabilities of River Village, without the consent of Snitzer.

45. Additionally, Kinsella and Diamond are proposing that the Court approve a substantive consolidation of the Debtors, pursuant to which proceeds of the sale of River Village West's (or, in their view, JS II's) industrial properties would generate cash to pay for or reimburse expenditures on Bridgeport Village for the benefit of River Village.

[...]

67. Despite River Village's requirement for capital to complete Bridgeport Village from 2005 to the present, Kinsella and Diamond have repeatedly refused to restore their previous capital contributions or to make additional contributions. Instead, upon information and belief, they have made what they characterize as "loans," in an aggregate amount that is substantially less than their prior capital contributions.

[...]

72. If Kinsella and Diamond had contributed capital to River Village pursuant to their obligations to do so, they could have avoided placing the Debtors into bankruptcy, which would have avoided the expenditure of several million dollars in administrative expenses, as well as the recent sale of the "Iron Street Property" at a distressed, as-zoned price of $12.50 per square foot.

[...]

78. Based on their own repeated declarations of financial crisis and statements to the Bankruptcy Court of a need for cash for the operations of Bridgeport Village, Kinsella and Diamond have admitted that River Village "requires additional capital contributions" and that such capital is "reasonably necessary to meet the expenses and obligations of the Company."

[...]

87. Based on the incomplete disclosures and discovery he has received to date, Snitzer is informed and believes that Kinsella and Diamond made several serious and material management errors that have diminished the profitability of River Village. Full discovery and an accounting are required to determine the scope and extent of their errors and their impact. He [Snitzer] presently believes that the errors include, without limitation, the following:

[...]

f. Spending unnecessarily large sums on "warranty," or "punch list" work. Based on Snitzer's experience as a developer, the sums reported by Kinsella and Diamond may reflect that they have agreed to repair certain alleged problems in sold homes that were out

15

AA16

of warranty or that were maintenance issues rather than construction defects for which River Village was responsible and/or they grossly overpaid for legitimate punch list or warranty work." to remedy an alleged structural issue raised by the City of Chicago. Kinsella and Diamond should either have contested the gates requirement as unreasonable (since the City is imposing the requirement at Bridgeport Village but not on approximately thirty thousand other similarly constructed homes in the City, and the City has admitted that the alleged structural problem poses no life or safety issues); or, alternatively, should be seeking reimbursement from the design professionals (and their insurers) who were responsible for the structural problem giving rise to the alleged problem.

g. Agreeing, upon information and belief, to the costly installation of "structural gates," to remedy an alleged structural issue raised by the City of Chicago. Kinsella and Diamond should either have contested the gates requirement as unreasonable (since the City is imposing the requirement at Bridgeport Village but not on approximately thirty thousand other similarly constructed homes in the City, and the City has admitted that the alleged structural problem poses no life or safety issues); or, alternatively, should be seeking reimbursement from the design professionals, contractors or material suppliers (and their insurers) who were responsible for the alleged problem.

Discovery is required to determine what these funds were spent on and whether such expenditures were proper. Alternatively, Kinsella and Diamond should be seeking reimbursement from the design professionals, contractors or material suppliers (and their insurers) who were responsible for the alleged problem.

h. Kinsella and Diamond were grossly negligent with respect to the very slow pace with which River Village completed and sold homes after June 2005. Under Snitzer's management, River Village completed and sold homes at a much more rapid rate. Kinsella and Diamond's very slow progress, combined with the excessive expenditures to complete and build homes, unnecessarily exacerbated the liquidity problems of River Village.

i. Kinsella and Diamond were grossly negligent with respect to their failure for over two years to sell undeveloped lots at Bridgeport Village to generate revenue for River Village.

By bringing these claims, the Debtors contend that Snitzer violated the Barton doctrine and should face sanctions for doing so.

The Barton doctrine, first announced by the Supreme Court in Barton v. Barbour, provides that a trustee of a bankruptcy estate is a statutory successor to the equity receiver and that a receiver cannot be sued without leave of the court appointing him. Barton v. Barbour, 104 U.S. 126, 128-29 (1881). Since the bankruptcy court appoints the trustee that administers property of the estate that is under the control of the bankruptcy court pursuant to the bankruptcy code, the trustee is essentially an agent of the court. Matter of Linton, 136 F.3d 544, 545 (7th Cir. 1998). Therefore, under the Barton doctrine, leave from the appointing court is required before filing suit against a trustee for acts done within the trustee's administrative capacity. Id. Further, the Barton doctrine bars suits

AA17

against the trustee in the appointing court as well as a foreign forum, such as a state court. *In re marchFIRST, Inc.*, 378 B.R. 563, 566-67 (Bankr. N.D. Ill. 2007) (Schwartz, J.). A debtor-in-possession enjoys the same rights and protections as a bankruptcy trustee. 11 U.S.C. § 1107(a); *Precision Industries v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003). Without prior court approval for suits against a trustee (or a debtor-in-possession, as in this case); a trustee would face the burden of defending the suit and the threat of distraction, raising the concern that it would be more difficult to appoint a trustee because the appointment would be less appealing or more costly. *See marchFIRST*, 378 B.R. at 567 (addressing these same concerns that were raised in *Linton*).

Snitzer makes three arguments disputing the Debtors' contention that the *Barton* doctrine has been violated. First, he argues that *marchFIRST* was wrongly decided and urges that the *Barton* doctrine only applies to suits in a foreign forum, not a suit brought in the appointing court. Second, Snitzer distinguishes *Linton* since equitable subordination, and not damages against the trustee (or debtor-in-possession), is being sought in this case. Finally, he argues that the *Barton* doctrine does not apply in this case because he is seeking relief from Kinsella and Diamond for pre-petition acts.

In his first argument against application of the *Barton* doctrine, Snitzer contends *marchFIRST* ignored the "concern with the integrity of the bankruptcy jurisdiction" that a suit against a trustee in another forum would threaten, as stated in *Linton*. *Linton*, 136 F.3d at 546. He asserts that there would be no threat to the "integrity of the bankruptcy jurisdiction" by allowing his claim because the appointing court would be deciding the matter. Snitzer further urges that the holding in *marchFIRST* is *dicta*, since the case was actually decided on a statute of limitations issue and is therefore not binding on this Court. However, the policy concerns recognized by both *Linton* and

17

AA18

*marchFIRST* against allowing suits against a trustee without prior court approval are involved here. Even a suit against a trustee in the appointing court subjects a trustee to the burden of defending a suit (or multiple suits) at a cost to a trustee and to the estate. This could affect effective administration of a bankruptcy estate. Therefore, this Court respectfully declines to disregard *marchFIRST*.

The remedy distinction Snitzer argues carries some weight. Whether facing a suit for damages or equitable subordination, the same burdens would exist for a trustee in defending the suit, except that equitable subordination targets other creditors, not the trustee. The Debtors have not been sued in the third-party complaint. They have not been named as defendants therein and no relief as to them is sought there.

Snitzer's strongest argument is that the *Barron* doctrine is inapplicable because the events underlying the undercapitalization claims occurred pre-petition and not during the administration of the bankruptcy estate. Therefore, the *Barron* doctrine would be inapplicable for events occurring during that time. Snitzer would be barred, however, from asserting claims against Kinsella and Diamond for acts occurring after March 5, 2007 without prior approval of this Court. The issue of potential sanctions for a *Barron* doctrine violation is premature. The *Barron* doctrine does not defeat Snitzer's equitable subordination claim.

C. *Res Judicata and Collateral Estoppel*

The Debtors next argue that Snitzer's claims regarding undercapitalization are barred under the doctrine of res judicata. Under *res judicata*, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *SEC's Leasing, Ltd. Partnership v. Nat'l Canada Finance Corp.*, 159 B.R. 522, 523

18

AA19

(Bankr. N.D. Ill. 1993) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 393, 398 (1981)).

Three essential elements must be satisfied in order for res judicata to apply. *La Preferida, Inc. v. Cervecería Modelo, S.A. de C.V.*, 914 F.2d 900, 907 (7th Cir. 1990). These elements are "1) a final judgment on the merits in an earlier action; 2) an identity of the cause of action in both the earlier and later suit; and 3) an identity of parties or privies in the two suits." *Id.* A bankruptcy sale order is considered a final judgment on the merits for purposes of res judicata. *Matter of Met-L-Wood Corp.*, 861 F.2d 1012, 1016 (7th Cir. 1988). In the Seventh Circuit, identity of a cause of action is determined under the "same transaction" test. *Alexander v. Chicago Park Dist.*, 773 F.2d 850, 854 (7th Cir. 1985), *cert. denied*, 475 U.S. 1095 (1986). Under this test, identity of a cause of action consists of a "single core of operative facts which give rise to a remedy." *Id.*

The Debtors argue Snitzer's undercapitalization allegations were decided when this Court entered an order approving the sale of the "Iron Street" property on December 10, 2007. The sale was precipitated by the fact that a $5 million payment was due to a secured lender in early 2008. Snitzer objected to the sale, specifically the amount of funds the sale would bring into the estate. The objection centered on Snitzer's assertion that the failure of Kinsella and Diamond to contribute capital as provided by the River Village operating agreement required the Debtors to sell the property as zoned for a much lower price than it would sell for if it was rezoned as was planned for the project. Had the capital contributions been made, Snitzer argues, the estate would not have been forced to sell the property in what Snitzer characterized as a fire sale. Snitzer argues that the lender could be paid from the required $8.5 million contribution from Kinsella and Diamond instead of selling the "Iron Street" property as zoned, at a lower value. Snitzer's objections were overruled in the December 10, 2007 sale order.

AA20

Snitzer argues that *res judicata* is inapplicable in this case for several reasons. First, Snitzer argues *Precision Industries* bars the application of *res judicata* in cases where the issue is before the court that issued the sale order in the same bankruptcy proceeding. Snitzer notes that the cases cited by the Debtors involved cases of an attack on the sale order itself. Snitzer distinguishes the present case by noting that he is seeking equitable subordination based on failure to contribute capital and is not attacking the sale order. Snitzer's reliance on *Precision Industries* is mistaken. In *Precision Industries*, the plaintiff leased a warehouse from the defendant. *Precision Industries*, 327 F.3d at 540. The defendant lessor filed for chapter 11 bankruptcy during the term of the lease. *Id.* As part of the bankruptcy, the defendant obtained a sale order authorizing the sale of the warehouse to another company affiliated with the debtor free and clear of any interests pursuant to 11 U.S.C. § 363(f). *Id.* at 540-41. Although present at the sale hearing, the plaintiff lessee did not raise any objections to the sale itself. *Id.* After the sale order was entered, the plaintiff lessee vacated the warehouse well before the lease term expired. *Id.* at 541. The defendant lessor then changed the locks and sealed off access from the plaintiff lessee who subsequently tried to reenter the property. *Id.* The plaintiff lessee filed suit in a district court alleging, *inter alia*, wrongful eviction and breach of contract. *Id.* The defendant lessor argued that § 363(f) extinguished any rights or interests the plaintiff had in the property. *Id.* Conversely, the plaintiff argued that § 363(f) did not apply; instead § 365(h) applied. *Id.* The language in § 365(h) indicates that a sale of real property pursuant to § 363 did not eliminate a lessee's possessory interest in property subject to a sale order, thus setting up a confrontation between the two subsections. *Id.* Both the plaintiff and defendant requested that the district court remand the matter back to the bankruptcy court in order to clarify the order by determining which provision prevailed. *Id.* On remand, the bankruptcy court

AA21

21

held, *inter alia*, that the sale order eliminated any possessory interest the plaintiff had in the property, including the remaining term of its lease. *Id.* Further, the bankruptcy court held that the plaintiff was barred by *res judicata* from further proceeding in the action since the plaintiff had an opportunity to object to the sale but failed to do so. *Id.* 541-42. On appeal, the Seventh Circuit held *res judicata* did not apply since both parties asked the bankruptcy court to clarify a previous order and the bankruptcy judge rendered a decision on the merits that the sale order eliminated the plaintiff's possessory interest. *Id.* at 543. Basically, *Precision Industries* dealt with a dispute regarding property interests *resulting* from the sale order, not issues attacking the sale order itself. Therefore, Snitzer's broad reading of *Precision Industries* that *res judicata* is inapplicable when the issue is heard before the same judge who issued the sale order is not persuasive.

Snitzer also argues that *res judicata* does not apply because the claims raised in the third-party complaint and the objection to the sale of the "Iron Street" property are different. Although he acknowledges that both claims assert a common fact in that both involve the failure to contribute capital by Kinsella and Diamond pursuant to the River Village operating agreement, there are additional facts rendering *res judicata* inapplicable. In the "Iron Street" property objection, Snitzer maintains that his argument was that the capital contribution requirement under the operating agreement was triggered when the loan payment became due and was a better financial alternative than selling property as zoned in 2007. Snitzer now argues in his third-party complaint that undercapitalization led to financial problems resulting from the failure of Kinsella and Diamond to contribute necessary capital after they were appointed as managers in 2005. Under Snitzer's argument, both claims are based on different evidence and facts, mainly that the objection to the sale of the "Iron Street" property involved financial issues in late 2007; the third-party complaint relates

AA22

to the financial condition of the project in 2005 and 2006.

Applying the elements for *res judicata* in this case, the first and third elements are not in issue. Snitzer concedes that the December 10, 2007 sale order of the "Iron Street" property was a final decision on the merits. The parties do not dispute that the parties involved in the objection to the sale of the "Iron Street" property are the parties currently before the Court in the third-party action.[9] At issue is whether Snitzer's third-party complaint, as it alleges undercapitalization by Kinsella and Diamond, is based upon the same core of operating facts involved in the "Iron Street" property sale objection.

In this case, Snitzer's argument, that the undercapitalization issues raised in the "Iron Street" property sale are different than the undercapitalization issues in the present motion, is persuasive. The applicable argument in Snitzer's objection to the sale of the "Iron Street" property was:

*Rather* than engage in a fire sale, Messrs. Kinsella and Diamond *should* honor their contractual obligation to contribute capital. Under the River Village I LLC Operating Agreement, Messrs. Kinsella and Diamond are obligated to contribute up to $8.5 million in capital when the LLC "requires" it... *If they were to* honor their capital contribution obligation, they *could* contribute either the $5 million needed for the DIP financing pay-down in January, or the amount needed for increased monthly payments, which would be paid back upon a resale subject to zoning.

(Snitzer's Objections to Proposed Sale of Commercial Properties, and Motion to Compel Debtors to Make Full Disclosure Regarding Sale of Debtors' Commercial Real Estate and to Enlarge Scope of Rule 2004 Examinations, attached as Ex. B to Third-Party Defendants Kinsella and Diamond's Motion to Dismiss Snitzer's Third-Party Complaint, pgs. 14-15) [Dkt. 510] (emphasis added).

---

[9]There may be an issue as to whether Kinsella and Diamond were parties to the sale order since the hearing that involved Snitzer's objections to the Debtor's motion to approve sale, a proceeding where Kinsella and Diamond were not named parties. In any event, Kinsella and Diamond are in privity with the Debtors as they are the Debtors' current managers.

22

AA23

Snitzer's contention that this objection suggested an alternative to the sale seems likely. The language from the applicable language from the objection suggests this. Further, Snitzer alleges that the undercapitalization that occurred in 2005 and 2006 concerns issues different from those raised in the sale objection. The language in the objection to the sale does not involve the undercapitalization relating to those years but to a different period of time, from March 5, 2007 to when the objection was before the Court in December 2007. However, Snitzer is not seeking to disturb the sale order but is seeking a different remedy, equitable subordination. There is no attack on the sale order. Since the third-party complaint is not based on the same core of operative facts which give rise to a remedy, there is no identity of causes of action. Snitzer did not seek to enforce the obligation in December at the sale hearing; therefore, his effort to rely on it in the third-party complaint is fresh, it is not an effort to relitigate. Snitzer should not have been required to seek equitable subordination in December because equitable subordination must proceed via an adversary proceeding, as required under Fed.R.Bankr.P. 3007(b) and 7001(8), making it impractical to delay a sale until trial of an adversary proceeding which takes longer to resolve because it entails discovery and motion practice.

The Debtors' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) Snitzer's third-party complaint due to the undercapitalization claim as barred by res judicata is denied.

Kinsella and Diamond also urge that Snitzer's undercapitalization allegations are barred by collateral estoppel. Collateral estoppel bars litigation of an issue of law or fact where the issue was actually litigated and decided in a prior action. La Preferida, 914 F.2d at 905 n.7. Four elements must be met for collateral estoppel to apply: "1) the issue sought to be precluded must be the same as that invoked in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel

23

AA24

is invoked must be fully represented in the prior action." *Id.* at 906.

In this case, the test cannot be met for the same reasons the applicability of *res judicata* was rejected. The issues in the objection and the third-party complaint regarding undercapitalization do not cover the same period of time. The second requirement that the issue must have been actually litigated cannot be satisfied herein either. The capitalization issue was not litigated; it was asserted in a summary fashion but not actually plead and proven, which should be the standard as to whether an issue has been previously litigated. Further, the third element is not met either. Granting the sale motion only required a determination that "a good, sufficient, and sound business purpose and justification and compelling circumstances" existed in order to approve the sale. (Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed.R.Bankr.P. 6004 and 6006, (A) Approving Purchase and Sale Agreement, (B) Authorizing Sale of Real Property Free and Clear of Liens, Claims, Encumbrances, and Interests, and (C) Granting Related Relief, attached as Ex. C to Third-Party Defendants Kinsella and Diamond's Motion to Dismiss Snitzer's Third-Party Complaint, ¶ I, pg. 4). Deciding and specifically ruling on the capitalization issue was not necessary to make this determination. The Court's order merely overruled the objections without determining the issue of capitalization requirements. The sale motion was granted because it was clear that the proposed sale had a valid business justification. The sale order, however, did not eliminate future consideration of the undercapitalization concerns. The equitable subordination effort and other remedies such as breach of fiduciary duty, etc. are available to address this issue. Therefore, Kinsella and Diamond's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) Snitzer's undercapitalization claims on collateral estoppel grounds is denied.

24

AA25

## D. Federal Rule of Bankruptcy Procedure 7014

Kinsella and Diamond additionally move to dismiss Snitzer's third-party complaint arguing that it is procedurally improper. They urge that a claim for equitable subordination cannot be filed as a third-party claim under Fed.R.Bankr.P. 7014(a).

Kinsella and Diamond also argue that because Snitzer does not allege that they are liable to him for all or a part of the claim against them, that he can not use Fed.R.Civ.P. 14 to combine all controversies having a common relationship into one action. Because there are no allegations that Kinsella and Diamond are liable to Snitzer or SFLLC for all or part of a claim against them, the third-party complaint fails for this reason too.

Fed.R.Bankr.P. 7001(8) requires that claims for equitable subordination be pursued via an adversary proceeding. *See* Fed.R.Bankr.P. 7001 ("The following are adversary proceedings:... (8) a proceeding to subordinate any allowed claim or interest, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for subordination[.]"); *see also In re Proturga, Inc.*, 2004 WL 1906145 at *3 (Bankr. D. Del. 2004) ("Claims for equitable subordination must be brought as a separate adversary proceeding pursuant to Rule 7001(8) of the Federal Rules of Bankruptcy Procedure.").

Snitzer concedes that his third-party complaint is improper under Rule 7014, but that the improper filing is a technicality. Although a technicality, it is improper under the Federal Rules of Bankruptcy Procedure and must be dismissed. However, this does not preclude Snitzer from filing a complaint in an adversary proceeding. Therefore, Kinsella and Diamond's motion to dismiss Snitzer's third-party complaint pursuant to Fed.R.Bankr.P. 7014 is granted without prejudice to

25

AA26

Snitzer bringing a separate adversary proceeding relating to these matters within thirty days.[10]

## IV. Conclusion

For the reasons set forth above, the Debtors' and Third-Party Defendants' Motions to Dismiss Third-Party Complaint (Dkt. Nos. 509 and 510) pursuant to Federal Rule of Civil Procedure 12(b)(6) (made applicable by Federal Rule of Bankruptcy Procedure 7012) are denied.    Third-Party Defendants' Motion to Dismiss Third-Party Complaint (Docket No. 510) pursuant to Federal Rule of Civil Procedure 14(a) is granted without prejudice.

Dated: May 27, 2008                                   Enter:

*Jacqueline P. Cox*
**Jacqueline P. Cox**
**U.S. Bankruptcy Judge**

---

[10] The Debtors' counterclaim to the objection should have been pursued as an adversary proceeding.  Fed.R.Bankr.P. 3007(b).

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| JS II, LLC, RIVER VILLAGE I, | ) |
| LLC, RIVER VILLAGE WEST, | ) Case No. 07-03856 |
| LLC, KND INVESTMENTS, LLC, | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Hon. Jacqueline P. Cox |
| | ) |

PROOF OF INTEREST OF THOMAS A. SNITZER AND SNITZER FAMILY LLC

Thomas A. Snitzer ("Snitzer") and Snitzer Family, LLC ("SFLLC") file this Proof of Interest pursuant to the Order Fixing Claims Bar Dates, Approving a Form of Proposed Notice, and Authorizing Notice to Unknown and Unscheduled Creditors by Publication entered April 12, 2007 ("Bar Order").

1.  Snitzer and SFLLC are Interested Parties whose membership interest in debtor J.S. II, L.L.C. ("Debtor") is disputed by Debtor. They have filed this Proof of Interest to assert and preserve their right, title and interest in and to 50% of the equity of Debtor.

2.  Snitzer and SFLLC are, collectively, members holding a 50% interest in River Village I, LLC and River Village West, LLC, debtors in two bankruptcies that are jointly administered with this matter. There is no dispute as to their membership interests in those debtor entities.

3.  In or about June 2004 Snitzer and SFLLC entered into a Memorandum of Understanding ("MOU") with Diamond Family L.L.C. and Kinsella Investments L.P. A true and correct copy of the MOU is attached hereto as Exhibit 1.



FILED

MAY 4 1 2007

KENNETH S. GARDNER, CLERK
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

PS REP. - RD

AA27

AA28

4.    Paragraph 6 of the MOU states in relevant part: "Contemporaneously with the execution of this agreement, John J. Kinsella and Sid Diamond will admit Snitzer as a 50% member of [Debtor]."

5.    Pursuant to paragraph 6 of the MOU, Snitzer and SFLLC were admitted as a 50% member of Debtor.

6.    In the alternative, pursuant to paragraph 6 of the MOU, Snitzer was admitted as a 50% member of Debtor.

7.    Kinsella Investments L.P, Diamond Family L.L.C., John Kinsella and Sidney Diamond ("KD Parties") have admitted in a verified state court pleading that "[i]n June 2004, Kinsella [Investments] L.P., Diamond [Family] LLC, Snitzer and [SFLLC] entered into a Memorandum of Understanding," and attached to that pleading a copy of the MOU. A true and correct copy of excerpts of this pleading is attached hereto as Exhibit 2.

8.    In the foregoing pleading, KD Parties admitted the language of paragraph 6 of the MOU, but alleged that the "term '50% member of JS II' was understood to mean that Snitzer would receive 50% of the net profits from transactions involving property owned by JS II, after the payment of all expenses, and after the return of all capital and loans contributed by Kinsella and Diamond," Ex. 2 *27, but they alleged that, despite being entitled to 50% of the profits of Debtor, Snitzer was not a member of Debtor. Id. ¶30.

9.    On June 23, 2005, the Circuit Court of Cook County, in the lawsuit captioned Snitzer et al v. Kinsella et al, 05 CH 7598, entered an Order finding in relevant part as a matter of law that: "Thomas Snitzer is presently a 50% member of JS II." June 23, 2005 Order at 6 ¶¶1a. A true and

2

correct copy of the June 23, 2005 Order is attached hereto as Exhibit 3. The Order also provided,

*inter alia,* that the MOU was ambiguous with respect to "whether [SFLLC] is a member of JS II."

10.    Snitzer and SFLLC's status as a member of Debtor is a matter of state law. Snitzer has been determined by an Illinois Court to be a member of Debtor as a matter of Illinois law.

11.    Debtor's position—that Snitzer is not a member of Debtor, but merely entitled to a 50% interest in profits after repayment of capital and expenses—is contrary to the MOU, contrary to the ruling of the Circuit Court, and wrong as a matter of Illinois law to the extent it asserts that Snitzer's interest in Debtor is limited to a 50% share in profits. That position was asserted in a wrongful attempt to remove Snitzer from having voting rights as a member of Debtor.

12.    Even if Debtor were correct in their restrictive definition of Snitzer's rights, KD Parties members have admitted that Snitzer has a legally valid and binding interest in "50% of the net profits from transactions involving property owned by JS II, after the payment of all expenses, and after the return of all capital and loans contributed by Kinsella and Diamond." In the alternative to his claim to a full 50% membership interest in Debtor, Snitzer hereby asserts and preserves his claim to all right, title and interest in and to 50% of the profits of Debtor as previously admitted by KD Parties.

13.    At present, Snitzer and SFLLC cannot place a monetary value on their interests in Debtor, but reserve their rights to do so in the future and to seek the full amounts owing them.

14.    Snitzer and SFLLC also assert and reserve all rights under the Bankruptcy Code, under Debtor's operating agreement and under the Illinois Limited Liability Act as members of Debtor holding a 50% interest in Debtor.

3

AA29

AA30

15.    Notices regarding this Statement of Interest should be sent to undersigned counsel at the address set forth below.

Date:  May 31, 2007

Respectfully submitted,
THOMAS A. SNITZER AND SNITZER FAMILY LLC

By: *Edward W. Feldman*
    Edward W. Feldman

Marc O. Beem
Edward W. Feldman
MILLER SHAKMAN & BEEM LLP
180 N. LaSalle St., Suite 3600
Chicago, Il. 60601
Tel: 312.263.3700
Fax: 312.263.3270

4

AA31

## CERTIFICATE OF SERVICE

Edward W. Feldman, an attorney, certifies that on May 31, 2007 he served the foregoing **Proof of Interest of Thomas A. Snitzer and Snitzer Family, L.L.C.** on the parties by E-mail and by First-class U.S. mail deposited in the U.S. post box at 180 N. LaSalle St., Chicago, IL at or before the hour of 5:00 p.m.

Dated: May 31, 2007

Edward W. Feldman

AA32

## SERVICE LIST

*Counsel for JS II, L.L.C., et al.*
Steven B. Towbin
Peter J. Roberts
Matthew A. Swanson
SHAW GUSSIS FISHMAN GLANTZ
WOLFSON & TOWBIN LLC
321 N. Clark St., Suite 800
Chicago, IL 60610
Tel. 312.541.0151
Fax. 312.980.3888
stowbin@shawgussis.com
proberts@shawgussis.com
mswanson@shawgussis.com

*Counsel for the U.S. Trustee*
Richard Craig Friedman
OFFICE OF THE U.S. TRUSTEE
227 West Monroe St., Suite 3350
Chicago, IL 60606
Fax. 312.886.5794
richard.c.friedman@usdoj.gov

*Counsel for FCL*
Robert A. Liden
Barry Frisch
RICHARD BRESLIN LLP
223 South Wacker Dr., Suite 5775
Chicago, IL 60606
Fax. 312.258.0977
reiden@RB-LLP.com
berlich@RB-LLP.com

*Counsel for American Chartered Bank*
Mary Ann Murray
BURKE BURNS & PINELLI, LTD.
70 West Madison, Suite 4300
Chicago, IL 60602
Fax. 312.541.8603
mmurray@bbp-chicago.com

*Counsel for Moore*
Matthew J. Cleveland
HOGAN MARREN, LTD.
180 N. Wacker Drive, Suite 600
Chicago, IL 60606
Fax. 312.946.9818
mjc@hmltd.com

*Financial Advisors to the Debtors*
Patrick Cavanaugh
Greg Apathy
HIGH RIDGE PARTNERS
140 S. Dearborn
Chicago, IL 60603
Fax. 312.456.5630
pcavanaugh@high-ridge.com
gapathy@high-ridge.com

AA33

**Proposed Counsel for the Creditors' Cmte.**
DRINKER BIDDLE & REATH LLP
Timothy R. Casey
191 N. Wacker Dr., Suite 3700
Chicago, IL 60606-1698
Fax.    312.569.3000
Timothy.V.Casey@dbr.com

FOUR COLUMNS, LTD.
Robert Stovall
1325 N. Sandberg Terrace
Chicago, IL 60610
Fax.    312.664.0845
rls@fourcolumnsltd.com

Arthur Hershkowitz
P. O. Box 8243
Northfield, IL 60093
Fax.    847.784.8954
Arthur74@aol.com

**Special Transactional Counsel**
John J. Vondran
P. O. Box 190
Winnetka, IL 60093
Fax.    847.441.5195
jvondran@comcast.net

**Special Counsel to the Debtors**
Michael I. Rothstein
Henry H. Hess
TABET DIVITO & ROTHSTEIN LLC
209 S. LaSalle St., 7th Floor
Chicago, IL 60604
Fax.    312.762.9451
mrothstein@tdrlawfirm.com
hhess@tdrlawfirm.com

**Counsel for Leventhal Perlstein**
LEVENFELD PEARLSTEIN LLC
Richard Lauter
2 North LaSalle St., Suite 1300
Chicago, IL 60602
Fax.    312.346.8434
rlauter@lplegal.com

**Counsel for Eden**
Richard C. Jones Jr.
JONES & JACOBS
77 W. Washington St., Suite 2100
Chicago, IL 60602
Fax.    312.419.9114
rjones@jonesandjacobs.com

**Counsel for the City of Chicago**
Mark A. Lumann
Esther L. Tryban Telser
CITY OF CHICAGO LAW DEPARTMENT
30 N. LaSalle St., Suite 700
Chicago, IL 60602
mlumann@cityofchicago.org
etrybantelser@cityofchicago.org

**Legal and Financial Advisor to John Kinsella and Sid Diamond**
Rockney W. Hudson
HACKBARTH & HUDSON PC
20 N. Wacker Dr., Suite 1520
Chicago, IL 60606
Fax.    312.609.2811
hudson@hackhud.com

AA34

# EXHIBIT 1

AA35

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("Agreement") is entered into as of this _____ day of June, 2004, by and among Snitzer Family L.L.C. ("Snitzer L.L.C."), Thomas Snitzer ("Snitzer"), Diamond Family L.L.C. ("Diamond L.L.C.") and Kinsella Investments L.P. ("Kinsella L.P.").

WHEREAS, each of the parties hereto has an economic interest in River Village I L.L.C., an Illinois limited liability company ("River Village I"), either as a member or interest holder;

WHEREAS, the parties hereto desire to enter into this Memorandum of Understanding to reflect certain agreements and understandings reached between the parties with respect to River Village I L.L.C. and the Operating Agreement bearing an effective date of June 17, 1998 ("Operating Agreement") and certain related issues;

NOW, THEREFORE, in consideration of Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Scope of the Project.    Notwithstanding anything in the Operating Agreement to the contrary, the parties hereto agree that River Village I shall be limited in scope to the completion of the development in which units are currently under construction, consisting of one hundred and sixteen (116) homes ("Project").

2.    Tax Distributions.    Notwithstanding anything in the Operating Agreement to the contrary, the Manager shall cause River Village I annually to distribute to each of the Members in cash on or before April 1 of the following calendar year an amount equal to thirty-eight percent (38%) of such Member's pro rata share of the taxable net income of River Village I for the preceding fiscal year, if being the intention of the parties that such distribution shall approximate the estimated income tax liability of such Member for such calendar year. If such distributions require the approval of any commercial lender now or hereafter having a mortgage on or security interest in the Project, then the parties hereto agree each to diligently use their best efforts to obtain such approval. If such lender approves a portion but not all of the distributions, River Village I shall make such distribution to the extent permitted by said lender. If the lender fails or refuses to approve substantially all of such distribution, the parties agree to cause River Village I to pursue other reasonable efforts to secure funds for such distribution, including without limitation obtaining subordinate financing.

3.    Distributions.    The Manager will make distributions from River Village I of all profits (subject to a reasonable reserve for known and contingent liabilities) in the accordance with the custom in prior developments involving the parties hereto (i.e., all of the profits, subject to the aforesaid reserves, promptly will be distributed to the Members upon substantial completion

C:\TODD\WVKinsella\Memorandum of Understanding 6-14-04.wpd

of the Project, and no portion of the profits will be used for any purposes other than completion of the Project and servicing the commercial debt which has been guaranteed by John Kinsella and Sid Diamond, and reserves will be distributed promptly upon the release or resolution of liabilities).

4.   Gray and Levy Properties.   A new limited liability company shall be formed by Snitzer, with Snitzer as Manager, for the purpose of acquiring the properties commonly referred to as Gray and Levy.  Kinsella L.P. and Diamond L.L.C. shall have until the later of (a) six (6) months from the date hereof or (b) sixty (60) days after Snitzer has advised them in writing of the seller's asking price for each property, to decide, each in their sole discretion, whether or not to participate in the acquisition and development of the Gray and Levy properties (to "Participate").  Notice of the decision shall be provided in writing.  Failure to provide such notice within such time period shall be deemed to be an election not to Participate.  In the event that Kinsella L.P. and Diamond L.L.C. elect not to Participate, the non-participating party shall have no liability or responsibility in connection with the acquisition or development of said properties and shall have no interest in the company acquiring said properties.  Furthermore, the participating party shall have no greater obligation or responsibility to Participate than such party's participation in River Village 1, L.L.C. (i.e. Kinsella L.P. 30%; Diamond L.L.C. 20%) without such party's consent.  The parties hereto understand and acknowledge that it is the intention of the parties to develop the Bridgeport Village parcels in which Kinsella L.P. and/or Diamond L.L.C. are investors, or have been given or will be given the opportunity to be investors (namely, Prairie, Chicago Plating, Levy, Gray, Holsom, Acme and AAA), prior to the development of any other properties.  Consequently, the parties hereto agree that, regardless of the entities holding title to the parcels that are part of the overall development plan, each of the aforesaid parcels shall be developed prior to the development of any other properties, with Prairie and Chicago Plating to be developed first.

5.   Bridgeport Village Sales Center.   The parties agree that the Bridgeport Village Sales Center, developed and paid for as a part of River Village 1, will not be sold as part of the Project.  It will continue to be utilized as a sales center to promote the development and sale of homes on Prairie, Chicago Plating, Levy and Gray.  The parties agree that, if either Kinsella L.P. or Diamond LLC elect not to participate in the acquisition and development of the Gray and Levy properties or if Kinsella L.P. elects to sell its interest in the Prairie and Chicago Plating properties in the Bridgeport Village Sales Center (via percentage interests in River Village 1 or any other title holding entity) will be sold to such investor(s)/participant(s) as invests in the new projects in their place as one of the assets that is the sale by one of the parties of his percentage interest in the Bridgeport Village Sales Center at its value determined by treating it as a home(s) that could be prepared for sale and sold at any time.  No such sale shall occur prior to the zoning of the Prairie and Chicago Plating properties as set forth in paragraph 10 below.

6.   IS II LLC.   Contemporaneously with the execution of this agreement, John J. Kinsella and Sid Diamond will admit Snitzer as a 50% member of IS II LLC.  Kinsella, Diamond and Snitzer all acknowledge that it would be in their mutual best interests at an early date to

2

AA36

AA37

memorialize in writing their respective rights and responsibilities as members of JS II LLC, including the appointment of Snitzer as manager. The parties agree that, simultaneously with the execution of a new operating agreement for JS II LLC, JS II LLC shall deposit deeds to AAA, Acme and Holsom in escrow. Snitzer may require the delivery of the deeds out of said escrow upon thirty (30) days written notice to Kinsella LLC and Diamond LLC. The deeds will be completed to run to, and each future phase of development will be developed through, separate limited liability companies with operating agreements containing the same terms as River Village I, which operating agreements in each case will be subject to the terms and conditions of this Memorandum of Understanding (including without limitation paragraphs 2, 3 and 7).

7.    Financial Reports/Tax Information.    The Manager shall provide or cause to be provided to each of the Members on a quarterly basis financial information in the form of complete Quick Books files. In addition, the Manager shall provide or cause to be provided to each of the Members on an annual basis a compiled financial statement. Within seventy-five (75) days after the end of each taxable year of River Village I, the Manager shall cause to be sent to each person or entity who was a Member or an interest holder at any time during the taxable year then ended that tax information concerning River Village I which is necessary or appropriate for preparing such person's or entity's income tax returns for that year. The books and records of River Village I shall be available at the company's principal office for examination by any Member, or the Member's duly authorized representative, at any and all reasonable times during normal business hours.

8.    Notice of Dissociation.    Upon the execution and delivery of this Agreement by all of the parties hereto, the Notice of Dissociation given by Kinsella L.P. on September 18, 2003 shall be deemed withdrawn and shall be considered null and void and Kinsella L.P. shall be deemed to have continued on as a member of River Village I at all times since its formation.

9.    Other Properties.    The parties agree that River Village I, River Village West, LLC, JS II, LLC, and any other entity in which all of the parties have an interest, shall not acquire or seek to acquire any other properties except for those commonly referred to as Acme, Holsom, Prairie, AAA and Chicago Plating (and, subject to the provisions of Paragraph 4 above, Levy and Gray) without the prior unanimous written consent of all of the parties hereto.

10.    Third Party Buyer.    The parties hereto agree that, provided that zoning for the properties commonly known as Prairie and Chicago Plating for residential development has been approved by the Chicago City Council as evidenced by a recorded ordinance, they shall not unreasonably withhold their consent to the sale of the Kinsella L.P. interests and the admission, as a Member, to any ownership or development entity involving Kinsella L.P. any reasonable buyer proposed by Kinsella L.P.

11.    Miscellaneous.

(a)    Successors and Assigns.    This Agreement applies to, inures to the benefit of, and binds all parties hereto and their successors and assigns; provided however that no

G:\TODD\WP\Kinsella\Memorandum of Understanding 6-14-04.wpd

AA38

party may assigns its rights or obligations hereunder without the prior written consent of the other.

(b) Governing Law. The internal laws of the State of Illinois without regard to its conflict of law rules shall govern the performance and enforcement of this Agreement.

(c) Severability. The invalidity, illegality or unenforceability of any provision of this Agreement pursuant to judicial decree shall not affect the validity or enforceability of any other provision of this Agreement, all of which shall remain in full force and effect.

(d) Further Assurances. In furtherance of the foregoing, the parties hereto agree to execute and deliver such additional documents as may be necessary or appropriate.

(e) Counterparts. This Agreement may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.

(f) Third Party Beneficiaries. None of the provisions of this Agreement are intended for the benefit of, nor shall be enforceable by, any third party.

(g) Notices. All notices or communications required or permitted to be given hereunder shall be given in writing by personal delivery or by registered or certified mail that shall be addressed to the last address of the party being notified shown on the records of River Village 1. Any notice given in accordance with the foregoing shall be deemed to have been given when delivered in person or, if mailed, on the day following the day when such notice was deposited in the mails.

(h) Remedies. Upon default by any party hereto which is not cured within five (5) days after written notice thereof, the other parties may seek and pursue any and all remedies available at law or in equity, including without limitation specific performance.

(i) Amendments. This Agreement may not be amended except by the written agreement of each of the parties hereto.

(j) Construction. All parties hereto have participated in the negotiation and drafting of this Agreement and the provisions hereof shall be construed in light of this subparagraph.

(k) Authorization. Each of the parties hereto represents and warrants to the other that the delivery and execution of this Agreement has been authorized and approved by all necessary manager, member, partner, director and shareholder actions.

4

G:\TOD\W\Wiki\slush\memorandum of Understanding  6.14-04.wpd

12.     Release.   The undersigned hereby agree to release, acquit and forever discharge Thomas Snitzer, his associates, agents, employees, servants, successors, executors, administrators, assigns and all other related persons, businesses, firms, corporations, associations or partnerships, of and from any and all known claims, actions, rights, damages, liabilities, costs and/or expenses whatsoever which the undersigned now has, on account of, or in any way growing out of, the management of River Village I LLC, River Village West LLC or JS II LLC as of the date signature; including but not limited to, claims related to allegations of malfeasance, breach of fiduciary duties, negligence and/or mismanagement by Thomas Snitzer in his duties as Manager of River Village I LLC or River Village West LLC, or agent for JS II LLC.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

Snitzer Family L.L.C.

By: _____
Thomas Snitzer, its Manager

_____
Thomas Snitzer

JS II LLC (joining for purposes of paragraph 6 only)

By: _____
John J. Kinsella, Member

Diamond Family L.L.C.

By: _____
Sid Diamond, its Manager

Kinsella Investments L.P.

By: Kinsella Investments LLC, its
General Partner

By: Kinsella Development Corp., its
Member

By: _____
John J. Kinsella, its President

By: Diamond Family L.L.C., Member

By: _____
Sid Diamond, its Manager

O:\Kinsella\River Village\Memorandum of Understanding - RV1.doc

5

TOTAL P.06

AA39

12. Release. The undersigned hereby agree to release, acquit and forever discharge Thomas Snitzer, his associates, agents, employees, servants, successors, executors, administrators, assigns and all other related persons, businesses, firms, corporations, associations or partnerships, of and from any and all known claims, actions, rights, damages, liabilities, costs and/or expenses whatsoever which the undersigned now has, on account of, or in any way growing out of, the management of River Village I LLC, River Village West LLC or JS II LLC as of the date signature; including but not limited to, claims related to allegations of malfeasance, breach of fiduciary duties, negligence and/or mismanagement by Thomas Snitzer in his duties as Manager of River Village I LLC or River Village West LLC, or agent for JS II LLC.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

**Snitzer Family L.L.C.**

By:____________________
Thomas Snitzer, its Manager

**Diamond Family L.L.C.**

By:____________________
Sid Diamond, its Manager

____________________
Thomas Snitzer

**JS II LLC (joining for purposes of paragraph 6 only)**

By: [signature]
John J. Kinsella, Member

By: Diamond Family L.L.C., Member

By:____________________
Sid Diamond, its Manager

**Kinsella Investments L.P.**

By: Kinsella Investments LLC, its General Partner

By: Kinsella Development Corp., its Member

By: [signature]
John J. Kinsella, its President

5

TOTAL P.02

AA40

AA41

**12. Release.** The undersigned hereby agree to release, acquit and forever discharge Thomas Sultzer, his associates, agents, employees, servants, successors, executors, administrators, assigns and all other related persons, businesses, firms, corporations, associations or partnerships, of and from any and all known claims, actions, rights, damages, liabilities, costs and/or expenses whatsoever which the undersigned now has, on account of, or in any way growing out of, the management of River Village I LLC, River Village West LLC or JS II LLC as of the date signature; including but not limited to, claims related to allegations of malfeasance, breach of fiduciary duties, negligence and/or mismanagement by Thomas Sultzer in his duties as Manager of River Village I LLC or River Village West LLC, or agent for JS II LLC.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

Sultzer Family L.L.C.

By: _____
Thomas Sultzer, its Manager

Thomas Sultzer
_____

JS II LLC (Joining for purposes of paragraph 6 only)

By: _____
John J. Kinsella, Member

By: _____
Diamond Family L.L.C., Member
By: _____
Sid Diamond, its Manager

Diamond Family L.L.C.

By: _____
Sid Diamond, its Manager

Kinsella Investments L.P.

By: Kinsella Investments LLC, its
General Partner

By: Kinsella Development Corp., its
Member

By: _____
John J. Kinsella, its President

5

AA42

6

TOTAL P.06

5

JUL-08-2008 11:56     FROM HUDGENNUMN & TRBOU LLP     ID 13WPH8319WWG13PW41Y     P.06/06

12.     **Release.**     The undersigned hereby agree to release, acquit and forever discharge Thomas Snitzer, his associates, agents, employees, servants, successors, executors, administrators, assigns and all other related persons, businesses, firms, corporations, associations or partnerships, of and from any and all known claims, actions, rights, damages, liabilities, costs and/or expenses whatsoever which the undersigned now has, on account of, or in any way growing out of, the management of River Village I LLC, River Village West LLC or JS II LLC as of the date signature, including but not limited to, claims related to allegations of malfeasance, breach of fiduciary duties, negligence and/or mismanagement by Thomas Snitzer in his duties as Manager of River Village I LLC or River Village West LLC, or agent for JS II LLC.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

Snitzer Family L.L.C.                          Diamond Family L.L.C.

By: _____                    By: _____
Thomas Snitzer, its Manager                     Sid Diamond, its Manager

Snitzer Family L.L.C.
By: Thomas Snitzer

JS II LLC (joining for purposes of
paragraph 6 only)

Kinsella Investments L.P.
By: Kinsella Investments LLC, its
General Partner
By: Kinsella Development Corp., its
Member

By: _____                    By: _____
John J. Kinsella, Member                        John J. Kinsella, its President

By: Diamond Family L.L.C., Member

By: _____
Sid Diamond, its Manager

AA43

# EXHIBIT 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

THOMAS SNITZER and SNITZER FAMILY L.L.C.,

          Plaintiffs,

          v.

KINSELLA INVESTMENTS L.P., JOHN J.
KINSELLA, DIAMOND FAMILY L.L.C., and
SID DIAMOND,

          Defendants.

KINSELLA INVESTMENTS L.P., individually and
derivatively on behalf of River Village I L.L.C. and
River Village West L.L.C.; DIAMOND FAMILY
L.L.C., individually and derivatively on behalf of
River Village I L.L.C. and River Village West L.L.C.;
and JOHN J. KINSELLA, individually,

          Counterplaintiffs,

          v.

THOMAS SNITZER and SNITZER FAMILY
L.L.C.,

          Counterdefendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 05 CH 07598

Judge Julia M. Nowicki

VERIFIED COUNTERCLAIM FOR STATUTORY
DISSOCIATION AND OTHER RELIEF

Counterplaintiffs Kinsella Investments L.P., individually and derivatively on behalf of

River Village I L.L.C. and River Village West L.L.C., Diamond Family L.L.C., individually and

derivatively on behalf of River Village I L.L.C. and River Village West L.L.C., and John J.

Kinsella, individually, by their attorneys, Tabet DiVito & Rothstein LLC and Kerns & Kenig

LLP, hereby counterclaim against counterdefendants Thomas Snitzer and Snitzer Family L.L.C.,

as follows:

AA45

## Allegations Common to All Counts

### A.    SUMMARY

1.    This case involves three Illinois limited liability companies, J.S. II L.L.C ("JS II"), River Village I L.L.C ("River Village") and River Village West, L.L.C. ("River Village West") (collectively, the "LLCs"). River Village is the development agent of a major real estate development owned by JS II. River Village is in peril and in hopeless deadlock because of the gross mismanagement and recalcitrance of its Manager, defendant Thomas Snitzer ("Snitzer"), and the Snitzer Family LLC, the family LLC that Snitzer controls. Because of Snitzer, JS II's multimillion-dollar housing development has been shut down since January for building code violations, bank loans are in default and about to be foreclosed, and existing and potential homebuyers are in distress and threatening litigation. In addition, Snitzer is now wrongfully seeking to control JS II itself when he has no right to do so. To save the project, River Village's other members seek a judicial dissociation of Snitzer and his family LLC from the LLCs.

### B.    The Parties

2.    Counterplaintiff Kinsella Investments L.P. ("Kinsella LP") is a Delaware limited partnership and a member of River Village and River Village West. Kinsella LP's general partner is Kinsella Investments LLC, an Illinois limited liability company. Kinsella Investments LLC's sole member is Kinsella Development Corp., an Illinois corporation, of which counterplaintiff John J. Kinsella is the president and sole shareholder.

3.    Counterplaintiff John J. Kinsella ("Kinsella"), an Illinois resident, is a member of JS II and the president and sole shareholder of Kinsella Development Corp., the sole member of Kinsella Investments LLC, the general partner of counterplaintiff Kinsella LP. Kinsella is the former chairman, president, and chief executive officer of Chicago-based Leo Burnett Worldwide, one of the world's largest advertising agencies. Kinsella is also a former director of Centerpoint Properties, an industrial real estate investment trust, Chicago's largest industrial real

AA46

estate management firm. (Kinsella and the Kinsella entities are collectively referred to herein as "Kinsella" unless the context requires otherwise.)

4.      Counterplaintiff Diamond Family, L.L.C. ("Diamond LLC") is an Illinois limited liability company and a member of River Village, River Village West and JS II. Sid Diamond ("Diamond"), an Illinois resident, is a Diamond LLC member and its sole Manager. Diamond is the founder and chairman of Imaginings 3, Inc. USA and Imaginings 3 Far East LTD. of Hong Kong.   Both family owned companies are in the business of developing, manufacturing and distributing childrens licensed character products throughout the world for the past 35 years. (Diamond and Diamond LLC are collectively referred to herein as "Diamond" unless the context requires otherwise.)   (Counterplaintiffs Kinsella and Diamond are collectively referred to herein as the "Investing Members.")

5.      Counterplaintiff JS II, L.L.C. ("JS II") is an Illinois limited liability company, and the entity that owns the real estate being developed by River Village.   JS II's members are Kinsella and Diamond LLC.

6.      Counterplaintiff River Village I L.L.C.   ("River Village") is an Illinois limited liability company, and the development agent for JS II of a major residential real-estate project along the Chicago river in the Bridgeport neighborhood of Chicago known as Bridgeport Village.

7.      Counterplaintiff River Village West L.L.C. ("River Village West") is an Illinois limited liability company, and acts as a rental agent for properties owned by JS II.

8.      Counterdefendant Thomas Snitzer ("Snitzer") is an Illinois resident, a profit-sharing member of River Village and River Village West, River Village and River Village West's sole Manager, a contingent member of JS II with a right to 50 percent of net profits, and an agent of JS II.

3

AA47

9.   Counterdefendant Snitzer Family L.L.C. ("Snitzer LLC") is an Illinois limited liability company and a profit-sharing, member of River Village and River Village West. On information and belief, counterdefendant Thomas Snitzer is Snitzer LLC's member-manager. (Snitzer and Snitzer LLC are referred to collectively herein as the "Snitzer Interests.")

C.   JURISDICTION AND VENUE

10.   This Court has jurisdiction over this matter pursuant to Section 2-209 of the Illinois Code of Civil Procedure because, among other things, counterplaintiffs' claims arise out of Snitzer's performance, and non-performance, of his duties as a member-manager of River Village, an Illinois LLC, and out of Snitzer's breaches of fiduciary and other duties to Kinsella, Diamond, and River Village, which occurred in the State of Illinois. 735 ILCS 5/2-209.

11.   Pursuant to Section 2-101 of the Illinois Code of Civil Procedure, venue is proper in this Court because the occurrences that gave rise to counterplaintiffs' claims occurred in this County. 735 ILCS 5/2-101.

12.   Kinsella and Diamond bring this action both individually and derivatively on behalf of River Village I L.L.C. and River Village West pursuant to section 40-1 of the Limited Liability Company Act. 805 ILCS 180/40-1. It would be futile for Kinsella and Diamond to make a demand on River Village I L.L.C. or River Village West to file suit asserting the claims stated herein, as the same deadlock and governance disputes that give rise to these counterclaims make any effort to cause Snitzer and Snitzer LLC to bring the action or consent to the action not likely to succeed.

13.   On May 23, 2005, Snitzer filed an amended complaint in this action in which he falsely claims that he is a Manager of JS II and otherwise misstates his rights in JS II. There has not yet been time under the JS II Operating Agreement to call a meeting to authorize JS II to join in this action directly. Kinsella and Diamond, the sole Managers of JS II and the controlling

members, expect that JS II will join in this action after a meeting has been noticed and the matter considered.

**D.    THE JS II OWNERSHIP ENTITY**

14.    In September 1997, Kinsella and Diamond LLC formed JS II to own and develop real estate projects in Illinois.

15.    The JS II Operating Agreement provides that Kinsella and Diamond LLC are the members of JS II.  (A true and correct copy of the JS II Operating Agreement is attached as Exhibit A.)

16.    The JS II Operating Agreement sets forth the percentage interests of JS II's members as follows: Kinsella – 60%; Diamond LLC – 40%.

17.    For Bridgeport Village Phase I, Kinsella and Diamond LLC contributed 100 percent of the capital of JS II, an amount totaling approximately $2.5 million.  In addition, Kinsella and Diamond personally guaranteed JS II's bank debt up to approximately $18 million, and pledged $4 million in personal assets as security for the bank debt.  For future phases, Kinsella and Diamond contributed approximately $5 million to JS II for land.

18.    On October 22, 1999, the members and Managers of JS II entered into a written resolution authorizing John Kinsella or Sidney Diamond to take such action as they deem necessary, advisable or proper relating to the Project's loan from Bank of America.  (A true and correct copy of the Resolution is attached as Exhibit B.)

19.    The JS II Operating Agreement provides that Kinsella and Diamond are JS II's Managers.

20.    Snitzer was not a founder of JS II, and initially had no interest in JS II.

21.    The Snitzer interests have never contributed any capital to JS II, have never signed any personal guaranties of JS II debt, and have never pledged any personal assets to secure JS II debt.

5

AA49

9

22.     At all times, Snitzer acted as JS II's agent.

23.     As JS II's agent, Snitzer owed and owes fiduciary duties to JS II.

24.     In June 2004, Kinsella LP, Diamond LLC, Snitzer and Snitzer LLC entered into a Memorandum of Understanding.    (A true and correct copy of the Memorandum of Understanding is attached as Exhibit C.)

25.     Paragraph 6 of the Memorandum of Understanding provides, in pertinent part:

Contemporaneously with the execution of this agreement, John J. Kinsella and Sid Diamond will admit Snitzer as a 50 % member of JS II LLC. Kinsella, Diamond and Snitzer all acknowledge that it would be in their mutual best interests at an early date to memorialize in writing their respective rights and responsibilities as members of JS II LLC, including the appointment of Snitzer as manager.

26.     Paragraph 6 of the Memorandum of Understanding applied only to Snitzer individually, and not to "Snitzer Family L.L.C."

27.     The term "50% member of JS II" was understood to mean that Snitzer would receive 50% of the net profits from transactions involving property owned by JS II, after the payment of all expenses, and after the return of all capital and loans contributed by Kinsella and Diamond.

28.     The writing referenced in the second sentence of paragraph 6 of the Memorandum of Understanding was never prepared.

29.     Kinsella, Diamond and Snitzer never memorialized in writing their respective rights and responsibilities as members of JS II.

30.     The JS II Operating Agreement does not reflect that Snitzer is a member of JS II.

31.     The members of JS II never elected Snitzer as a Manager of JS II.

32.     The JS II Operating Agreement does not reflect that Snitzer is a Manager of JS II.

AA50

33. The effect of paragraph 6 of the Memorandum of Understanding is that Snitzer individually has a 50% share of the net profits from transactions involving property owned by JS II, after the payment of all expenses, and after the return of all capital and loans contributed by Kinsella and Diamond.

E. THE RIVER VILLAGE DEVELOPMENT ENTITY

1. Organization and Membership of River Village

34. Beginning in or about 1998, JS II acquired certain parcels of land along the Chicago River in the Bridgeport neighborhood of Chicago.

35. In June 1998, Kinsella LP and Diamond LLC formed River Village to act as the development agent with respect to the Bridgeport property. (A true and correct copy of the River Village Operating Agreement is attached as Exhibit D.)

36. The property to be developed by River Village is known as Bridgeport Village-Phase 1 ("Bridgeport Village" or the "Project").

37. Kinsella LP and Diamond LLC contributed 100 percent of the capital of River Village.

38. The Snitzer Interests did not contribute any capital to River Village.

39. In exchange for Thomas Snitzer's agreement to serve as the Manager of River Village and the Bridgeport Village Project, Kinsella LP and Diamond LLC agreed to give the Snitzer Interests a membership interest in River Village.

40. The membership interest in River Village entitled the Snitzer Interests to a share of the net profits in River Village, after the payment of all expenses, and after the return of all capital and loans contributed by Kinsella and Diamond.

41. As set forth in the River Village Operating Agreement, the members of River Village agreed to share the net profits as follows:

7

243.    Kinsella LP, Diamond LLC, and River Village have been damaged by Snitzer's

breaches of fiduciary duty in an amount to be determined at trial.

WHEREFORE, Counterplaintiff Kinsella LP, both individually and derivatively on

behalf of River Village, and Counterplaintiff Diamond LLC, both individually and derivatively

on behalf of River Village, respectfully request: (1) entry of judgment against Snitzer for breach

of fiduciary duty; (2) an complete accounting to Kinsella LP and Diamond LLC of the financial

condition and transactions of JS II, River Village and River Village West; (3) damages in an

amount to be determined at trial; (4) an award of attorneys' fees; and, (5) all further relief

appropriate in the circumstances.

DATED:  May 27, 2005

Respectfully submitted,

KINSELLA INVESTMENTS L.P., individually and
derivatively on behalf of RIVER VILLAGE I L.L.C.
and RIVER VILLAGE WEST, L.L.C., JOHN J.
KINSELLA, individually, DIAMOND FAMILY L.L.C.,
individually and derivatively on behalf of RIVER
VILLAGE I L.L.C. and RIVER VILLAGE WEST, L.L.C.

By: _____
                        One of Their Attorneys

Michael I Rothstein
Mary Beth Wynn
Henry H. Hess
TABET DIVITO & ROTHSTEIN LLC
209 S. LaSalle Street, 7th Floor
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
Firm I.D. 38234

Benjamin J. Randall
RANDALL & KENIG LLP
455 North CityFront Plaza Drive
Suite 3160
Chicago, IL 60611
Firm I.D. 40686

32

AA51

---

AA52

22639_1.

# VERIFICATION

Under penalties provided by law pursuant to Section 1-109 of the Code of Civil Procedure, I, Sid Diamond, certify that the statements set forth in the foregoing Counterclaim are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verify believe the same to be true.

Dated: May 27, 2005



Sid Diamond

AA53

## VERIFICATION

Under penalties provided by law pursuant to Section 1-109 of the Code of Civil Procedure, I, John J. Kinsella, certify that the statements set forth in the foregoing Counterclaim are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verily believe the same to be true.

Dated: May 27, 2005



John J. Kinsella

AA54

22763_1.DOC

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 27, 2005, he caused a true and correct copy of the Counterplaintiffs' Notice of Filing and Verified Counterclaim For Statutory Dissolution And Other Relief attached hereto to be served upon the party listed below via hand delivery:

Peter D. Sullivan
HINSHAW & CULBERTSON LLP
222 N. LaSalle St., Ste. 300
Chicago, IL 60601-1081

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

AA55

# EXHIBIT 3

AA56

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

THOMAS A. SNITZER and SNITZER FAMILY L.L.C.,
on their own behalf and derivatively on behalf of River
Village I, L.L.C., River Village West, L.L.C., and JS II,
L.L.C.,

              Plaintiffs,

       v.

KINSELLA INVESTMENTS L.P., JOHN J. KINSELLA,
DIAMOND FAMILY L.L.C., and
STID DIAMOND,

              Defendants.

KINSELLA INVESTMENTS L.P., individually and
derivatively on behalf of River Village I L.L.C. and River
Village West L.L.C.; DIAMOND FAMILY L.L.C.,
individually and derivatively on behalf of River Village I
L.L.C. and River Village West L.L.C.; and JOHN J.
KINSELLA, individually,

              Counterplaintiffs,

       v.

THOMAS SNITZER and SNITZER FAMILY L.L.C.,

              Counterdefendants.

Case No. 05 CH 07598

Judge Julia M. Nowicki

ORDER

This cause, coming to be heard on Plaintiffs/Counterdefendants' emergency motion to dissolve or modify TRO filed on June 16, 2005, and pursuant to the parties' respective motions for preliminary injunction, due notice having been given, and the Court having considered memoranda submitted by the parties regarding their rights as members and managers of the Bridgeport Village Project (the "Project") limited liability

companies, and having heard the argument of counsel, the Court makes the following additional findings:

THE COURT HEREBY FINDS:

I. Membership and Management Issues That Can Be Determined As a Matter of Law

A. JS II L.L.C ("JS II"), River Village I L.L.C. ("River Village"), and River Village West L.L.C. ("River Village West") are Illinois limited liability companies;

B. As reflected in written operating agreements:

1. Defendants/Counterplaintiffs John Kinsella ("Kinsella") and Sid Diamond ("Diamond"), individually and/or through entities they control, are members of all three limited liability companies, i.e., JS II, River Village, and River Village West;

2. Kinsella and Diamond are also managers of JS II;

3. Plaintiffs/Counterdefendants Thomas Snitzer ("Snitzer") and Snitzer Family L.L.C. ("Snitzer LLC") (collectively, the "Snitzer Interests") are members of River Village and River Village West;

4. Snitzer is the sole manager of River Village and River Village West;

C. The initial operating agreement for JS II does not include the Snitzer Interests as members or managers of JS II;

D. Paragraph 6 of a written memorandum of understanding entered into as of June 2004 provided as follows:

Contemporaneously with the execution of this agreement, John J. Kinsella and Sid Diamond will admit Snitzer as a 50 percent member of JS II LLC. Kinsella, Diamond and Snitzer all acknowledge that it would be in their mutual best interests at an early date to memorialize in writing their respective rights and responsibilities as members of JS II LLC, including the appointment of Snitzer as manager.

E. The Snitzer Interests claim that paragraph 6 of the memorandum of understanding gave Snitzer and Snitzer LLC a full 50 percent membership interest in JS II, with full voting rights, and made Snitzer the sole manager of JS II;

2

AA58

F. Kinsella and Diamond claim that paragraph 6 of the memorandum of understanding gave Thomas Snitzer an undefined 50 percent profit interest in JS II, gave no interest or rights of any kind to Snitzer LLC, and left the determination of any and all other rights and responsibilities of Thomas Snitzer to future negotiations;

G. An actual controversy exists regarding the scope and extent of the Snitzer Interests' membership and management rights in JS II;

H. The Court finds the following as a matter of law from the unambiguous language of the JS II operating agreement and the June 2004 memorandum of understanding:

   1. Thomas Snitzer is presently a 50% member of JS II; however, the Court is not able to determine as a matter of law the extent of his rights and responsibilities, if any;

   2. Kinsella and Diamond are presently managers of JS II;

I. The Court finds that the June 2004 memorandum of understanding is ambiguous with respect to the following:

   1. whether Snitzer LLC is a member of JS II;

   2. whether Thomas Snitzer is a manager of JS II; and

   3. the extent of the Snitzer Interests' rights and responsibilities as members and/or managers of JS II, if any.

II. Emergency Motion to Dissolve or Modify TRO Entered on June 14, 2005

A. The Bridgeport Village Project (the "Project") has been shut down by the City of Chicago since January 2005, for building code violations, some of which may involve the risk of significant safety issues;

B. Prior to the shut down by the City of Chicago in January 2005, and at all times thereafter, Plaintiff/Counterdefendant Snitzer had or purported to have management authority and responsibility for the Project, including authority and responsibility for the construction of homes;

C. On June 10, 2005, Plaintiff/Counterdefendant Snitzer sent a letter to Kinsella and Diamond that he copied to Bridgeport Village homeowners, to the Project's prospective lender, and to the Project's prospective lender. Snitzer's conduct had the potential to place the physical and financial integrity of the Project in jeopardy;

3

D.    The Bank of America Loan used to finance the Project with an outstanding balance totaling approximately $6 million is in default and the Bank is demanding immediate payment;

E.    The status quo is defined as the condition of the Project prior to the threat to its physical and financial integrity.

F.    Defendants/Counterplaintiffs' Kinsella and Diamond have identified individuals with construction experience who are immediately available to address safety and construction issues at the Project, including:

1.    Mr. Ralph Schmidt, who has been approved by all parties and by the City of Chicago to serve as Supervising Engineer;

2.    Mr. Jay Barry, who is available to serve as on-site Construction Superintendent; and

3.    Mr. Robert Stovall, who is available to serve as a Project Consultant;

G.    Kinsella and Diamond have been negotiating new financing to replace Bank of America on a short-term basis and to obtain financing to continue the Project. The cooperation of Kinsella and Diamond is necessary to obtain this new financing;

H.    Based on the above findings, Defendants/Counterplaintiffs' Kinsella and Diamond have established:

1.    an ascertainable right in need of protection, i.e., the right to have the Project progress without unreasonable interference of members and managers;[1]

2.    the risk of irreparable injury without the protection of injunctive relief, in that the conduct of Plaintiff/Counterdefendant Shitzer had the potential to put the project in physical and financial jeopardy;

3.    the lack of an adequate remedy at law is the same as the risk of irreparable injury;

4.    a likelihood of success on the merits, especially as it relates to the expulsion of a member of a limited liability company pursuant to section 35-45 of the Limited Liability Company Act, 805 ILCS 180/35-45(6)(c); and

5.    a balancing of the hardships weighs in Kinsella and Diamond's favor.   In reaching this conclusion, the Court was required to

---

[1] Plaintiffs/Counterdefendants share this ascertainable right.

4

consider the operating agreements of all three limited liability companies and the memorandum of understanding. The factors included in this Court's conclusion, but not limited to these factors, are:

    a.   of the three limited liability companies at issue, JS II was the first in time;

    b.   Kinsella and Diamond were the original members and managers of JS II, and the original owners of the property under the JS II agreement, and they provided all of the financing for the Project;

    c.   the Project cannot continue without additional financing;

    d.   Kinsella and Diamond are necessary to procure additional financing and/or capital for the Project, and the Project has no viability without the participation of Kinsella and Diamond;

    e.   as described in this Order, Snitzer's conduct has the potential to place the physical and financial integrity of the Project in jeopardy; and

    f.   Kinsella and Diamond have the ability to hire personnel until the preliminary injunction motion is heard.

I.   The Court has considered and overruled Plaintiffs'/Counterdefendants' objections based on:

    1.   timeliness of notice; the court finds that notice was practical under the circumstances;

    2.   unclean hands;

    3.   lack of an ascertainable right;

    4.   causation by Defendants/Counterplaintiffs;

    5.   likelihood of success;

    6.   balancing of the equities and hardship; and

    7.   inconsistency with status quo.

J.   Defendants/Counterplaintiffs have posted an injunction bond in the amount of $75,000.00.

5

AA60

AA61

6

**IN ACCORDANCE WITH THE ABOVE FINDINGS, THE COURT HEREBY ORDERS:**

1. For purposes of all parties' pending motions for preliminary injunctions, the Court finds as a matter of law that:

   a. Thomas Snitzer is presently a 50% member of JS II; however, the Court is not able to determine as a matter of law the extent of his rights and responsibilities, if any, at this time;

   b. Kinsella and Diamond are presently managers of JS II; and

   c. the June 2004 memorandum of understanding is ambiguous with respect to the extent of Thomas Snitzer's rights and responsibilities as a 50% member of JS II, if any, and as to whether Snitzer LLC is a member of JS II, and whether Thomas Snitzer is a manager of JS II.

2. Plaintiffs/Counterdefendants' motion to dissolve or modify the TRO is granted in part and denied in part. The motion to dissolve the TRO entered on June 14, 2005, is denied; however, the TRO entered on June 14, 2005, shall be modified as set forth herein;

3. Plaintiffs/Counterdefendants continue to be enjoined from interfering with the management or control of the Project and acting or purporting to act as manager of River Village I LLC, River Village West LLC, and JS II LLC (the "Bridgeport Village Entities");

4. Given the injunction against Plaintiffs/Counterdefendants' interference with the management or control of the Bridgeport Village Entities, John Kinsella and Sid Diamond may act as controlling managers and members for each such entity without interference by Plaintiffs/Counterdefendants in the following limited respects:

   a. Negotiating and completing all acts necessary to obtain financing to replace the existing Bank of America Loan to the Project, Kinsella and Diamond will present any final loan agreements to Snitzer prior to execution;

   b. Performing all acts necessary to address and resolve safety, building code compliance, security, and maintenance issues at the Project, including entering into an agreement with the City of Chicago to permit a resumption of construction and to complete all acts required under such an agreement;

   c. Performing all acts necessary to complete punchlists;

AA62

d. Performing all acts necessary to complete construction of and complete sales of all homes for which construction has commenced but not been completed;

c. Collecting and holding rents from tenants on the Acme, Holsum, and AAA properties; such collected rents shall be accounted for and spent only for Project activities;

5. Kinsella and Diamond shall provide Snitzer with weekly reports detailing all Project work done, rents received, and Project revenues, expenditures, and financing;

6. Notwithstanding the above, John Kinsella, Sid Diamond, and Thomas Snitzer shall each act as managers with respect to pending litigation related in any way to the Project and/or River Village I, River Village West, and JS II, and decisions regarding such litigation matters shall be made jointly; and

7. The TRO entered on June 14, 2005, remains in effect, as modified by this Order, and shall remain in effect while the Court conducts further preliminary injunction hearings or until further order.

ENTERED:

# ENTERED

JUN 2 3 2005

JUDGE
JULIA M. NOWICKI - 293

Judge                    Judge's No.

Prepared By:
Firm No.: 38234
Michael I Rothstein
Tabet DiVito & Rothstein LLC
The Rookery Building
209 S. LaSalle St., 7th Floor
Chicago, IL. 60604
(312) 762-9490

7

AA63

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| *JS II, L.L.C., et al.,* | ) | Case No. 07-03856 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hon. Jacqueline P. Cox |

**DEBTORS' OBJECTION TO THE PROOF OF INTEREST OF THOMAS A. SNITZER
AND SNITZER FAMILY LLC AND DEBTORS' COUNTERCLAIM AGAINST
THOMAS SNITZER AND SNITZER FAMILY LLC**

Debtors J.S. II, L.L.C. ("*JS II*"), River Village I, L.L.C. ("River Village"), River Village West, L.L.C. ("River Village West"), and KND Investments, L.L.C. ("KND") (collectively referred to in the Objections as "Debtors"), for their Objections to the Proof of Interest of Thomas A. Snitzer and Snitzer Family LLC and for their Counterclaim against counterdefendant Thomas A. Snitzer, state as follows:

**OBJECTION TO PROOF OF INTEREST**

1.      On May 31, 2007, Snitzer and Snitzer Family LLC ("SFLLC") filed their Proof of Interest in this Court, which has been docketed as Item Number 188 on this Court's General Docket. A true and correct copy of the Snitzer/SFLLC Proof of Interest is attached hereto as Exhibit A.

2.      Snitzer and SFLLC acknowledge in Paragraph 1 of the Proof of Interest that the Debtors dispute the Proof of Interest, and then go on to describe the nature of the dispute in Paragraphs 8 and 9.

3.      The Debtors dispute that SFLLC is a member of J.S. II., as the June 2004 Memorandum of Understanding clearly states that only Snitzer, not SFLLC, is to be admitted as "a 50% member of J.S. II, L.L.C." *See* Exhibit 1 to Proof of Interest at ¶ 6.

AA64

{5618 OBJ A0191530.DOC}

2

4.      Further, Snitzer's interest in J.S. II is limited to 50% of the net profits from transactions involving property owned by J.S. II, after the payment of all expenses, creditors, and the payment of all loans and the return of all capital to Messrs. Kinsella and Diamond, plus interest to the extent permitted.

5.      Based on the Counterclaim made a part of this Objection, any equity or other interest that Snitzer or SFLLC may claim as to any of the Debtors should be disallowed unless Snitzer satisfies the damages, in full, that this Court may award the Debtors.

6.      This Objection, which is joined by a claim for money damages, becomes an adversary proceeding by operation of law pursuant to Fed. R. Bankr. P. 3007.

7.      This Court has core jurisdiction to enter a final order and judgment on this Objection and the accompanying Counterclaim pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), 157(b)(2)(A), (B), (C) and (O). *In re AVN Corp.*, 235 B.R. 417, 422-25, (Bankr. W.D. Tenn. 1999).

WHEREFORE, the Debtors request the entry of an order in accordance with the foregoing and for such other and further relief as may be appropriate.

## COUNTERCLAIM

Debtors J.S. II, L.L.C. ("J.S II"), River Village I, L.L.C. ("River Village"), River Village West, L.L.C. ("River Village West") (collectively referred to in the Counterclaim as "Debtors") hereby counterclaim against Thomas Snitzer and Snitzer Family L.L.C. as follows:

## INTRODUCTION

8.      This action involves the intentional, fraudulent and grossly negligent conduct of Counterdefendant Thomas Snitzer ("Snitzer"), the Debtors' former manager and/or agent, whose

egregious misconduct, breaches of fiduciary duties, violations of contractual obligations, and waste have single handedly brought a lucrative real estate development project to financial ruin.

## JURISDICTION AND VENUE

9.      This Court has core jurisdiction to hear and determine this Counterclaim pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), 157(b)(2)(A), 157(b)(2)(B), 157(b)(2)(C), and 157(b)(2)(O).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) as this Counterclaim is brought in the Debtors' chapter 11 cases that are pending in this judicial district.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.      The Parties

11.     Debtor JS II is an Illinois limited liability company and the owner of a major residential real estate project along the Chicago River in the Bridgeport neighborhood of Chicago known as Bridgeport Village, as well as other nearby parcels acquired for future development.

12.     Debtor River Village is an Illinois limited liability company that acted in developing Bridgeport Village.

13.     Debtor River Village West is an Illinois limited liability company that acted as the rental agent for the parcels acquired by JS II for future development.

14.     Counterdefendant Snitzer is an Illinois resident. He is a member of River Village and River Village West, and was a contingent member of JS II with a right to 50 percent of its net profits after the return of capital to its investing members.

AA65

AA66

15.     Counterdefendant Snitzer Family L.L.C. ("SFLLC") is an Illinois limited liability company.  It is a member of River Village and River Village West.  Snitzer is the managing member of SFLLC.

16.     Snitzer served as the sole manager of River Village and River Village West, and as the agent of JS II until June 2005.

17.     In June 2005, the Circuit Court of Cook County, Illinois, removed Snitzer from his positions as the Debtors' manager and agent in an emergency proceeding, finding that Snitzer's conduct had placed the physical and financial integrity of the Project in jeopardy. *Thomas Snitzer, et al. v. Kinsella Investments, L.P., et al.*, Circuit Court of Cook County, Illinois, No. 05 CH 07598.

**B.     The Project**

18.     The Debtors were formed to acquire, develop, and sell various real estate parcels along the Chicago River in the Bridgeport neighborhood of Chicago.

19.     In a series of transactions, Debtors acquired approximately 31 acres of industrial property in the Bridgeport neighborhood of Chicago.

20.     Debtors intended to convert the acquired parcels to residential use and to develop, construct and sell residences to the public.

21.     Debtors intended to develop the overall project in several phases, with the total build-out and sale of residences to be over 400 residences.

22.     Phase I of the project involved approximately 11 acres located near 33rd Street and Racine in Chicago, Illinois.

23.     As approved by the Department of Planning and Development, Phase I of the project consisted of the development of approximately 115 single-family homes.

4.

24.    The Debtors refer to Phase 1 of the project as "Bridgeport Village" or the "Bridgeport Village Project" or "BPV."

25.    Bridgeport Village is the only phase of the project that the Debtors actually developed.

26.    The remaining parcels purchased by the Debtors, totaling approximately 20 acres, have not yet been rezoned for residential use and have not yet otherwise been developed.

**C.    Snitzer's Gross Misconduct and Violations of Duty**

27.    Snitzer served as JS II's managing agent from September 1997 until June 2005.

28.    Snitzer served as the sole manager of River Village from June 1998 until June 2005, and as the sole manager of River Village West from January 2002 until June 2005.

29.    At all times while Snitzer served as the Debtors' agent and/or manager, he owed the Debtors contractual and fiduciary duties.

30.    The Bridgeport Village Project, with 115 intended homes, was Chicago's largest single-family-home development project in recent years.

31.    As set forth in the following paragraphs, Snitzer breached his contractual and fiduciary duties in many material respects, causing great harm to the Bridgeport Village Project entrusted to his care, and causing the Debtors to incur expenses in excess of $3 million to remedy Snitzer's violations of duty.

32.    Snitzer concealed these breaches from the Debtors' non-managing members, John Kinsella and Sid Diamond, and the ensuing delay in remediating the harm to the Bridgeport Village Project compounded BPV's problems and ultimately led to its financial ruin and declaration of bankruptcy.

5

{5618 OB} A0191530.DOC}

AA68

## I. Snitzer's Violations of Chicago Ordinances, Building Code Sections, Permits, and Customary Construction Standards.

33.     Snitzer built or started construction on approximately 90 homes at Bridgeport Village.

34.     All of the homes built or started by Snitzer violated one or more of the following:

a.     The Chicago Zoning Code governing Planned Developments (Chi. Zoning Code §§ 17-8-0101 through 17-8-0912);

b.     Residential-Waterway Planned Development No. 769, enacted by the Chicago City Council on December 13, 2000, and amended on October 31, 2001 ("PDO-769");

c.     The City of Chicago Building Code;

d.     Regulations of the City of Chicago Department of Construction and Permits;

e.     Permits issued by the City of Chicago Department of Construction and Permits;

f.     Usual and customary construction practices and standards.

35.     Snitzer was knowledgeable regarding the specific requirements of PDO-769, both as originally enacted and as amended.

36.     Notwithstanding his knowledge regarding the specific requirements of PDO-769, Snitzer violated PDO-769 in material respects.

37.     Snitzer was either knowledgeable of the provisions of the Chicago Building Code or had such requirements explained to him.

38.     Snitzer was either knowledgeable of usual and customary construction practices and standards or had such requirements explained to him.

{5618 OBJ A0191530.DOC}

39.     As set forth below, Snitzer knowingly violated PDO-769, the Chicago Building Code, and usual and customary construction standards.

40.     Snitzer was directly responsible for the ordinance, code, permit, and construction standard violations at Bridgeport Village.

41.     During construction of Bridgeport Village, Snitzer rarely visited the construction site in person more than once or twice weekly, often spending only a few hours at the site.

42.     Snitzer built BPV homes without registering with the City of Chicago as the general contractor and without using a general contractor who was licensed by the City of Chicago.

43.     Upon information and belief, Snitzer built BPV homes using subcontractors who were not licensed by the City of Chicago.

44.     Snitzer did not ensure that an architect or engineer oversaw the construction of Bridgeport Village.

45.     Snitzer built BPV homes without proper building permits.

46.     Snitzer built BPV homes without providing contractors or subcontractors with detailed architectural drawings.

47.     Snitzer built BPV homes without providing contractors or subcontractors with detailed plans.

48.     Snitzer built BPV homes without providing contractors or subcontractors with detailed specifications.

49.     Snitzer built BPV homes that varied from architectural plans submitted with permit applications.

AA70

50. Snitzer changed BPV plans and specifications without the review or approval of a licensed architect or engineer.

51. Snitzer built BPV homes with lateral load shear walls moved from their designed locations.

52. Snitzer built BPV homes that exceeded applicable height restrictions.

53. Snitzer built BPV porches with combustible materials without allowing sufficient distances from adjoining structures.

54. Snitzer built BPV homes with third-floor square footages exceeding that permitted under fire safety regulations.

55. Snitzer built third floors on BPV homes without a required second means of egress.

56. Snitzer built BPV homes without the required rating of fire insulation on exterior walls.

57. Snitzer built BPV homes with unpermitted basements.

58. Snitzer built unpermitted decks on BPV garages.

59. Snitzer built BPV homes that violated side-yard setback requirements.

60. Snitzer built BPV homes or garages that encroached on adjacent BPV lots.

61. Snitzer built a BPV home or garage that encroached on property owned by a neighboring landowner.

62. Snitzer built a home that encroached on the river walk setback required by the City of Chicago.

{5618 OBJ A0191530.DOC}

AA71

63. The City of Chicago found multiple violations in all of the approximately 90 homes built by Snitzer, all or most of which had been sold and almost all of which were occupied.

64. The cost of remedying Snitzer's violations of PDO-769, the Chicago Building Code, and usual and customary construction practices and standards has been immense.

65. The Debtors have had to expend tremendous sums to complete punch lists, remedy defective construction, replace windows, repair roofs and showers, and demolish foundations built over lot and property lines.

66. The construction cost alone of remedying the lateral load shear walls is expected to exceed $1 million for the entire project.

67. In addition, Debtors have incurred hundreds of thousands of dollars in professional fees to resolve permit and technical violations and to address litigation which Snitzer entered into with third parties without the consent of a majority of the Debtors' members.

68. Debtors' damages are a direct and proximate result of Snitzer's intentional violation of PDO-769, the Chicago Building Code, usual and customary building standards, and fiduciary duties.

**2.    Snitzer's Removal from Management for Breaches of Fiduciary Duty.**

69. In May 2005, Snitzer sued for an injunction against John Kinsella and Sid Diamond, the members and principals of JS II and the other members of River Village and River Village West, claiming that they were unlawfully interfering with his management of the Bridgeport Village Project.

70. Kinsella and Diamond counterclaimed against Snitzer, seeking his removal as a manager and agent to the Debtors.

{5618 OBJ A0191530.DOC}

71.     In June 2005, the Circuit Court of Cook County, Illinois (Nowicki, J.) denied Snitzer's request for a temporary restraining order against Kinsella and Diamond.  The Illinois Court then granted the request from Kinsella and Diamond for a temporary restraining order against Snitzer and enjoined him from acting as the Debtors' manager and agent.

72.     The Illinois court expressly held that Snitzer's conduct had the potential to place the physical and financial integrity of the Project in jeopardy.  *Thomas Snitzer, et al. v. Kinsella Investments, L.P., et al.*, Circuit Court of Cook County, Illinois, No. 05 CH 07598.

73.     The effect of the Illinois Court's order was to remove Snitzer from management of the Bridgeport Village Project.

74.     The Illinois Court appointed John Kinsella and Sid Diamond to manage the Bridgeport Village Project instead of Snitzer.

**3.     Snitzer's Responsibility for Homeowner Claims.**

75.     When Debtors' new management took over the Bridgeport Village Project, they discovered extensive outstanding punch list and warranty claims from the Bridgeport Village home purchasers.

76.     Snitzer built BPV homes with construction defects.

77.     Snitzer routinely ignored the homeowners' punch lists and warranty claims.

78.     These punch list and warranty claims resulted directly from Snitzer's failure to follow proper and customary construction practices.

79.     Under Snitzer's watch, Snitzer's construction personnel attempted to intimidate the homeowners from insisting that their homes be completed or repaired.

80.     Correction of Snitzer's unattended punch list and warranty claims has taken 28 months and cost the Debtors over $2.5 million to date.

(5618 OBJ A0191530.DOC)

AA72

AA73

### 4. Snitzer's Fraudulent Concealment of Violations of Chicago Ordinances, Permits, and Customary Construction Standards.

81. In 2003, a disgruntled subcontractor began publicly challenging Snitzer's construction practices at Bridgeport Village.

82. In response, Snitzer commenced a plan and scheme to hide his many violations of Chicago ordinances, construction codes, permits, and construction standards from Debtors, the investors, the Debtors' lender, and the City of Chicago.

83. Specifically, Snitzer fraudulently misrepresented to the Debtors (through their members, Kinsella and Diamond) that no material code, permit, or construction problems existed at Bridgeport Village while he continued to build another 75 homes disregarding the warnings.

84. Snitzer also fraudulently misrepresented to the Debtors' lender and to the City of Chicago that construction plans approved by the City were used to build the BPV homes when in fact Snitzer built the BPV homes without plans or with plans that varied materially from those approved by the City.

85. To divert attention from the extensive violations at Bridgeport Village, and to attempt to rebut the claims of the disgruntled former subcontractor, Snitzer hired a respected construction engineer to opine on the BPV plans approved by the City of Chicago.

86. Snitzer, however, did not require the engineer to visit the site or to inspect the homes as built and never disclosed to the engineer that the as-built homes varied materially from the approved plans.

87. Had Snitzer properly investigated the claims of construction deficiencies when first made, the Debtors would have discovered the deficiencies, including that the lateral load shear wall did not meet code in mid-2003.

AA74

88.     Snitzer's false denials and hindrance of any investigation of as-built homes resulted in up to 75 additional homes being built with misplaced lateral load shear walls and other deficiencies.

89.     Debtors have incurred and will continue to incur substantial costs to remedy the misplaced lateral load shear wall in the Bridgeport Village homes, all of which was proximately caused by Snitzer's building homes without architectural and City of Chicago review and approval.

90.     In addition, Snitzer's false denials of the existence of construction issues, his refusal to obtain an objective engineering opinion regarding the condition of the homes, and his conscious attempt to mislead further delayed discovery of the construction problems and resulted in necessary repairs to several additional homes.

**5.     Snitzer's Obstruction of City of Chicago Enforcement Efforts.**

91.     Between May 29, 2002, and November 3, 2004, the City of Chicago issued 78 stop work orders to Bridgeport Village, nearly all of which were for work contrary to permits approved by the City of Chicago.

92.     On November 5, 2004, the City of Chicago inspected the homes at the Bridgeport Village Project and raised concerns about design issues.

93.     As a result of this inspection, the City issued stop work orders for all work at Bridgeport Village.

94.     The magnitude of the number of violations found by the City of Chicago was so great that Stanley Kaderbeck, the head of the City of Chicago's Building Department, a licensed structural engineer, became personally involved in attempting to resolve the crisis at Bridgeport Village.

12

95.     Snitzer met with the head of the City of Chicago's Building Department in early November 2004 and promised to resolve the serious code and permit violations at Bridgeport Village.

96.     Based on Snitzer's promises, the City allowed some construction to resume at Bridgeport Village.

97.     Snitzer, however, did not resolve the serious code and permit violations raised by the City of Chicago.

98.     Moreover, despite repeated requests, Snitzer refused to again meet in person with the head of the City of Chicago's Building Department.

99.     Following a January 2005 inspection, the City determined that Snitzer had not made progress in resolving the City's concerns.

100.    On January 21, 2005, based on the continuing code and permit violations, the City again shut down all construction work at Bridgeport Village.

101.    Despite the City's stop-work orders, Snitzer continued working at Bridgeport Village.

102.    Snitzer's construction of Bridgeport Village with known ordinance, code, and permit violations directly caused the January 21, 2005, shutdown of the Bridgeport Village Project.

103.    Snitzer's intentional, reckless, and grossly negligent misconduct, including his refusal to meet with Commissioner Kaderbeck directly caused the January 21, 2005, shutdown of the Bridgeport Village Project.

104.    Following the January 21, 2005, shutdown of the Bridgeport Village Project, the Debtors' lender called its loan, placing the project in severe financial peril with no alternative

AA75

financing in process and resulting in over $130,000 in additional financing and forfeiture costs to the non-managing members of the Debtors.

105.    In addition, the January 21, 2005, shutdown of the Bridgeport Village Project placed contract purchasers of Bridgeport Village homes under construction without homes to move into and in crisis, triggering numerous cancellation of purchase contracts and threats of lawsuits.

106.    Moreover, the January 21, 2005, shutdown of the Bridgeport Village Project forced numerous subcontractors off the job without being paid.

**6.    Other Recklessness, Gross Negligence, and Fiduciary Breaches**

**a.    Snitzer's False Books and Records**

107.    At the time that Snitzer was removed from management of the Bridgeport Village Project the Debtors were in a severe financial crisis.

108.    Snitzer had hidden the Debtors' dire financial condition through his maintenance of false accounting records.

109.    For example, after the Circuit Court of Cook County ordered Snitzer removed from Project management, the Debtors' new management discovered that Snitzer had failed to record material liabilities, including amounts payable to major subcontractors, thus making the Debtors' books and records under Snitzer's management materially misleading.

110.    Moreover, although Snitzer was not an accountant, he insisted on personally keeping the Debtors' books on his personal computer at his home in Arlington Heights, Illinois.

111.    Snitzer never had an independent accountant audit the Project's books and records, and did not provide adequate, accurate financial information to the non-managing members, Kinsella and Diamond.

AA76

**b.    Snitzer's Diversion of Debtor Assets to Snitzer's Brother-in-Law.**

112.    In addition, Snitzer allowed Debtor assets to be used to construct an addition on his brother-in-law's house.

113.    Snitzer also directed a Bridgeport Village subcontractor to work on Snitzer's brother-in-law's house.  The subcontractor claims that Debtors owe it tens of thousands of dollars in connection with this unauthorized work.

**c.    Snitzer's Diversion of Debtor Assets to Pay Personal Legal Expenses.**

114.    Snitzer is or was an individual defendant in two actions pending in the Circuit Court of Cook County, Illinois, relating to a previous real estate development project in which Snitzer was the manager:

1.    *Dearborn Village Condo Association v. Dearborn Village V LLC et al.*, Case No. 03-L-014051 (Cir. Ct. Cook County, Law Div.); and

2.    *Dearborn Village III Condo Association v. Dearborn Village LLC III et al.*, Case No. 03-L-014778 (Cir. Ct. Cook County, Law Div.);

(the "Dearborn Village Lawsuits").

115.    The Debtors are not parties to the Dearborn Village lawsuits.

116.    The Debtors have no interest in the Dearborn Village lawsuits.

117.    Snitzer directed the Debtors' attorney to represent him personally in the Dearborn Village Lawsuits.

118.    Although the Debtors' had no interest in the Dearborn Village Lawsuit, Snitzer caused the Debtors to pay the Debtors' attorney from the Debtors' assets.

119.    The amount of the Debtors' funds diverted to Snitzer for Dearborn Village Litigation legal fees totals over $24,000.

15

AA77

AA78

{5618 OBJ A0191530.DOC}

("Fortress").

130.    In March 2001, Michael Kennedy incorporated Fortress Construction, Inc.

129.    When he worked at Bridgeport Village, Michael Kennedy was not licensed as a contractor with the City of Chicago.

128.    Snitzer hired his long-time associate Michael Kennedy to supervise construction at Bridgeport Village.

**e.    Snitzer's Breaches of Fiduciary Duty Regarding Michael Kennedy and Banyan Without the Non-Managing Members' Knowledge or Consent.**

Chicago but ignored during Snitzer's tenure as BPV manager and agent.

127.    After the Circuit Court of Cook County removed Snitzer from management, Debtors paid thousands of dollars in accumulated fines and penalties assessed by the City of Chicago but ignored during Snitzer's tenure as BPV manager and agent.

126.    Because of Snitzer's failure to respond to the citations, the City of Chicago cited Debtors repeatedly for the same, correctible violations.

125.    Snitzer did not pay the City of Chicago's fines.

124.    Snitzer did not correct the cited conditions.

123.    Snitzer did not appear in court to contest the citations.

122.    Snitzer ignored the citations.

121.    During Snitzer's tenure as the Debtors' manager and/or agent, the City of Chicago issued numerous citations against Debtors for miscellaneous infractions at Bridgeport Village.

**d.    Snitzer's Ignoring of City Citations.**

120.    Snitzer's reckless and grossly negligent disregard of his duties to Debtors resulted in other damages to the Debtors.

131.    The Illinois Secretary of State lists Michael Kennedy as Fortress' president and gives his address as Minooka, Illinois.

132.    Snitzer knew that Michael Kennedy owned or controlled Fortress at all relevant times.

133.    On information and belief, Michael Kennedy also incorporated Banyan Distribution and Building Supplies, Inc. ("Banyan") in March 2001.

134.    Banyan's business address in September 2001 was in Minooka, Illinois.

135.    Banyan's business address in September 2001 was identical to Michael Kennedy's business address for Fortress listed on the Illinois Secretary of State's records.

136.    In September, 2001, Snitzer, as manager and/or agent of Debtors, executed a contract (the "Material Contract") with Banyan.

137.    Executing the Material Contract was a major decision requiring the consent of the non-managing members.

138.    Snitzer executed the Material Contract without the non-managing members' knowledge or consent.

139.    Under the Material Contract, Banyan was granted the exclusive right to provide all windows, cabinetry, millwork and hardware for Debtors' residential development as described in the Material Contract

140.    Although he worked for the Debtors at the time, Michael Kennedy signed the Material Contract on behalf of Banyan.

141.    On information and belief, Michael Kennedy owned and controlled Banyan when he signed the Material Contract on Banyan's behalf.

AA80

142.   Although Michael Kennedy signed the Material Contract on behalf of Banyan, Snitzer designated Michael Kennedy and himself as the only persons authorized to act on the Debtors' behalf in connection with the Material Contract.

143.   Snitzer knowingly and intentionally breached his duties to the Debtors when he authorized Michael Kennedy to act on the Debtors' behalf with respect to an agreement with a company owned or controlled by Michael Kennedy.

144.   By authorizing the Material Contract, Snitzer allowed Michael Kennedy to enrich himself at the Debtors' expense.

145.   Under the Material Contract, Banyan received the exclusive right to supply all of the windows, cabinetry, millwork and hardware for a total of 414 homes to be built by Debtors.

146.   When Snitzer entered this insider contract with his associate Michael Kennedy for 414 homes in September 2001, the Debtors had started developing only Phase I of the Bridgeport Village Project, contemplating construction of only approximately 115 residences.

147.   Snitzer had no justifiable business reason for causing the Debtors to enter into the Material Contract with Michael Kennedy and Banyan for 414 homes in September 2001.

148.   Contrary to customary ordering practices, Snitzer and Michael Kennedy ordered and accepted delivery of materials from Banyan for multiple homes in advance.

149.   Under customary ordering practices, developers and contractors order home building materials for delivery directly to the construction site of the home being built "just in time" for construction.

150.   Ordering delivery of building materials "just in time" avoids storage costs, lessens the risk of undetected defective products, and allows the warranty to transfer unexpired to the home buyer.

{5618 OBJ A0191530.DOC}

AA81

151.    Snitzer and Michael Kennedy caused Banyan to deliver building products to a warehouse across the Chicago River.

152.    Most of the building products purchased from Banyan remained in the warehouse for months. Some products remained in the warehouse for years.

153.    As a result of Snitzer's insider deal with Michael Kennedy, Debtors purchased and paid for building materials long before they were needed.

154.    The building materials Snitzer ordered from Banyan through Michael Kennedy contained numerous defects and mistakes in specifications.

155.    These defects and mistakes in specifications were either known to Snitzer and/or Kennedy or went undetected while the building materials sat in the warehouse.

156.    Because of the time that elapsed while the Banyan goods sat in the warehouse, some of the windows and other building materials ordered through Banyan became useless because of subsequent design changes.

157.    When windows or other building materials did not fit correctly, the Debtors were forced to purchase replacement windows and materials from Banyan for functionally the same item.

158.    Snitzer's knowing entry into the Banyan contract on behalf of the Debtors caused the Debtors to suffer significant damages.

159.    Moreover, because the Banyan goods sat in a warehouse for extended periods of time, the manufacturer's warranties expired before the residence closed, leaving the purchaser with no manufacturer's warranty and causing them to look to Debtors for repair or replacement of defective windows or other building materials.

{5618 OBJ A0191530.DOC}

AA82

**f.    Snitzer's Insider Deal with Arthur Hershkowitz.**

160.    Snitzer entered into an unauthorized agreement with his long-time personal friend Arthur Hershkowitz ("Hershkowitz").

161.    Snitzer and Hershkowitz have worked together for many years.

162.    Upon information and belief, Snitzer, on behalf of Debtors, gave Hershkowitz a purported open-ended listing contract to sell the industrial properties at Bridgeport Village.

163.    There was no economic justification for such an agreement at the time it purportedly was made, because the industrial properties were not then being offered for sale.

164.    The purported agreement with Hershkowitz was a major decision requiring approval of a majority of the members of the affected LLCs.

165.    Snitzer did not obtain approval for this purported agreement from a majority of members of Debtors JS II, River Village, or River Village West.

166.    Moreover, Snitzer concealed the purported agreement with Hershkowitz from the Debtors' new court-appointed managers, John Kinsella and Sid Diamond, while they sought to sell the properties through a different agent.

167.    Snitzer did not object to the agent that the Debtors' new managers sought to use, despite purportedly having previously hired Hershkowitz to perform the same task.

168.    Snitzer took an active role in selecting the new agent, even meeting privately with the agent before giving his approval.

169.    Debtors now face a $1 million claim filed by Hershkowitz, which the Debtors must contest.

{5618 OBJ A0191530.DOC}

**g.    Snitzer's Breaches of Fiduciary Duty Regarding Unauthorized Deferred Compensation Agreements.**

170.    Snitzer engaged Michael Kennedy to supervise construction at the Bridgeport Village Project.

171.    Snitzer had worked with Michael Kennedy for many years on previous real estate development projects.

172.    Snitzer engaged a law firm in December 2004 to draft a deferred compensation agreement for Michael Kennedy, and for two other Project personnel, David Kennedy, and Andrew Tack.

173.    Snitzer never informed Kinsella or Diamond that he had procured draft deferred compensation agreements for Michael Kennedy, David Kennedy, or Andy Tack.

174.    Snitzer never informed Kinsella or Diamond that he intended to defer compensation under any trust or agreement for David Kennedy or Andy Tack.

175.    The decision to cause River Village to enter into a deferred compensation agreement with Michael Kennedy was a major decision requiring the approval of a majority of River Village's members.

176.    The decision to cause River Village to enter into deferred compensation agreements with David Kennedy and Andrew Tack were major decisions requiring the approval of a majority of River Village's members.

177.    Snitzer never obtained the approval of a majority of River Village's members before entering into the type of deferred compensation agreement with Michael Kennedy that Snitzer had drafted.

178.    In 1997, Snitzer advised Kinsella and Diamond that he wished to establish a "Rabbi's Trust" for Michael Kennedy as an incentive to keep him as the project's construction

AA84

manager. A "Rabbi's Trust" is a means of setting aside compensation for a key employee to be paid at a future date. Snitzer, however, never presented a draft "Rabbi's Trust" to Kinsella or Diamond for review or approval.

179. The deferred compensation agreements that were drafted are not "Rabbi's Trusts" and were never authorized by Kinsella or Diamond.

180. Snitzer never obtained the approval of a majority of River Village's members before entering into a deferred compensation agreement of any type with David Kennedy.

181. Snitzer never obtained the approval of a majority of River Village's members before entering into a deferred compensation agreement of any type with Andrew Tack.

182. Snitzer never disclosed to John Kinsella or Sid Diamond the draft deferred compensation agreements prepared for Michael Kennedy, David Kennedy, or Andrew Tack.

183. In addition, without counsel's knowledge, Snitzer modified the draft deferred compensation agreements prepared by counsel to be far more favorable to Michael Kennedy, David Kennedy, and Andrew Tack and far less favorable to River Village.

184. Snitzer unilaterally and without approval re-wrote the deferred compensation agreements drafted for Michael Kennedy, David Kennedy, and Andrew Tack to add one-sided terms at River Village's expense.

185. For example, Snitzer rewrote a provision of those deferred compensation agreements, changing the phrase "Neither the Company nor any individual acting as an employee or agent of the Company shall be liable . . ." to "The Company shall be liable . . . ."

186. In May 2005, with the Project still shut down by the City of Chicago, and Snitzer, Kinsella, and Diamond enmeshed in litigation, Snitzer directed the custodian of the purported deferred compensation account to liquidate its holdings.

{5618 OBJ A0191530.DOC}

187. On June 22, 2005—the day before the Illinois Circuit Court amended and reissued its TRO removing Snitzer from management of the Debtors—all of the holdings in the account were liquidated.

188. On June 23, 2005—the same day that the Court entered its final order removing Snitzer from management of the Debtors—the broker holding the funds wired $395,000 to a bank account controlled by Michael Kennedy.

189. Snitzer never informed Kinsella or Diamond or the Illinois Court that he was transferring almost $400,000 to Michael Kennedy.

190. Snitzer never obtained the consent of a majority of Debtors' members to make this $395,000 transaction.

191. Snitzer had no authority to transfer the $395,000 to Michael Kennedy in June 2005.

192. Had Kinsella and Diamond known that Snitzer intended to transfer $395,000 to Michael Kennedy, they could have stopped the transfer before it occurred.

193. In June 2005, the extent of Snitzer's misconduct and the construction problems at Bridgeport Village were just becoming known.

194. As construction supervisor, Michael Kennedy shared responsibility with Snitzer for the breaches of PDO-769, the Chicago Building Code, and other construction issues.

195. Michael Kennedy shared responsibility with Snitzer for the losses incurred from shoddy construction practices at Bridgeport Village.

196. River Village therefore had defenses against Michael Kennedy with respect to any claim under the deferred compensation agreement.

AA85

AA86

197. Snitzer, as River Village's fiduciary, is liable to River Village for the return of the $395,000 transferred without authorization to Michael Kennedy.

198. Snitzer similarly caused River Village to enter into deferred compensation agreements with David Kennedy and Andrew Tack.

199. The deferred compensation agreements with David Kennedy and Andrew Tack were not authorized by Kinsella or Diamond.

200. David Kennedy and Andrew Tack both have made claims against River Village arising from the unauthorized deferred compensation agreements.

201. David Kennedy has claimed a right to penalties amounting to $500 per day based on an unenforceable penalty clause that Snitzer unilaterally added to David Kennedy's deferred compensation agreement, and Debtors now must contest this claim.

202. Andrew Tack commenced litigation against River Village, and River Village was forced to settle with Andrew Tack in the amount of $80,000.

203. Snitzer, as River Village's fiduciary, is liable to River Village for the amount paid to Andrew Tack and for any amount to be paid to David Kennedy, as well as for the amounts that Debtors must spend to address these claims originating from the unauthorized deferred compensation agreements.

i.    **Snitzer's Interference with the Project Following his Removal as Manager.**

204. Snitzer has continued to interfere with the Project even after the Illinois Court removed him as manager in June 2005.

205. As one example, in late 2005 and again in late 2006, Snitzer interfered with Debtors' ability to settle environmental litigation—litigation that Snitzer had previously initiated

AA87

without authorization. In one instance, Snitzer commenced new lawsuits in his personal capacity against the defendant in one of those cases in order to interfere with the settlement.

206.    Snitzer's interference required Debtors to seek further relief from the Illinois Circuit Court and resulted in an order forbidding further interference from Snitzer and stating that there was a likelihood of success on the merits for a claim of breach of fiduciary duty against Snitzer.

207.    In the Circuit Court's January 10, 2007 order, the court held that "Kinsella and Diamond have established a fair question of a likelihood of success on the merits that Thomas Snitzer has breached his fiduciary duties to the Kinsella and Diamond interests by asserting environmental claims and lawsuits while the Venture was seeking to settle similar litigation against the same party."

208.    In the transcript of the court's findings, which was incorporated into the court's January 10, 2007 order, the court found that:

Mr. Snitzer had an equal vote with Kinsella and Diamond in terms of litigation matters concerning Peoples.... He chose not to do so. He chose to take his own action by filing lawsuits without the knowledge of Kinsella and Diamond, without the knowledge of the lawyer hired to negotiate with Peoples. And these lawsuits, in my opinion, had a bearing on the ability of the venture to negotiate and finalize a settlement with Peoples. As such, it is my opinion that Mr. Snitzer violated his fiduciary duties.

209.    This and other tactics on Snitzer's part unnecessarily delayed the sale of the remaining undeveloped parcels of land owned by the Debtors until their value had diminished.

210.    The delay and the costs of combating Snitzer's interference, as well as Snitzer's numerous other breaches of his fiduciary and contractual duties, forced the Bridgeport Village Project into Chapter 11 bankruptcy.

AA88

## COUNT I
### (Breach of Fiduciary Duty)

211.    Debtors incorporate the allegations in Paragraph 1 through 210 of the Counterclaim as though fully set forth herein.

212.    At all relevant times, Snitzer acted as an agent of Debtor JS II.

213.    At all relevant times, Snitzer held the position of manager and member of Debtors River Village and River Village West under the River Village and River Village West Operating Agreements.

214.    At all relevant times, Snitzer owed fiduciary duties to JS II, River Village and River Village West.

215.    Snitzer was required to discharge his fiduciary duties consistent with the obligation of good faith and fair dealing.

216.    As set forth above, Snitzer breached his fiduciary duties to JS II, River Village, and River Village West by:

a.    engaging in insider deals to benefit his relatives, family friends, and business associates;

b.    making major decisions without the consent of a majority of Debtor members;

c.    engaging in intentional, reckless, and grossly negligent misconduct in constructing Bridgeport Village and in managing its affairs;

d.    failing to exercise ordinary prudence in discharging his duties on behalf of JS II, River Village, and River Village West;

e.    failing to discharge his duties as manager in good faith;

{5618 OBJ A0191530.DOC}

AA89

f.     Failing to manage River Village and River Village West in accordance with all applicable laws, regulations and ordinances;

g.     Failing to meet with City of Chicago officials regarding the numerous violations of the PDO, applicable permits, and/or the City of Chicago Building Code;

h.     interfering with the Bridgeport Village Project and the sale of the undeveloped properties following his removal from management by the Illinois Court; and

i.     forcing the Bridgeport Village Project into bankruptcy.

217.    As a direct and proximate cause of Snitzer's breaches of his fiduciary duties as set forth above, Debtors have incurred damages in excess of $3 million spent or incurred to remedy the harm caused to Bridgeport Village and Debtors by Snitzer's misconduct.

218.    Snitzer's conduct was egregious and justifies an award of punitive damages.

WHEREFORE, JS II, River Village, and River Village West respectfully request that this Court (1) enter judgment in their favor and against Snitzer for breach of fiduciary duty; (2) award damages in an amount to be proved at trial, plus prejudgment interest and costs; (3) award punitive damages against Snitzer in a just amount; (4) award attorney fees; and order all further relief appropriate in the circumstances.

## COUNT II
### (Breach of Contract)

219.    Debtors incorporate the allegations in Paragraphs 1 through 210 of the Counterclaim as though fully set forth herein.

220.    At all relevant times, Snitzer acted as a contractual agent of Debtor JS II.

{5618 OBJ A0191530.DOC}

AA90

221.     At all relevant times, Snitzer held the position of manager and member of Debtors River Village and River Village West under the River Village and River Village West Operating Agreements.

222.     Snitzer agreed to perform his duties as agent and manager in good faith, in a manner he reasonably believed to be in the best interests of the companies, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

223.     Debtors have fully performed their obligations to Snitzer under the terms of the River Village and River Village West Operating Agreements.

224.     As set forth above, Snitzer has breached his contractual duties to JS II, River Village, and River Village West by:

a.     Making major decisions without the consent of a majority of Debtor members;

b.     engaging in insider deals to benefit his relatives, family friends, and business associates;

c.     engaging in intentional, reckless, and grossly negligent misconduct in constructing Bridgeport Village and in managing its affairs;

d.     failing to exercise ordinary prudence in discharging his duties on behalf of JS II, River Village, and River Village West;

e.     failing to discharge his duties as manager in good faith;

f.     failing to manage River Village and River Village West in accordance with all applicable laws, regulations and ordinances; and

g.    failing to meet with City of Chicago officials regarding the numerous violations of the PDO, applicable permits, and/or the City of Chicago Building Code; and

h.    forcing the Bridgeport Village Project into bankruptcy.

225.    As a direct and reasonably foreseeable consequential result of Snitzer's breaches of his contractual duties, Debtors have incurred damages in excess of $3 million spent or incurred to remedy the harm caused to Bridgeport Village and Debtors by Snitzer's misconduct.

WHEREFORE, JS II, River Village, and River Village West, respectfully request that this Court (1) enter judgment in their favor and against Snitzer for breach of contract; (2) award damages in an amount to be proved at trial, plus prejudgment interest and costs; (3) award attorney fees; and order all further relief appropriate in the circumstances.

## COUNT III
(Equitable Subordination of Snitzer and SFLLC Interests)

226.    Debtors incorporate the allegations in Paragraph 1 through 210 of the Counterclaim as though fully set forth herein.

227.    As set forth above, Snitzer engaged in misconduct that injured the interests of Debtors and Debtors' other equity interest holders.

228.    On account of Snitzer's inequitable conduct, any equity interest held by Snitzer should be subordinated to all other equity interest holders pursuant to section 510(c)(1) of the Bankruptcy Code.

229.    Further, as SFLLC's manager, Snitzer dominated and controlled SFLLC such that SFLLC operated as Snitzer's alter ego, with such unity of interest and ownership that the separate personalities of SFLLC and Snitzer no longer exist.

{5618 OBJ A019153O.DOC}

AA91

230.    The observance of a separate existence between SFLLC and Snitzer would, under

the circumstances, sanction an injustice.

231.    Accordingly, any equity interest held by SFLLC should be subordinated to all

other equity interest holders pursuant to section 510(c)(1) of the Bankruptcy Code.

WHEREFORE, JS II, River Village, and River Village West, respectfully request that

this Court (1) enter judgment in their favor and against Snitzer and SFLLC; (2) order that any

equity interest held by Snitzer and SFLLC are to be subordinated to the interests of all other

equity interest holders; and (3) award attorney fees; and order all further relief appropriate in the

circumstances.

Respectfully submitted,

JS II, L.L.C., et al.,

By:    /s/ Steven B. Towbin
       ────────────────────────
       One of their attorneys

Dated: November 1, 2007

Steven B. Towbin
Peter J. Roberts
Janice A. Alwin
Shaw Gussis Fishman Glantz
Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL 60610
P: (312) 276-1333
F: (312) 275-0569

*Bankruptcy Counsel to Debtors*

Michael I. Rothstein
Henry H. Hess
Daniel I. Konieczny
Tabet DiVito & Rothstein LLC
209 South LaSalle Street, 7th Floor
Chicago, IL 60604
P: (312) 762-9450
F: (312) 762-9451

*Special Litigation Counsel to Debtors*

AA92

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re: | ( ) Chapter 11 |
| | ( ) |
| *JS II, L.L.C., et al.,* | ( ) Case No. 07-03856 |
| | ( ) (Jointly Administered) |
| Debtors | ( ) |
| | ( ) Hon. Jacqueline P. Cox |

**THOMAS A. SNITZER AND SNITZER FAMILY LLC'S**
**ANSWER AND AFFIRMATIVE DEFENSES TO DEBTORS' COUNTERCLAIM, AND**
**THIRD PARTY COMPLAINT FOR EQUITABLE SUBORDINATION**

**ANSWER TO COUNTERCLAIM**

Thomas A. Snitzer ("Snitzer") and Snitzer Family LLC ("SFLLC"), for their Answer to

Debtors' Counterclaim Against Thomas Snitzer and Snitzer Family LLC, state as follows:[1]

*Counterclaim ¶8.*

*This action involves the intentional, fraudulent and grossly negligent conduct of Counterdefendant Thomas Snitzer ("Snitzer"), the Debtors' former manager and/or agent, whose egregious misconduct, breaches of fiduciary duties, violations of contractual obligations, and waste have single handedly brought a lucrative real estate development project to financial ruin.*

**ANSWER:**    Denied, except Snitzer admits that he was manager of Debtors until on or

about June 23, 2005, when the Circuit Court removed him from that position and replaced him

with Kinsella and Diamond.

*Counterclaim ¶9.*

*This Court has core jurisdiction to hear and determine this Counterclaim pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), 157(b)(2)(A), 157(b)(2)(B), 157(b)(2)(C), and 157(b)(2)(O).*

---

[1]    Debtors' Counterclaim begins with numbered paragraph 8. Paragraphs 1-7 set
forth their response to Snitzer's Proof of Interest.

AA94

**ANSWER:**   Paragraph 9 alleges legal conclusions to which no response is required.

*Counterclaim ¶10.*

*Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) as this Counterclaim is brought in the Debtors' chapter 11 cases that are pending in this judicial district.*

**ANSWER:**   Snitzer does not contest venue.

*Counterclaim ¶11.*

*Debtor JS II is an Illinois limited liability company and the owner of a major residential real estate project along the Chicago River in the Bridgeport neighborhood of Chicago known as Bridgeport Village, as well as other nearby parcels acquired for future development.*

**ANSWER:**   Denied, except Snitzer admits that JS II is an Illinois limited liability company and that at certain times it held legal title to real estate in Bridgeport as a nominee for River Village I, LLC ("River Village") or River Village West, LLC ("River Village West").

*Counterclaim ¶12.*

*Debtor River Village is an Illinois limited liability company that acted in developing Bridgeport Village.*

**ANSWER:**   Admitted.  Answer further, Snitzer states that River Village was the operating company and real party in interest with respect to the development of Bridgeport Village and sale of homes to purchasers.

-2-

-3-

**Counterclaim ¶13.**

*Debtor River Village West is an Illinois limited liability company that acted as the rental agent for the parcels acquired by JS II for future development.*

**ANSWER:**    Denied, except Snitzer admits that River Village West is an Illinois limited liability company that acquired certain parcels for future development.  JS II acted as a mere nominee for the benefit of River Village West regarding such acquisitions.

**Counterclaim ¶14.**

*Counterdefendant Snitzer is an Illinois resident. He is a member of River Village and River Village West, and was a contingent member of JS II with a right to 50 percent of its net profits after the return of capital to its investing members.*

**ANSWER:**    Denied, except Snitzer admits that he is an Illinois resident, is a member of River Village and River Village West, that he is a full member of JS II, in which he and SFLLC jointly own a 50% interest, and that he is entitled to 50% of JS II's net profits.

**Counterclaim ¶15.**

*Counterdefendant Snitzer Family L.L.C. ("SFLLC") is an Illinois limited liability company. It is a member of River Village and River Village West. Snitzer is the managing member of SFLLC.*

**ANSWER:**    Admitted.

**Counterclaim ¶16.**

*Snitzer served as the sole manager of River Village and River Village West, and as the agent of JS II until June 2005.*

**ANSWER:**    Denied, except Snitzer admits that he served as the sole manager of River Village and River Village West until June 2005, and that he served as an agent for JS II with

respect to certain matters until June 2005. Answering further, Snitzer states that he also served
as manager of JS II prior to June 2005.

Counterclaim ¶17.

*In June 2005, the Circuit Court of Cook County, Illinois, removed Snitzer
from his positions as the Debtors' manager and agent in an emergency
proceeding, finding that Snitzer's conduct had placed the physical and financial
integrity of the Project in jeopardy. Thomas Snitzer, et al. v. Kinsella Investments,
LLC, et al., Circuit Court of Cook County, Illinois, No. 05 CH 07598.*

ANSWER: Snitzer admits the allegations of paragraph 17 to the extent they are
consistent with the June 23, 2005 Circuit Court TRO, and otherwise denies the allegations and
respectfully refers the Court to the TRO for the contents thereof.

Counterclaim ¶18.

*The Debtors were formed to acquire, develop, and sell various real estate
parcels along the Chicago River in the Bridgeport neighborhood of Chicago.*

ANSWER: Admitted with respect to River Village and River Village West, but denied
with respect to JS II. JS II was formed in connection with a prior development, Dearborn
Village, and functioned as a nominee to hold title to real estate parcels for the benefit of the
actual development entities.

Counterclaim ¶19.

*In a series of transactions, Debtors acquired approximately 31 acres of
industrial property in the Bridgeport neighborhood of Chicago.*

**ANSWER:** Admitted, except that JS II's role in the acquisitions was as a mere nominee, and River Village West acquired certain parcels and River Village acquired certain other parcels that were developed as Bridgeport Village.

*Counterclaim ¶20.*

*Debtors intended to convert the acquired parcels to residential use and to develop, construct and sell residences to the public.*

**ANSWER:** Admitted, except deny that JS II was intended to have any role other than as a mere nominee to hold title to real estate for the benefit of River Village or River Village West.

*Counterclaim ¶21.*

*Debtors intended to develop the overall project in several phases, with the total build-out and sale of residences to be over 400 residents.*

**ANSWER:** Admitted, except that the intent was to develop 300 to 400 residences, JS II's role was a mere nominee, and River Village's role was limited to Bridgeport Village and River Village West was limited to other parcels.

*Counterclaim ¶22.*

*Phase I of the project involved approximately 11 acres located near 33rd Street and Racine in Chicago, Illinois.*

**ANSWER:** Admitted.

-5-

AA97

AA98

*Counterclaim ¶23.*

*As approved by the Department of Planning and Development, Phase I of the project consisted of the development of approximately 115 single-family homes.*

**ANSWER:**    Admitted, except the approval was initially for 116 homes.

*Counterclaim ¶24.*

*The Debtors refer to Phase I of the project as "Bridgeport Village" or the "Bridgeport Village Project" or "BPV."*

**ANSWER:**    Admitted.

*Counterclaim ¶25.*

*Bridgeport Village is the only phase of the project that the Debtors actually developed.*

**ANSWER:**    Admitted as to River Village, and otherwise denied.

*Counterclaim ¶26.*

*The remaining parcels purchased by the Debtors, totaling approximately 20 acres, have not yet been rezoned for residential use and have not yet otherwise been developed.*

**ANSWER:**    Admitted as to River Village West, and denied as to the other Debtors.

*Counterclaim ¶27.*

*Snitzer served as JS II's managing agent from September 1997 until June 2005.*

-6-

**ANSWER:** Denied, except admit that Snitzer served as a managing agent of JS II for certain purposes during the alleged time period, with the knowledge and consent of Kinsella and Diamond.

*Counterclaim ¶28.*

*Snitzer served as the sole manager of River Village from June 1998 until June 2005, and as the sole manager of River Village West from January 2002 until June 2005.*

**ANSWER:** Admitted.

*Counterclaim ¶29.*

*At all times while Snitzer served as the Debtors' agent and/or manager, he owed the Debtors contractual and fiduciary duties.*

**ANSWER:** Paragraph 29 alleges legal conclusions to which no response is required.

*Counterclaim ¶30.*

*The Bridgeport Village Project, with 115 intended homes, was Chicago's largest single-family-home development project in recent years.*

**ANSWER:** Admitted, upon information and belief.

*Counterclaim ¶31.*

*As set forth in the following paragraphs, Snitzer breached his contractual and fiduciary duties in many material respects, causing great harm to the Bridgeport Village Project entrusted to his care, and causing the Debtors to incur expenses in excess of $3 million to remedy Snitzer's violations of duty.*

**ANSWER:** Denied.

-7-

AA100

**Counterclaim ¶32.**

Snitzer concealed these breaches from the Debtors' non-managing members, John Kinsella and Sid Diamond, and the ensuing delay in remediating the harm to the Bridgeport Village Project compounded BPV's problems and ultimately led to its financial ruin and declaration of bankruptcy.

**ANSWER:** Denied.

**Counterclaim ¶33.**

Snitzer built or started construction on approximately 90 homes at Bridgeport Village.

**ANSWER:** Denied, except that Snitzer admits that while he was manager of River Village, that entity entered into contracts with architectural and construction firms that completed or started construction on about 90 homes at Bridgeport Village.

**Counterclaim ¶34.**

All of the homes built or started by Snitzer violated one or more of the following:

    a.    *The Chicago Zoning Code governing Planned Developments (Chi. Zoning Code §§ 17-8-0101 through 17-8-0912);*

    b.    *Residential-Waterway Planned Development No. 769, enacted by the Chicago City Council on December 13, 2000, and amended on October 31, 2001 ("PDO-769");*

    c.    *The City of Chicago Building Code;*

    d.    *Regulations of the City of Chicago Department of Construction and Permits;*

    e.    *Permits issued by the City of Chicago Department of Construction and Permits;*

    f.    *Usual and customary construction practices and standards.*

-8-

-6-

**ANSWER:**    Paragraph 34 alleges legal conclusions to which no answer is required. If and to the extent an answer is required, Snitzer denies the allegations.

*Counterclaim ¶35.*

*Snitzer was knowledgeable regarding the specific requirements of PDO-769, both as originally enacted and as amended.*

**ANSWER:**    Denied, except Snitzer admits that he had general knowledge concerning the requirements of PDO-769, and, answering further, states that he caused River Village to retain architectural, land planning and construction personnel who were familiar with the specific requirements of the PDO and responsible for implementation.

*Counterclaim ¶36.*

*Notwithstanding his knowledge regarding the specific requirements of PDO-769, Snitzer violated PDO-769 in material respects.*

**ANSWER:**    Denied.

*Counterclaim ¶37.*

*Snitzer was either knowledgeable of the provisions of the Chicago Building Code or had such requirements explained to him.*

**ANSWER:**    Denied, except that Snitzer admits that he had some knowledge concerning some of the provisions of the Chicago Building Code, and that he relied on the architects, construction firms and other professional personnel hired by River Village regarding any such applicable provisions

AA101

AA102

*Counterclaim ¶38.*
*Snitzer was either knowledgeable of usual and customary construction practices and standards or had such requirements explained to him.*

ANSWER: Denied, except that Snitzer admits that he had some knowledge concerning some usual and customary construction practices and standards, and that he relied on the architects, construction firms and other professional personnel hired by River Village regarding any such applicable practices and standards.

*Counterclaim ¶39.*
*As set forth below, Snitzer knowingly violated PDO-769, the Chicago Building Code, and usual and customary construction standards.*

ANSWER: Denied.

*Counterclaim ¶40.*
*Snitzer was directly responsible for the ordinance, code, permit, and construction standard violations at Bridgeport Village.*

ANSWER: Denied.

*Counterclaim ¶41.*
*During construction of Bridgeport Village, Snitzer rarely visited the construction site in person more than once or twice weekly, often spending only a few hours at the site.*

ANSWER: Denied, except Snitzer admits that during construction of Bridgeport Village he visited the site approximately once or twice weekly. Answering further, Snitzer states that while he was manager of River Village, that entity entered into contracts with architectural

-10-

AA103

and construction firms that were principally responsible for the day-to-day construction activities,

and he had no duty to visit the construction site more than once or twice weekly.

*Counterclaim ¶42.*
*Snitzer built BPV homes without registering with the City of Chicago as*
*the general contractor and without using a general contractor who was licensed*
*by the City of Chicago.*

**ANSWER:**    Denied, except Snitzer admits that he did not register with the City as a

general contractor and that he had no duty to do so since he is not a contractor subject to the

ordinance.  Answering further, Snitzer states that the ordinance requiring such registration

(Chicago Mun. Code Ch. 4-36) became effective in or about March 2004; that, as a matter of

law, the ordinance operated prospectively only and did not apply to River Village's contractor

with respect to Bridgeport Village; that (although there was no duty to do so) in 2005 Snitzer

sought to procure such a license in response to the City's unlawful demands but Kinsella and

Diamond refused to contribute capital that was needed to pay for the bond required for such a

license; and that, after Snitzer was removed in June 2005, Kinsella and Diamond hired a

contractor who was not licensed by the City and the City permitted that situation to persist for

many months without complaint.

*Counterclaim ¶43.*
*Upon information and belief, Snitzer built BPV homes using*
*subcontractors who were not licensed by the City of Chicago.*

**ANSWER:**    Denied, except Snitzer lacks knowledge or information sufficient to form a

belief as to the truth of whether subcontractors were not licensed by the City.

-11-

AA104

*Counterclaim ¶ 44.*

*Snitzer did not ensure that an architect or engineer oversaw the construction of Bridgeport Village.*

**ANSWER:** Denied, except Snitzer admits that Michael Kennedy was hired as project superintendent to oversee the construction and that he consulted with architect Robert Kirk and land planner Duane Linden on an as needed basis, an organizational structure that was followed on several prior, profitable projects Snitzer was involved in with Kinsella and Diamond (six with Kinsella and four with Diamond), with their knowledge and consent.

*Counterclaim ¶ 45.*

*Snitzer built BPV homes without proper building permits.*

**ANSWER:** Denied.

*Counterclaim ¶ 46.*

*Snitzer built BPV homes without providing contractors or subcontractors with detailed architectural drawings.*

**ANSWER:** Denied.

*Counterclaim ¶ 47.*

*Snitzer built BPV homes without providing contractors or subcontractors with detailed plans.*

**ANSWER:** Denied.

*Counterclaim ¶ 48.*

*Snitzer built BPV homes without providing contractors or subcontractors with detailed specifications.*

-12-

AA105

ANSWER: Denied.

Counterclaim ¶49.
*Snitzer built BPV homes that varied from architectural plans submitted with permit applications.*

ANSWER: Denied, except Snitzer admits that, pursuant to an agreement with the City, when certain design or field changes were made after permit issuance and during construction, the changes were to be reflected later in revised plans that would be submitted to the City to account for the changes, and that City inspectors, who inspected homes during construction, observed changes without objection. Such changes were beneficial to River Village because they allowed for construction and the sales of homes to be completed on a more rapid basis, at higher sale prices, thereby generating revenue and paying down bank debt more quickly.

Counterclaim ¶50.
*Snitzer changed BPV plans and specifications without the review or approval of a licensed architect or engineer.*

ANSWER: Denied.

Counterclaim ¶51.
*Snitzer built BPV homes with lateral load shear walls moved from their designed locations.*

ANSWER: Denied, except Snitzer admits that River Village's land planner recommended moving one interior wall in certain homes approximately 18 inches, which change

-13-

was reviewed and approved by the project superintendent and the architect (who incorporated the new layout in marketing drawings for the project).

Counterclaim ¶52.

*Snitzer built BPV homes that exceeded applicable height restrictions.*

ANSWER:     Denied.

Counterclaim ¶53.

*Snitzer built BPV porches with combustible materials without allowing sufficient distances from adjoining structures.*

ANSWER:     Denied.

Counterclaim ¶54.

*Snitzer built BPV homes with third-floor square footages exceeding that permitted under fire safety regulations.*

ANSWER:     Denied.

Counterclaim ¶55.

*Snitzer built third floors on BPV homes without a required second means of egress.*

ANSWER:     Denied, except Snitzer admits that the City later asserted this issue with respect to homes built by River Village, which was resolved between River Village and the City via an agreement to install "JOMY ladders," a solution that was preferred by the majority of homeowners.

-14-

AA107

**Counterclaim ¶56.**

*Snitzer built BPV homes without the required rating of fire insulation on exterior walls.*

ANSWER: Denied. Answering further, Snitzer states that tests showed that the walls performed to nearly double the standard required by the Code.

**Counterclaim ¶57.**

*Snitzer built BPV homes with unpermitted basements.*

ANSWER: Denied, except, upon information and belief, the basement issue was asserted by the City and later resolved via administrative relief.

**Counterclaim ¶58.**

*Snitzer built unpermitted decks on BPV garages.*

ANSWER: Denied, except upon information and belief, this issue that was asserted by the City regarding certain homes was resolved administratively..

**Counterclaim ¶59.**

*Snitzer built BPV homes that violated side-yard setback requirements.*

ANSWER: Denied, except upon information and belief, this issue that was asserted by the City regarding certain homes was resolved administratively.

**Counterclaim ¶60.**

*Snitzer built BPV homes or garages that encroached on adjacent BPV lots.*

ANSWER: Denied.

-15-

AA108

-16-

*Counterclaim ¶61.*

*Snitzer built a BPV home or garage that encroached on property owned by a neighboring landowner.*

**ANSWER:** Denied.

*Counterclaim ¶62.*

*Snitzer built a home that encroached on the river walk setback required by the City of Chicago.*

**ANSWER:** Denied.

*Counterclaim ¶63.*

*The City of Chicago found multiple violations in all of the approximately 90 homes built by Snitzer, all or most of which had been sold and almost all of which were occupied.*

**ANSWER:** Denied, except Snitzer admits that the City of Chicago alleged certain violations in completed and incomplete homes, most of which had been sold and were occupied. Answering further, Snitzer states that agents of the City had been familiar with the construction throughout the process and took no action to prevent the sales or occupancy of homes that it later cited as having certain code or permit violations, the City has never required any purchaser to vacate any home due to any alleged health or safety violation, and many of the putative violations were resolved via administrative relief. Snitzer refers the Court to his federal civil rights complaint for facts concerning the motivations of City officials for citing the alleged violations. See Snitzer v. Degnan, 07 C 0339 (N.D. Ill.).

**Counterclaim ¶64.**

*The cost of remedying Snitzer's violations of PDO-769, the Chicago Building Code, and usual and customary construction practices and standards has been immense.*

**ANSWER:**    Denied.

**Counterclaim ¶65.**

*The Debtors have had to expend tremendous sums to complete punch lists, remedy defective construction, replace windows, repair roofs and showers, and demolish foundations built over lot and property lines.*

**ANSWER:**    Denied, except Snitzer is without knowledge or information sufficient to form a belief as to the extent of legitimate warranty or punch-list work reasonably performed by Debtors and the amount spent on such work.

**Counterclaim ¶66.**

*The construction cost alone of remedying the lateral load shear walls is expected to exceed $1 million for the entire project.*

**ANSWER:**    Snitzer is without knowledge or information sufficient to form a belief as to the truth of the prediction in paragraph 66, but denies that the contemplated remedy is required or reasonable or that, if it is, Snitzer is liable for any portion of it.

**Counterclaim ¶67.**

*In addition, Debtors have incurred hundreds of thousands of dollars in professional fees to resolve permit and technical violations and to address litigation which Snitzer entered into with third parties without the consent of a majority of the Debtors' members.*

-17-

AA110

**ANSWER:** Snitzer is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 67. Answering further, Snitzer states that to the extent funds were spent to secure administrative relief from the City via the submission of revised as-built drawings, the costs of such relief are far outweighed by the benefits River Village realized from the as-built changes, which resulted in the more rapid sale of homes at substantially higher prices than would otherwise have been the case.

*Counterclaim ¶ 68.*

*Debtors' damages are a direct and proximate result of Snitzer's intentional violation of PDO-769, the Chicago Building Code, usual and customary building standards, and fiduciary duties.*

**ANSWER:** Denied.

*Counterclaim ¶ 69.*

*In May 2005, Snitzer sued for an injunction against John Kinsella and Sid Diamond, the members and principals of JS II and the other members of River Village and River Village West, claiming that they were unlawfully interfering with his management of the Bridgeport Village Project.*

**ANSWER:** Admitted to the extent the allegations are consistent with Snitzer's chancery complaint, and otherwise deny the allegations and deny the implication that Snitzer was not a member of JS II. Answering further, Snitzer states that a principal reason he sued Kinsella and Diamond was that they unlawfully and in violation of their fiduciary duties purported to assign certain commercial properties owned by River Village West to a limited liability company in which they were the sole members. Having no defense to that patently unlawful purported assignment, they agreed to unwind the assignment.

-18-

AA111

*Counterclaim ¶70.*

*Kinsella and Diamond counterclaimed against Snitzer, seeking his removal as a manager and agent to the Debtors.*

**ANSWER:** Admitted.

*Counterclaim ¶71.*

*In June 2005, the Circuit Court of Cook County, Illinois (Nowicki, J.) denied Snitzer's request for a temporary restraining order against Kinsella and Diamond. The Illinois Court then granted the request from Kinsella and Diamond for a temporary restraining order against Snitzer and enjoined him from acting as the Debtors' manager and agent.*

**ANSWER:** Admitted to the extent the allegations are consistent with Judge Nowicki's rulings, and otherwise the allegations are denied, and Snitzer refers the Court to Judge Nowicki's rulings for the contents thereof. Answering further, Snitzer states that Kinsella and Diamond voluntarily agreed to rescind their purported transfer of certain properties from the limited liability company owned solely by them, thereby mooting Snitzer's TRO request on that issue.

*Counterclaim ¶72.*

*The Illinois court expressly held that Snitzer's conduct had the potential to place the physical and financial integrity of the Project in jeopardy. Thomas Snitzer, et al. v. Kinsella Investments, L.P., et al., Circuit Court of Cook County, Illinois, No. 05 CH 07598.*

**ANSWER:** Admitted to the extent the allegations are consistent with Judge Nowicki's rulings, and otherwise the allegations are denied, and Snitzer respectfully refers the Court to Judge Nowicki's rulings for the contents thereof. Snitzer further denies that Judge Nowicki's ruling, which was based on the pleadings and rendered without an evidentiary hearing, was correct or that the evidence supports the ruling.

-19-

AA112

*Counterclaim ¶73.*

*The effect of the Illinois Court's order was to remove Snitzer from management of the Bridgeport Village Project.*

ANSWER:    Admitted to the extent the allegations are consistent with Judge Nowicki's rulings, and otherwise the allegations are denied, and Snitzer respectfully refers the Court to Judge Nowicki's rulings for the contents thereof.

*Counterclaim ¶74.*

*The Illinois Court appointed John Kinsella and Sid Diamond to manage the Bridgeport Village Project instead of Snitzer.*

ANSWER:    Admitted.

*Counterclaim ¶75.*

*When Debtors' new management took over the Bridgeport Village Project, they discovered extensive outstanding punch list and warranty claims from the Bridgeport Village home purchasers.*

ANSWER:    Denied, except Snitzer admits that, as in any incomplete construction project, particularly one as large as Bridgeport Village, punch list and warranty items necessarily existed at that time.

*Counterclaim ¶76.*

*Snitzer built BPV homes with construction defects.*

-20-

AA113

**ANSWER:** Denied, except that Snitzer admits that, as in any construction project, particularly one as large as Bridgeport Village, the homes built by River Village's contractors had punch list or warranty items to correct.

*Counterclaim ¶77.*

*Snitzer routinely ignored the homeowners' punch lists and warranty claims.*

**ANSWER:** Denied.

*Counterclaim ¶78.*

*These punch list and warranty claims resulted directly from Snitzer's failure to follow proper and customary construction practices.*

**ANSWER:** Denied.

*Counterclaim ¶79.*

*Under Snitzer's watch, Snitzer's construction personnel attempted to intimidate the homeowners from insisting that their homes be completed or repaired.*

**ANSWER:** Denied.

*Counterclaim ¶80.*

*Correction of Snitzer's unattended punch list and warranty claims has taken 28 months and cost the Debtors over $2.5 million to date.*

**ANSWER:** Denied, except Snitzer lacks knowledge or information sufficient to form a belief as to the truth of the allegation of how much Debtors have spent to address any legitimate punch list or warranty claims. Answering further, Snitzer states that an expenditure of $2.5

-21-

AA114

million to address such claims, as well as a 28 month period to do so, would be unreasonable and excessive, and would demonstrate gross mismanagement by Messrs. Kinsella and Diamond.

*Counterclaim ¶81.*

*In 2003, a disgruntled subcontractor began publicly challenging Snitzer's construction practices at Bridgeport Village.*

**ANSWER:**    Denied, except Snitzer admits that a disgruntled subcontractor, Brickcraft, began publicly challenging construction practices at Bridgeport Village.

*Counterclaim ¶82.*

*In response, Snitzer commenced a plan and scheme to hide his many violations of Chicago ordinances, construction codes, permits, and construction standards from Debtors, the investors, the Debtors' lender, and the City of Chicago.*

**ANSWER:**    Denied.

*Counterclaim ¶83.*

*Specifically, Snitzer fraudulently misrepresented to the Debtors (through their members, Kinsella and Diamond) that no material code, permit, or construction problems existed at Bridgeport Village while he continued to build another 75 homes disregarding the warnings.*

**ANSWER:**    Denied.

*Counterclaim ¶84.*

*Snitzer also fraudulently misrepresented to the Debtors' lender and to the City of Chicago that construction plans approved by the City were used to build the BPV homes when in fact Snitzer built the BPV homes without plans or with plans that varied materially from those approved by the City.*

**ANSWER:**    Denied.

-22-

AA115

*Counterclaim ¶85.*

To divert attention from the extensive violations at Bridgeport Village, and to attempt to rebut the claims of the disgruntled former subcontractor, Snitzer hired a respected construction engineer to opine on the BPV plans approved by the City of Chicago.

**ANSWER:**    Denied, except that Snitzer admits that he caused River Village to retain a respected construction engineer to review and opine concerning the engineering report submitted by the disgruntled subcontractor, Brickcraft, who had based his opinion on the BPV plans.

*Counterclaim ¶86.*

Snitzer, however, did not require the engineer to visit the site or to inspect the homes as built and never disclosed to the engineer that the as-built homes varied materially from the approved plans.

**ANSWER:**    Denied. Answering further, Snitzer states that he did not direct the engineer how to perform his job, and did not withhold any information from the engineer; further, upon information and belief, the architect, who was aware of variations between the as-built homes and the approved plans, stated that the homes were sound and had retained an engineer who confirmed that opinion.

*Counterclaim ¶87.*

Had Snitzer properly investigated the claims of construction deficiencies when first made, the Debtors would have discovered the deficiencies, including that the lateral load shear wall did not meet code in mid-2003.

**ANSWER:**    Denied. Answering further, Snitzer states that he reasonably relied on the opinion of the project architect on this issue.

-23-

AA116

**Counterclaim ¶88.**

*Snitzer's false denials and hindrance of any investigation of as-built homes resulted in up to 75 additional homes being built with misplaced lateral load shear walls and other deficiencies.*

**ANSWER:**    Denied.

**Counterclaim ¶89.**

*Debtors have incurred and will continue to incur substantial costs to remedy the misplaced lateral load shear wall in the Bridgeport Village homes, all of which was proximately caused by Snitzer's building homes without architectural and City of Chicago review and approval.*

**ANSWER:**    Denied, except Snitzer admits that Debtors are incurring costs to address

the alleged shear wall problem, and that they have installed only a few "gates" to date despite

being aware of the alleged problem since 2005, but Snitzer denies that such remedy is reasonable

or legitimately required by the City and states that if it were legitimately required, the responsible

parties would be River Village's design professionals (and their insurers), not Snitzer.

**Counterclaim ¶90.**

*In addition, Snitzer's false denials of the existence of construction issues, his refusal to obtain an objective engineering opinion regarding the condition of the homes, and his conscious attempt to mislead further delayed discovery of the construction problems and resulted in necessary repairs to several additional homes.*

**ANSWER:**    Denied.

**Counterclaim ¶91.**

*Between May 29, 2002, and November 3, 2004, the City of Chicago issued 78 stop work orders to Bridgeport Village, nearly all of which were for work contrary to permits approved by the City of Chicago.*

-24-

**ANSWER:**    Denied, except Snitzer admits that in the early phase of the construction

the City issued work stop orders, principally because River Village's contractor poured

foundations before permits were issued. Answering further, Snitzer states that each of these

stoppages was resolved with the City, caused no harm to Debtors and in many instances the

contractors' early commencement of work allowed homes to be completed sooner and sold to

homeowners, benefitting them and bringing revenue to River Village that was used to pay down

bank debt.

*Counterclaim ¶92.*

*On November 5, 2004, the City of Chicago inspected the homes at the*
*Bridgeport Village Project and raised concerns about design issues.*

**ANSWER:**    Denied, except Snitzer admits that the City inspected the homes on or

about November 5, 2004.

*Counterclaim ¶93.*

*As a result of this inspection, the City issued work stop orders for all work*
*at Bridgeport Village.*

**ANSWER:**    Denied, except Snitzer admits that in early November 2004, the City

issued stop work orders for all work at Bridgeport Village.

*Counterclaim ¶94.*

*The magnitude of the number of violations found by the City of Chicago*
*was so great that Stanley Kaderbeck [sic], the head of the City of Chicago's*
*Building Department, a licensed structural engineer, became personally involved*
*in attempting to resolve the crisis at Bridgeport Village.*

-25-

AA117

AA118

**ANSWER:** Denied, except Snitzer admits that Kaderbek became personally involved, that he was Commissioner of the Building Department, and that he was a licensed structural engineer.

*Counterclaim ¶95.*
*Snitzer met with the head of the City of Chicago's Building Department in early November 2004 and promised to resolve the serious code and permit violations at Bridgeport Village.*

**ANSWER:** Denied, except Snitzer admits that he and River Village's architect met with Mr. Kaderbek of the Building Department in early November 2004, and reached an agreement to resolve code and permit allegations made by the City.

*Counterclaim ¶96.*
*Based on Snitzer's promises, the City allowed some construction to resume at Bridgeport Village.*

**ANSWER:** Denied, except Snitzer admits that the day after the meeting the City permitted construction to resume at Bridgeport Village.

*Counterclaim ¶97.*
*Snitzer, however, did not resolve the serious code and permit violations raised by the City of Chicago.*

**ANSWER:** Denied. Answering further, Snitzer states that the River Village construction team was proceeding in good faith to resolve the alleged code and permit violations raised by the City between November 2004 and late January 2005, when the City shut down construction again.

-26-

AA119

*Counterclaim ¶ 98.*

*Moreover, despite repeated requests, Snitzer refused to again meet in person with the head of the City of Chicago's Building Department.*

**ANSWER:**    Denied, except that Snitzer admits that after the City shut down construction at Bridgeport Village in late January 2005 in retaliation for Snitzer's refusals to cause Debtors to provide kickbacks and favors to Thomas Dipiazza and others associated with Timothy Degnan and the 11th Ward Regular Democratic Organization, Kaderbek requested to meet with Snitzer to discuss the alleged violations, and Snitzer informed Kaderbek that the project manager, Mike Kennedy, was authorized to represent Debtors, was the most knowledgeable person concerning the City's allegations, and was available to meet, but Kaderbek unlawfully refused repeated requests to meet with Kennedy to address the alleged code issues.

*Counterclaim ¶ 99.*

*Following a January 2005 inspection, the City determined that Snitzer had not made progress in resolving the City's concerns.*

**ANSWER:**    Denied.

*Counterclaim ¶ 100.*

*On January 21, 2005, based on the continuing code and permit violations, the City again shut down all construction work at Bridgeport Village.*

**ANSWER:**    Denied, except that Snitzer admits that the City shut down all construction work at Bridgeport Village in late January 2005.

-27-

AA120

**Counterclaim ¶101.**

*Despite the City's stop-work orders, Snitzer continued working at Bridgeport Village.*

**ANSWER:**    Denied.

**Counterclaim ¶102.**

*Snitzer's construction of Bridgeport Village with known ordinance, code, and permit violations directly caused the January 21, 2005, shutdown of the Bridgeport Village Project.*

**ANSWER:**    Denied.

**Counterclaim ¶103.**

*Snitzer's intentional, reckless, and grossly negligent misconduct, including his refusal to meet with Commissioner Kaderbeck [sic] directly caused the January 21, 2005, shutdown of the Bridgeport Village Project.*

**ANSWER:**    Denied.

**Counterclaim ¶104.**

*Following the January 21, 2005, shutdown of the Bridgeport Village Project, the Debtors' lender called its loan, placing the project in severe financial peril with no alternative financing in process and resulting in over $130,000 in additional financing and forfeiture costs to the non-managing members of the Debtors.*

**ANSWER:**    Denied, except that Snitzer admits that in or about March 2005 Kaderbek unlawfully and improperly contacted the lender regarding the shut down in order to punish Snitzer personally, as alleged more fully in Snitzer's federal civil rights complaint.

-28-

*Counterclaim ¶105.*

*In addition, the January 21, 2005, shutdown of the Bridgeport Village Project placed contract purchasers of Bridgeport Village homes under construction without homes to move into and in crisis, triggering numerous cancellation of purchase contracts and threats of lawsuits.*

**ANSWER:** Denied, except Snitzer admits that the City's retaliatory and unlawful refusal to lift the January stop-work order, combined with Kinsella and Diamond's refusal to contribute needed capital to River Village despite a contractual obligation to do so, froze River Village's ability to complete homes, causing certain purchasers to cancel their contracts.

*Counterclaim ¶106.*

*Moreover, the January 21, 2005, shutdown of the Bridgeport Village Project forced numerous subcontractors off the job without being paid.*

**ANSWER:** Denied, except Snitzer admits that the City's retaliatory and unlawful refusal to lift the January stop-work order led the Project lender to declare a default, which, combined with Kinsella and Diamond's refusal to contribute needed capital to River Village despite a contractual obligation to do so, caused River Village to be unable to pay certain subcontractors.

*Counterclaim ¶107.*

*At the time that Snitzer was removed from management of the Bridgeport Village Project the Debtors were in a severe financial crisis.*

**ANSWER:** Denied, except that Snitzer admits that at the time of his removal River Village had liquidity problems caused by the City's unlawful and retaliatory conduct, the Bank's

-29-

AA122

declaration of a default and Kinsella and Diamond's refusal to honor obligations to contribute

capital to River Village.

*Counterclaim ¶108.*

> *Snitzer had hidden the Debtors' dire financial condition through his*
> *maintenance of false accounting records.*

**ANSWER:**    Denied.

*Counterclaim ¶109.*

> *For example, after the Circuit Court of Cook County ordered Snitzer*
> *removed from Project management, the Debtors' new management discovered*
> *that Snitzer had failed to record material liabilities, including amounts payable to*
> *major subcontractors, thus making the Debtors' books and records under*
> *Snitzer's management materially misleading.*

**ANSWER:**    Denied.

*Counterclaim ¶110.*

> *Moreover, although Snitzer was not an accountant, he insisted on*
> *personally keeping the Debtors' books on his personal computer at his home in*
> *Arlington Heights, Illinois.*

**ANSWER:**    Denied, except Snitzer admits that he is not an accountant and that he

maintained River Village and River Village West's accounting records on the computer in his

home office in Arlington Heights, Illinois, as Kinsella and Diamond knew at all relevant times

and as he had done with prior projects in which he, Kinsella and Diamond were partners.

*Counterclaim ¶111.*

> *Snitzer never had an independent accountant audit the Project's books*
> *and records, and did not provide adequate, accurate financial information to the*
> *non-managing members, Kinsella and Diamond.*

-30-

**ANSWER:** Denied, except Snitzer admits that he never retained an independent accountant to audit the Project's books and records. Answering further, Snitzer states that there was no obligation under the operating agreements or otherwise to conduct an audit, that an independent accountant prepared tax returns each year based on the Project's books and records that Kinsella and Diamond did not object to, that they never requested an audit of the Project's books and records, and that audits were not requested or conducted regarding the several previous projects developed by Snitzer, Kinsella and Diamond.

*Counterclaim ¶112.*

*In addition, Snitzer allowed Debtor assets to be used to construct an addition on his brother-in-law's house.*

**ANSWER:** Denied.

*Counterclaim ¶113.*

*Snitzer also directed a Bridgeport Village subcontractor to work on Snitzer's brother-in-law's house. The subcontractor claims that Debtors owe it tens of thousands of dollars in connection with this unauthorized work.*

**ANSWER:** Denied, except Snitzer is without knowledge or information sufficient to form a belief as to the truth of whether the subcontractor is asserting the claim alleged, but Snitzer denies that there is a legitimate basis for the subcontractor to assert any such claim against Debtors or that Snitzer engaged in any conduct that would have given rise to such a claim.

-31-

AA123

*Counterclaim ¶ 114.*

*Snitzer is or was an individual defendant in two actions pending in the Circuit Court of Cook County, Illinois, relating to a previous real estate development project in which Snitzer was the manager:*

*1.    Dearborn Village Condo Association v. Dearborn Village V LLC et al., Case No. 03-L-01403 (Cir. Ct. Cook County, Law Div.); and*

*2.    Dearborn Village III Condo Association v. Dearborn Village LLC III et al., Case No. 03-L-01778 (Cir. Ct. Cook County, Law Div.); (the "Dearborn Village Lawsuits").*

**ANSWER:**    Admitted, but Snitzer states that one of the actions was dismissed.

*Counterclaim ¶ 115.*

*The Debtors are not parties to the Dearborn Village lawsuits.*

**ANSWER:**    Admitted.

*Counterclaim ¶ 116.*

*The Debtors have no interest in the Dearborn Village lawsuits.*

**ANSWER:**    Admitted. Answering further, Snitzer states that he, Kinsella and Diamond hold or control membership interests in the LLC defendant in the Dearborn Village lawsuit in the same percentage they have in Debtors.

*Counterclaim ¶ 117.*

*Snitzer directed the Debtors' attorney to represent him personally in the Dearborn Village Lawsuits.*

**ANSWER:**    Denied, except Snitzer admits that counsel, who represented the Debtors on certain matters, also represented Snitzer in the Dearborn Village Lawsuits (with Kinsella and

-32-

AA124

Diamond's knowledge and without any objection by them), and that there was no reason why he could not do so.

**Counterclaim ¶118.**

*Although the Debtors' had no interest in the Dearborn Village Lawsuit, Snitzer caused the Debtors' attorney to pay the Debtors' attorney from the Debtors' assets.*

**ANSWER:**    Denied.

**Counterclaim ¶119.**

*The amount of the Debtors' funds diverted to Snitzer for Dearborn Village Litigation legal fees totals over $24,000.*

**ANSWER:**    Denied.

**Counterclaim ¶120.**

*Snitzer's reckless and grossly negligent disregard of his duties to Debtors resulted in other damages to the Debtors.*

**ANSWER:**    Denied.

**Counterclaim ¶121.**

*During Snitzer's tenure as the Debtors' manager and/or agent, the City of Chicago issued numerous citations against Debtors for miscellaneous infractions at Bridgeport Village.*

**ANSWER:**    Denied.

-33-

AA125

AA126

-34-

*Counterclaim ¶122.*

*Snitzer ignored the citations.*

<u>ANSWER</u>:    Denied.

*Counterclaim ¶123.*

*Snitzer did not appear in court to contest the citations.*

<u>ANSWER</u>:    Denied, except Snitzer admits that with respect to certain citations issued by the City for alleged infractions such as garbage cleanup during construction, Snitzer caused River Village to negotiate a settlement with the City to pay certain fines.

*Counterclaim ¶124.*

*Snitzer did not correct the cited conditions.*

<u>ANSWER</u>:    Denied.

*Counterclaim ¶125.*

*Snitzer did not pay the City of Chicago's fines.*

<u>ANSWER</u>:    Snitzer admits that he did not personally pay any fines, but denies that River Village did not pay fines.

*Counterclaim ¶126.*

*Because of Snitzer's failure to respond to the citations, the City of Chicago cited Debtors repeatedly for the same, correctible (sic) violations.*

<u>ANSWER</u>:    Denied.

AA127

-35-

after construction began at Bridgeport Village; that, as a matter of law, the ordinance operated

such registration (Chicago Mun. Code Ch. 4-36) became effective in or about March 2004, well

at the time of his engagement. Answering further, Snitzer states that the ordinance requiring

to the truth of paragraph 129, but states that if Kennedy was not so licensed, it was not required

**ANSWER:**    Snitzer is without knowledge or information sufficient to form a belief as

*as a contractor with the City of Chicago.*

*When he worked at Bridgeport Village, Michael Kennedy was not licensed*

*Counterclaim ¶129.*

they themselves attempted to retain Kennedy after Snitzer's ouster in June 2005.

Kinsella and Diamond were fully aware of and never objected to the hiring of Kennedy, and that

development entities (in which Kinsella and Diamond were members) to hire Kennedy, that

Kennedy to supervise construction and Bridgeport Village, that he had caused four prior

**ANSWER:**    Denied, except that Snitzer admits that he caused River Village to hire

*construction at Bridgeport Village.*

*Snitzer hired his long-time associate Michael Kennedy to supervise*

*Counterclaim ¶128.*

form a belief as to the truth of whether Debtors paid such fines.

**ANSWER:**    Denied, except Snitzer is without knowledge or information sufficient to

*BPV manager and agent.*

*penalties assessed by the City of Chicago but ignored during Snitzer's tenure as*

*management, Debtors paid thousands of dollars in accumulated fines and*

*After the Circuit Court of Cook County removed Snitzer from*

*Counterclaim ¶127.*

AA128

prospectively only and did not apply to Kennedy with respect to Bridgeport Village; that

(although there was no duty to do so) in 2005 Snitzer sought to procure such a license in

response to the City's unlawful demands but Kinsella and Diamond refused to contribute capital

that was needed to pay for the bond required for such a license; and that, after Snitzer was

removed in June 2005, Kinsella and Diamond hired a contractor who was not licensed by the

City and the City permitted that situation to persist for many months without complaint.

*Counterclaim ¶130.*

*In March 2001, Michael Kennedy incorporated Fortress Construction,*
*Inc. ("Fortress").*

ANSWER:    Snitzer is without knowledge or information sufficient to form a belief as

to the truth of paragraph 130.

*Counterclaim ¶131.*

*The Illinois Secretary of State lists Michael Kennedy as Fortress'*
*president and gives his address as Minooka, Illinois.*

ANSWER:    Snitzer is without knowledge or information sufficient to form a belief as

to the truth of paragraph 131.

*Counterclaim ¶132.*

*Snitzer knew that Michael Kennedy owned or controlled Fortress at all*
*relevant times.*

ANSWER:    Admitted.

-36-

AA129

*Counterclaim ¶133.*

*On information and belief, Michael Kennedy also incorporated Banyan Distribution and Building Supplies, Inc. ("Banyan") in March 2001.*

ANSWER:    Snitzer is without knowledge or information sufficient to form a belief as to the truth of paragraph 133.

*Counterclaim ¶134.*

*Banyan's business address in September 2001 was in Minooka, Illinois.*

ANSWER:    Snitzer is without knowledge or information sufficient to form a belief as to the truth of paragraph 134.

*Counterclaim ¶135.*

*Banyan's business address in September 2001 was identical to Michael Kennedy's business address for Fortress listed on the Illinois Secretary of State's records.*

ANSWER:    Snitzer is without knowledge or information sufficient to form a belief as to the truth of paragraph 135.

*Counterclaim ¶136.*

*In September, 2001, Snitzer, as manager and/or agent of Debtors, executed a contract (the "Material Contract") with Banyan.*

ANSWER:    Denied, except Snitzer admits that as manager of River Village he executed a contract with Banyan, and, since the contract was at the project site when he was removed as manager in June 2005 and he does not have a copy, he lacks knowledge or information sufficient to form a belief as to the allegation of the date of the contract.

-37-

AA130

*Counterclaim ¶ 137.*

*Executing the Material Contract was a major decision requiring the consent of the non-managing members.*

**ANSWER:**    Denied.

*Counterclaim ¶ 138.*

*Snitzer executed the Material Contract without the non-managing members' knowledge or consent.*

**ANSWER:**    Snitzer admits that he did not procure Kinsella and Diamond's specific consent before signing the Material Contract, but had no obligation to do so. Answering further, Snitzer states that at no time during the previous projects he developed with Kinsella and Diamond, which collectively required numerous construction and materials contracts, did they ever state that their consent was needed for any construction contract or subcontract. Snitzer followed the same course of dealing that had been established in the other projects he developed with Kinsella and Diamond, and pursuant to that course of dealing, Kinsella and Diamond consented generally to Snitzer's execution of construction and material contracts such as the Material Contract.

*Counterclaim ¶ 139.*

*Under the Material Contract, Banyan was granted the exclusive right to provide all windows, cabinetry, millwork and hardware for Debtors' residential development as described in the Material Contract*

**ANSWER:**    Snitzer is without knowledge or information sufficient to form a belief as to the truth of paragraph 139, and he further denies paragraph 139 to the extent it is inconsistent with the terms of the Material Contract.

-38-

*Counterclaim ¶140.*

*Although he worked for the Debtors at the time, Michael Kennedy signed the Material Contract on behalf of Banyan.*

**ANSWER:** Denied, except Snitzer admits that Kennedy performed project management services for River Village and he lacks knowledge or information sufficient to form a belief as to the truth of the allegation concerning Kennedy's signature.

*Counterclaim ¶141.*

*On information and belief, Michael Kennedy owned and controlled Banyan when he signed the Material Contract on Banyan's behalf.*

**ANSWER:** Snitzer lacks knowledge or information sufficient to form a belief as to the truth of paragraph 141.

*Counterclaim ¶142.*

*Although Michael Kennedy signed the Material Contract on behalf of Banyan, Snitzer designated Michael Kennedy and himself as the only persons authorized to act on the Debtors' behalf in connection with the Material Contract.*

**ANSWER:** Snitzer lacks knowledge or information sufficient to form a belief as to the truth of paragraph 142, and Snitzer denies paragraph 142 to the extent it is inconsistent with the terms of the Material Contract.

*Counterclaim ¶143.*

*Snitzer knowingly and intentionally breached his duties to the Debtors when he authorized Michael Kennedy to act on the Debtors' behalf with respect to an agreement with a company owned or controlled by Michael Kennedy.*

**ANSWER:** Denied.

-39-

**Counterclaim ¶144.**

*By authorizing the Material Contract, Snitzer allowed Michael Kennedy to enrich himself at the Debtors' expense.*

**ANSWER:**   Denied.

**Counterclaim ¶145.**

*Under the Material Contract, Banyan received the exclusive right to supply all of the windows, cabinetry, millwork and hardware for a total of 414 homes to be built by Debtors.*

**ANSWER:**   Denied.

**Counterclaim ¶146.**

*When Snitzer entered this insider contract with his associate Michael Kennedy for 414 homes in September 2001, the Debtors had started developing only Phase I of the Bridgeport Village Project, contemplating construction of only approximately 115 residences.*

**ANSWER:**   Denied, except Snitzer admits that at the time the Material Contract was signed, River Village was only proceeding with Phase I.

**Counterclaim ¶147.**

*Snitzer had no justifiable business reason for causing the Debtors to enter into the Material Contract with Michael Kennedy and Banyan for 414 homes in September 2001.*

**ANSWER:**   Denied that the characterization of the Contract is correct and, therefore, paragraph 147 is denied.

-40-

AA132

AA133

**Counterclaim ¶148.**

*Contrary to customary ordering practices, Snitzer and Michael Kennedy ordered and accepted delivery of materials from Banyan for multiple homes in advance.*

**ANSWER:**    Denied, except Snitzer admits that certain materials were ordered in advance so that they would be available for timely installation, and doing so was proper and beneficial to River Village.

**Counterclaim ¶149.**

*Under customary ordering practices, developers and contractors order home building materials for delivery directly to the construction site of the home being built "just in time" for construction.*

**ANSWER:**    Denied.

**Counterclaim ¶150.**

*Ordering delivery of building materials "just in time" avoids storage costs, lessens the risk of undetected defective products, and allows the warranty to transfer unexpired to the home buyer.*

**ANSWER:**    Denied.

**Counterclaim ¶151.**

*Snitzer and Michael Kennedy caused Banyan to deliver building products to a warehouse across the Chicago River.*

**ANSWER:**    Admitted.

**Counterclaim ¶152.**

*Most of the building products purchased from Banyan remained in the warehouse for months. Some products remained in the warehouse for years.*

-41-

AA134

**ANSWER:** Denied, except Snitzer is without knowledge or information sufficient to form a belief as to the truth of the second sentence, but states that if any products remained in the warehouse for years, it was due to the City's shutdown of the project and Kinsella and Diamond's slow pace of construction, not due to any improprieties in the ordering of the materials.

*Counterclaim ¶153.*

*As a result of Snitzer's insider deal with Michael Kennedy, Debtors purchased and paid for building materials long before they were needed.*

**ANSWER:** Denied.

*Counterclaim ¶154.*

*The building materials Snitzer ordered from Banyan through Michael Kennedy contained numerous defects and mistakes in specifications.*

**ANSWER:** Denied.

*Counterclaim ¶155.*

*These defects and mistakes in specifications were either known to Snitzer and/or Kennedy or went undetected while the building materials sat in the warehouse.*

**ANSWER:** Denied.

*Counterclaim ¶156.*

*Because of the time that elapsed while the Banyan goods sat in the warehouse, some of the windows and other building materials ordered through Banyan became useless because of subsequent design changes.*

-42-

AA135

**ANSWER:** Denied for the time period prior to June 2005, and Snitzer is without

knowledge or information sufficient to form a belief as to the truth of paragraph 156 with respect

to the time period following his removal as manager.

*Counterclaim ¶157.*

*When windows or other building materials did not fit correctly, the Debtors were forced to purchase replacement windows and materials from Banyan for functionally the same item.*

**ANSWER:** Denied.

*Counterclaim ¶158.*

*Snitzer's knowing entry into the Banyan contract on behalf of the Debtors caused the Debtors to suffer significant damages.*

**ANSWER:** Denied.

*Counterclaim ¶159.*

*Moreover, because the Banyan goods sat in a warehouse for extended periods of time, the manufacturer's warranties expired before the residence closed, leaving the purchaser with no manufacturer's warranty and causing them to look to Debtors for repair or replacement of defective windows or other building materials.*

**ANSWER:** Snitzer lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 159, but denies any suggestion that he is responsible for

alleged facts giving rise to the alleged expiration of the warranties.

*Counterclaim ¶160.*

*Snitzer entered into an unauthorized agreement with his long-time personal friend Arthur Hershkowitz ("Hershkowitz").*

-43-

AA136

**ANSWER:** Denied, except that Snitzer admits that in or about March 2005, he caused JS II and River Village West to enter into an agreement with Hershkowitz, a licensed and able broker with whom Snitzer had a purely professional relationship.

*Counterclaim ¶161.*

*Snitzer and Hershkowitz have worked together for many years.*

**ANSWER:** Admitted. Answering further, Snitzer states that Hershkowitz brought substantial value to the estate through his efforts in River Village West's acquisition of commercial properties and subsequent leasing of the properties, and that even after Snitzer was replaced as a manager in June 2005, Kinsella and Diamond continued to use Hershkowitz's services regarding the commercial properties.

*Counterclaim ¶162.*

*Upon information and belief, Snitzer, on behalf of Debtors, gave Hershkowitz a purported open-ended listing contract to sell the industrial properties at Bridgeport Village.*

**ANSWER:** Admitted to the extent the allegations are consistent with the listing contract, and otherwise denied (including the allegation that the listing contract is open ended), and the Court is referred to the listing agreement for the contents thereof.

*Counterclaim ¶163.*

*There was no economic justification for such an agreement at the time it purportedly was made, because the industrial properties were not then being offered for sale.*

-44-

AA137

-45-

**ANSWER:** Denied, except Snitzer admits that the properties were not then being offered for sale.

*Counterclaim ¶ 164.*
*The purported agreement with Hershkowitz was a major decision requiring approval of a majority of the members of the affected LLCs.*

**ANSWER:** Denied.

*Counterclaim ¶ 165.*
*Snitzer did not obtain approval for this purported agreement from a majority of members of Debtors JS II, River Village, or River Village West.*

**ANSWER:** Snitzer does not recall whether he obtained approval from Kinsella and Diamond in advance, and therefore is without knowledge or information sufficient to form a belief as to the truth of paragraph 165, but states further that they later used Hershkowitz's services for the Debtors and thereby ratified the agreement.

*Counterclaim ¶ 166.*
*Moreover, Snitzer concealed the purported agreement with Hershkowitz from the Debtors' new court-appointed managers, John Kinsella and Sid Diamond, while they sought to sell the properties through a different agent.*

**ANSWER:** Denied.

*Counterclaim ¶ 167.*
*Snitzer did not object to the agent that the Debtors' new managers sought to use, despite purportedly having previously hired Hershkowitz to perform the same task.*

AA138

proceedings to the retention of the agent.

**ANSWER:**    Denied, except Snitzer admits that he did not file objections in any legal

*Counterclaim ¶168.*

*Snitzer took an active role in selecting the new agent, even meeting privately with the agent before giving his approval.*

**ANSWER:**    Denied, except Snitzer admits that he met with the agent.

*Counterclaim ¶169.*

*Debtors now face a $1 million claim filed by Hershkowitz, which the Debtors must contest.*

**ANSWER:**    Denied, except Snitzer admits that Hershkowitz filed a claim, to which the Court is referred for the contents thereof.

*Counterclaim ¶170.*

*Snitzer engaged Michael Kennedy to supervise construction at the Bridgeport Village Project.*

**ANSWER:**    Denied, except Snitzer admits that he caused River Village to engage Kennedy to supervise construction at Bridgeport Village.

*Counterclaim ¶171.*

*Snitzer had worked with Michael Kennedy for many years on previous real estate development projects.*

**ANSWER:**    Admitted, except for the word "many," and Kinsella and Diamond were partners in several of those projects and were fully aware of and consented to the engagement of

-46-

Kennedy, and they attempted to retain Kennedy's continuing services after they replaced Snitzer

as managers in June 2005.

**Counterclaim ¶ 172.**

Snitzer engaged a law firm in December 2004 to draft a deferred
compensation agreement for Michael Kennedy, and for two other Project
personnel, David Kennedy, and Andrew Tack.

**ANSWER:**    Admitted.

**Counterclaim ¶ 173.**

Snitzer never informed Kinsella or Diamond that he had procured draft
deferred compensation agreements for Michael Kennedy, David Kennedy, or
Andy Tack.

**ANSWER:**    Denied.

**Counterclaim ¶ 174.**

Snitzer never informed Kinsella or Diamond that he intended to defer
compensation under any trust or agreement for David Kennedy or Andy Tack.

**ANSWER:**    Denied.

**Counterclaim ¶ 175.**

The decision to cause River Village to enter into a deferred compensation
agreement with Michael Kennedy was a major decision requiring the approval of
a majority of River Village's members.

**ANSWER:**    Denied.

-47-

AA139

AA140

-48-

*Counterclaim ¶176.*

*The decision to cause River Village to enter into deferred compensation
agreements with David Kennedy and Andrew Tack were major decisions
requiring the approval of a majority of River Village's members.*

**ANSWER:**    Denied.

*Counterclaim ¶177.*

*Snitzer never obtained the approval of a majority of River Village's
members before entering into the type of deferred compensation agreement with
Michael Kennedy that Snitzer had drafted.*

**ANSWER:**    Denied, including the implication that their approval was required.

*Counterclaim ¶178.*

*In 1997, Snitzer advised Kinsella and Diamond that he wished to establish
a "Rabbi's Trust" for Michael Kennedy as an incentive to keep him as the
project's construction manager. A "Rabbi's Trust" is a means of setting aside
compensation for a key employee to be paid at a future date. Snitzer, however,
never presented a draft "Rabbi's Trust" to Kinsella or Diamond for review or
approval.*

**ANSWER:**    Admitted that he so advised Kinsella and Diamond in 1997 and at other
times.  Snitzer admits the characterization of a Rabbi's Trust to the extent it accurately describes
such a legal arrangement, and otherwise denies the characterization.  Snitzer admits that he never
presented a draft "Rabbi's Trust" to Kinsella and Diamond, but denies that he was required to do
so or that they ever asked to see it.

*Counterclaim ¶179.*

*The deferred compensation agreements that were drafted are not "Rabbi's
Trusts" and were never authorized by Kinsella or Diamond.*

AA141

-49-

form a belief as to the truth of whether the agreements meet the technical definition of "Rabbi's

Trusts."

**ANSWER:**    Denied, except that Snitzer lacks knowledge or information sufficient to

*Counterclaim ¶180.*

*Snitzer never obtained the approval of a majority of River Village's*
*members before entering into a deferred compensation agreement of any type*
*with David Kennedy.*

**ANSWER:**    Denied, including the implication that their approval was required.

*Counterclaim ¶181.*

*Snitzer never obtained the approval of a majority of River Village's*
*members before entering into a deferred compensation agreement of any type*
*with Andrew Tack.*

**ANSWER:**    Denied, including the implication that their approval was required.

*Counterclaim ¶182.*

*Snitzer never disclosed to John Kinsella or Sid Diamond the draft deferred*
*compensation agreements prepared for Michael Kennedy, David Kennedy, or*
*Andrew Tack.*

**ANSWER:**    Denied, except he admits he did not personally give the documents to

Kinsella and Diamond.  Answering further, he states that Kinsella and Diamond were aware that

deferred compensation agreements were going to be prepared for the three individuals, the

agreements were in the possession of Debtors' counsel, were never withheld from Kinsella and

Diamond, and were available to Kinsella and Diamond if they had wanted to see them.

*Counterclaim ¶183.*

*In addition, without counsel's knowledge, Snitzer modified the draft deferred compensation agreements prepared by counsel to be far more favorable to Michael Kennedy, David Kennedy, and Andrew Tack and far less favorable to River Village.*

**ANSWER:**    Denied, except he admits certain modifications were negotiated.

*Counterclaim ¶184.*

*Snitzer unilaterally and without approval re-wrote the deferred compensation agreements drafted for Michael Kennedy, David Kennedy, and Andrew Tack to add one-sided terms at River Village's expense.*

**ANSWER:**    Denied, except Snitzer admits that he approved modifications in the draft deferred compensation agreements and that he did not obtain Kinsella and Diamond's prior approval for such changes, but denies that such approval was required or that the modifications were an unreasonable exercise of business judgment.

*Counterclaim ¶185.*

*For example, Snitzer rewrote a provision of those deferred compensation agreements, changing the phrase "Neither the Company nor any individual acting as an employee or agent of the Company shall be liable..." to "The Company shall be liable..."*

**ANSWER:**    Snitzer lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 185.

*Counterclaim ¶186.*

*In May 2005, with the Project still shut down by the City of Chicago, and Snitzer, Kinsella, and Diamond enmeshed in litigation, Snitzer directed the custodian of the purported deferred compensation account to liquidate its holdings.*

-50-

AA142

AA143

**ANSWER:**   Denied, except Snitzer admits that in May 2005 the Project was improperly shut down by the City and Snitzer, Kinsella and Diamond were involved in chancery litigation, and that in or about May 2005, Snitzer complied with a direction by Kennedy to liquidate his holdings pursuant to rights he had under his deferred compensation agreement. Answering further, Snitzer states that the funds in question had been paid to Kennedy's deferred compensation account over the course of several years, with the knowledge of Kinsella and Diamond, and were a reasonable and wholly proper compensation plan for a construction professional who had provided capable services to Kinsella, Diamond and Snitzer's prior development projects and to Bridgeport Village.

*Counterclaim ¶ 187.*

*On June 22, 2005—the day before the Illinois Circuit Court amended and reissued its TRO removing Snitzer from management of the Debtors—all of the holdings in the account were liquidated.*

**ANSWER:**   Snitzer lacks knowledge or information sufficient to form a belief as to the truth of paragraph 187, except he admits that June 22, 2005 was the day before Judge Nowicki issued an amended TRO and he denies there was any impropriety if the alleged liquidation occurred on that date.

*Counterclaim ¶ 188.*

*On June 23, 2005—the same day that the Court entered its final order removing Snitzer from management of the Debtors—the broker holding the funds wired $395,000 to a bank account controlled by Michael Kennedy.*

-51-

**ANSWER:** Denied, except Snitzer admits that the Circuit Court entered a TRO on June 23, 2005 that, *inter alia*, removed Snitzer from management of Debtors, and that a wire from Kennedy's deferred compensation account to another account of his occurred on or about that day. Snitzer denies any implication that such a transfer was improper or that the funds in question were property of the Debtors.

*Counterclaim ¶189.*

*Snitzer never informed Kinsella or the Illinois Court that he was transferring almost $400,000 to Michael Kennedy.*

**ANSWER:** Denied, except Snitzer admits that he did not inform Kinsella or Diamond or the Illinois Court that Kennedy had transferred his own funds, but denies that he had any obligation to do so or that there was any impropriety in the transfer of deferred compensation funds that had been paid for Kennedy's benefit over the course of several years with the knowledge of Kinsella and Diamond.

*Counterclaim ¶190.*

*Snitzer never obtained the consent of a majority of Debtors' members to make this $395,000 transaction.*

**ANSWER:** Denied, including the implications that Snitzer "made this $395,000 transaction" and that consent was required.

*Counterclaim ¶191.*

*Snitzer had no authority to transfer the $395,000 to Michael Kennedy in June 2005.*

-52-

AA144

**ANSWER:** Denied, including the implication that he transferred $395,000 of Debtor funds to Kennedy.

*Counterclaim ¶192.*

*Had Kinsella and Diamond known that Snitzer intended to transfer $395,000 to Michael Kennedy, they could have stopped the transfer before it occurred.*

**ANSWER:** Denied, including the implication that Snitzer transferred $395,000 of Debtor funds to Kennedy.

*Counterclaim ¶193.*

*In June 2005, the extent of Snitzer's misconduct and the construction problems at Bridgeport Village were just becoming known.*

**ANSWER:** Denied, including the allegation of misconduct.

*Counterclaim ¶194.*

*As construction supervisor, Michael Kennedy shared responsibility with Snitzer for the breaches of PDO-769, the Chicago Building Code, and other construction issues.*

**ANSWER:** Denied.

*Counterclaim ¶195.*

*Michael Kennedy shared responsibility with Snitzer for the losses incurred from shoddy construction practices at Bridgeport Village.*

**ANSWER:** Denied.

-53-

AA145

**Counterclaim ¶196.**

River Village therefore had defenses against Michael Kennedy with respect to any claim under the deferred compensation agreement.

**ANSWER:**    Paragraph 196 alleges legal conclusions to which no response is required. If and to the extent a response is required, Snitzer denies paragraph 196.

**Counterclaim ¶197.**

Snitzer, as River Village's fiduciary, is liable to River Village for the return of the $395,000 transferred without authorization to Michael Kennedy.

**ANSWER:**    Denied.

**Counterclaim ¶198.**

Snitzer similarly caused River Village to enter into deferred compensation agreements with David Kennedy and Andrew Tack.

**ANSWER:**    Denied, except he admits that he caused River Village to enter into deferred compensation agreements with David Kennedy and Andrew Tack.

**Counterclaim ¶199.**

The deferred compensation agreements with David Kennedy and Andrew Tack were not authorized by Kinsella or Diamond.

**ANSWER:**    Denied.

**Counterclaim ¶200.**

David Kennedy and Andrew Tack both have made claims against River Village arising from the unauthorized deferred compensation agreements.

-54-

AA146

**ANSWER:**   Denied, except Snitzer admits upon information and belief that Kennedy
and Tack claimed that they were owed funds under these agreements.

*Counterclaim ¶201.*

*David Kennedy has claimed a right to penalties amounting to $500 per*
*day based on an unenforceable penalty clause that Snitzer unilaterally added to*
*David Kennedy's deferred compensation agreement, and Debtors now must*
*contest this claim.*

**ANSWER:**   Denied, except Snitzer lacks knowledge or information sufficient to form a
belief as to the truth of the allegations concerning what Kennedy has claimed and he admits that
Snitzer reasonably added the $500 per day clause to Kennedy's agreement pursuant to
negotiations with Kennedy.

*Counterclaim ¶202.*

*Andrew Tack commenced litigation against River Village, and River*
*Village was forced to settle with Andrew Tack in the amount of $80,000.*

**ANSWER:**   Snitzer lacks knowledge or information sufficient to form a belief as to the
truth of the allegations of paragraph 202, except he admits upon information and belief that a
settlement was agreed to by Tack and River Village, and he denies any implication that the
settlement or obligation to Tack were unreasonable.

*Counterclaim ¶203.*

*Snitzer, as River Village's fiduciary, is liable to River Village for the*
*amount paid to Andrew Tack and for any amount to be paid to David Kennedy, as*
*well as for the amounts that Debtors must spend to address these claims*
*originating from the unauthorized deferred compensation agreements.*

**ANSWER:**   Denied.

-55-

*Counterclaim ¶204.*

*Snitzer has continued to interfere with the Project even after the Illinois Court removed him as manager in June 2005.*

**ANSWER:**    Denied.

*Counterclaim ¶205.*

*As one example, in late 2005 and again in late 2006, Snitzer interfered with Debtors' ability to settle environmental litigation—litigation that Snitzer had previously initiated without authorization. In one instance, Snitzer commenced new lawsuits in his personal capacity against the defendant in one of those cases in order to interfere with the settlement.*

**ANSWER:**    Denied, except Snitzer admits he filed two environmental lawsuits in his personal capacity regarding sites other than the sites involved in the Debtors' lawsuits.

Answering further, Snitzer states that Kinsella and Diamond ratified the lawsuits that had been filed by Debtors and that one of the lawsuits that Snitzer caused Debtors to file resulted in the conveyance in late 2005, at no net cost to the Debtors, of the option to purchase the "Gray" property from People's Gas after it cleans up the property, which Debtors represented to the Court on December 10, 2007 has an estimated value to the estate of $1 million to $2 million.

*Counterclaim ¶206.*

*Snitzer's interference required Debtors to seek further relief from the Illinois Circuit Court and resulted in an order forbidding further interference from Snitzer and stating that there was a likelihood of success on the merits for a claim of breach of fiduciary duty against Snitzer.*

**ANSWER:**    Denied, except Snitzer admits that the Circuit Court entered an order on or about January 10, 2007 regarding the environmental litigation, to which the Court is referred, and

-56-

AA148

that that order was vacated by the Circuit Court pursuant to the agreement of the Debtors,

Kinsella and Diamond, and with the approval of this Court on or about April 12, 2007 (Dkt.

112), and pursuant to that agreement, Snitzer paid $77,605.86 to Debtors, which were all of the

litigation expenses they had incurred in connection with that pending environmental litigation.

*Counterclaim ¶207.*

*In the Circuit Court's January 10, 2007 order, the court held that "Kinsella and Diamond have established a fair question of a likelihood of success on the merits that Thomas Snitzer has breached his fiduciary duties to the Kinsella and Diamond interests by asserting environmental claims and lawsuits while the Venture was seeking to settle similar litigation against the same party."*

**ANSWER:**   Snitzer admits that the quoted language appears in the order, but

answering further, Snitzer states that the order was vacated by agreement of the Debtors, Kinsella

and Diamond, and with permission of this Court on or about April 12, 2007. <u>See</u> Answer to

¶206 above.

*Counterclaim ¶208.*

*In the transcript of the court's findings, which was incorporated into the court's January 10, 2007 order, the court found that:*

*Mr. Snitzer had an equal vote with Kinsella and Diamond in terms of litigation matters concerning Peoples.... He chose not to do so. He chose to take his own action by filing lawsuits without the knowledge of Kinsella and Diamond, without the knowledge of the lawyer hired to negotiate with Peoples. And these lawsuits, in my opinion, had a bearing on the ability of the venture to negotiate and finalize a settlement with Peoples. As such, it is my opinion that Mr. Snitzer violated his fiduciary duties.*

**ANSWER:**   Snitzer admits that the quoted language appears in the transcript, but

answering further, Snitzer states that the order was vacated by agreement of the Debtors, Kinsella

AA149

AA150

and Diamond, and with permission of this Court on or about April 12, 2007. See Answer to

¶206 above.

*Counterclaim ¶209.*

*This and other tactics on Snitzer's part unnecessarily delayed the sale of the remaining undeveloped parcels of land owned by the Debtors until their value had diminished.*

**ANSWER:**    Denied.

*Counterclaim ¶210.*

*The delay and the costs of combating Snitzer's interference, as well as Snitzer's numerous other breaches of his fiduciary and contractual duties, forced the Bridgeport Village Project into Chapter 11 bankruptcy.*

**ANSWER:**    Denied. Answering further, Snitzer states that Kinsella and Diamond forced Debtors into bankruptcy after nearly two years of being in management, and that they had grossly mismanaged the Debtors during that period.

**ANSWER TO COUNT I**
**(Alleged Breach of Fiduciary Duty)**

*Counterclaim ¶211.*

*Debtors incorporate the allegations in Paragraph 1 through 210 of the Counterclaim as though fully set forth herein.*

**ANSWER:**    Snitzer incorporates his answers to paragraph 8 through 210. Paragraphs 1-7 are not pleaded by Debtors as part of the Counterclaim, but consist of Debtors' responding paragraphs to Snitzer's Proof of Interest, and require no response.

-58-

AA151

*Counterclaim* ¶212.

*At all relevant times, Snitzer acted as an agent of Debtor JS II.*

**ANSWER:** Denied, except Snitzer admits that he acted as an agent of JS II for certain acts prior to June 2005.

*Counterclaim* ¶213.

*At all relevant times, Snitzer held the position of manager and member of Debtors River Village and River Village West under the River Village and River Village West Operating Agreements.*

**ANSWER:** Denied, except Snitzer admits that he was manager of River Village and River Village West prior to June 2005 and has been a member of those entities at all relevant times.

*Counterclaim* ¶214.

*At all relevant times, Snitzer owed fiduciary duties to JS II, River Village and River Village West.*

**ANSWER:** Paragraph 214 alleges legal conclusions to which no response is required.

*Counterclaim* ¶215.

*Snitzer was required to discharge his fiduciary duties consistent with the obligation of good faith and fair dealing.*

**ANSWER:** Paragraph 215 alleges legal conclusions to which no response is required.

*Counterclaim* ¶216.

*As set forth above, Snitzer breached his fiduciary duties to JS II, River Village, and River Village West by:*

-59-

AA152

a.  *engaging in insider deals to benefit his relatives, family friends, and business associates;*

b.  *making major decisions without the consent of a majority of Debtor members;*

c.  *engaging in intentional, reckless, and grossly negligent misconduct in constructing Bridgeport Village and in managing its affairs;*

d.  *failing to exercise ordinary prudence in discharging his duties on behalf of JS II, River Village, and River Village West;*

e.  *failing to discharge his duties as manager in good faith;*

f.  *failing to manage River Village and River Village West in accordance with all applicable laws, regulations and ordinances;*

g.  *failing to meet with City of Chicago officials regarding the numerous violations of the PDO, applicable permits, and/or the City of Chicago Building Code;*

h.  *interfering with the Bridgeport Village Project and the sale of the undeveloped properties following his removal from management by the Illinois Court; and*

i.  *forcing the Bridgeport Village Project into bankruptcy.*

**ANSWER:**  Denied.

*Counterclaim ¶217.*

*As a direct and proximate cause of Snitzer's breaches of his fiduciary duties as set forth above, Debtors have incurred damages in excess of $3 million spent or incurred to remedy the harm caused to Bridgeport Village and Debtors by Snitzer's misconduct.*

**ANSWER:**  Denied.

-69-

*Counterclaim ¶218.*

*Snitzer's conduct was egregious and justifies an award of punitive damages.*

**ANSWER:**    Denied.

**ANSWER TO COUNT II**
**(Alleged Breach of Contract)**

*Counterclaim ¶219.*

*Debtors incorporate the allegations in Paragraph 1 through 210 of the Counterclaim as though fully set forth herein.*

**ANSWER:**    Snitzer incorporates his answers to paragraph 8 through 210. Paragraphs 1-7 are not pleaded by Debtors as part of the Counterclaim, but consist of Debtors' responding paragraphs to Snitzer's Proof of Interest, and require no response.

*Counterclaim ¶220.*

*At all relevant times, Snitzer acted as a contractual agent of Debtor JS II.*

**ANSWER:**    Denied, except Snitzer admits that with respect to certain matters he acted as an agent with authority on behalf of JS II.

*Counterclaim ¶221.*

*At all relevant times, Snitzer held the position of manager and member of Debtors River Village and River Village West under the River Village and River Village West Operating Agreements.*

-61-

AA153

**ANSWER:** Denied, except Snitzer admits that he was manager of River Village and River Village West prior to June 2005 and has been a member of those entities at all relevant times.

*Counterclaim ¶ 222.*
*Snitzer agreed to perform his duties as agent and manager in good faith, in a manner he reasonably believed to be in the best interests of the companies, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.*

**ANSWER:** Paragraph 215 alleges legal conclusions to which no response is required. If and to the extent a response is required, the allegations are denied to the extent they misstate such duties.

*Counterclaim ¶ 223.*
*Debtors have fully performed their obligations to Snitzer under the terms of the River Village and River Village West Operating Agreements.*

**ANSWER:** Denied.

*Counterclaim ¶ 224.*
*As set forth above, Snitzer has breached his contractual duties to JS II, River Village, and River Village West by:*

a.  *Making major decisions without the consent of a majority of Debtor members;*

b.  *engaging in insider deals to benefit his relatives, family friends, and business associates;*

c.  *engaging in intentional, reckless, and grossly negligent misconduct in constructing Bridgeport Village and in managing its affairs;*

d.  *failing to exercise ordinary prudence in discharging his duties on behalf of JS II, River Village, and River Village West;*

-62-

AA154

AA155

e.  *Failing to discharge his duties as manager in good faith;*

f.  *Failing to manage River Village and River Village West in accordance with all applicable laws, regulations and ordinances; and*

g.  *Failing to meet with City of Chicago officials regarding the numerous violations of the PDO, applicable permits, and/or the City of Chicago Building Code; and*

h.  *Forcing the Bridgeport Village Project into bankruptcy.*

**ANSWER:**   Denied.

*Counterclaim ¶225.*

*As a direct and reasonably foreseeable consequential result of Snitzer's breaches of his contractual duties, Debtors have incurred damages in excess of $3 million spent or incurred to remedy the harm caused to Bridgeport Village and Debtors by Snitzer's misconduct.*

**ANSWER:**   Denied.

**ANSWER TO COUNT III**
**(Alleged Equitable Subordination of Snitzer and SFLLC Interests)**

*Counterclaim ¶226.*

*Debtors incorporate the allegations in Paragraph 1 through 210 of the Counterclaim as though fully set forth herein.*

**ANSWER:**   Snitzer incorporates his answers to paragraph 8 through 210. Paragraphs 1-7 are not pleaded by Debtors as part of the Counterclaim, but consist of Debtors' responding paragraphs to Snitzer's Proof of Interest, and require no response.

-63-

AA156

*Counterclaim ¶227.*

As set forth above, Snitzer engaged in misconduct that injured the interests of Debtors and Debtors' other equity interest holders.

**ANSWER:**    Denied.

*Counterclaim ¶228.*

On account of Snitzer's inequitable conduct, any equity interest held by Snitzer should be subordinated to all other equity interest holders pursuant to section 510(c)(1) of the Bankruptcy Code.

**ANSWER:**    Denied.

*Counterclaim ¶229.*

Further, as SFLLC's manager, Snitzer dominated and controlled SFLLC such that SFLLC operated as Snitzer's alter ego, with such unity of interest and ownership that the separate personalities of SFLLC and Snitzer no longer exist.

**ANSWER:**    Denied.

*Counterclaim ¶230.*

The observance of a separate existence between SFLLC and Snitzer would, under the circumstances, sanction an injustice.

**ANSWER:**    Denied.

*Counterclaim ¶231.*

Accordingly, any equity interest held by SFLLC should be subordinated to all other equity interest holders pursuant to section 510(c)(1) of the Bankruptcy Code.

**ANSWER:**    Denied.

-64-

**AA157**

**AFFIRMATIVE DEFENSES TO COUNTERCLAIM**

1.  *Standing.* JS II and River West have no standing to assert claims concerning

Snitzer's alleged misconduct with respect to Bridgeport Village. Bridgeport Village was

developed by River Village while Snitzer was manager. The alleged injuries, if any, flowed only

to River Village. Snitzer and SFLLC are, collectively, members holding a 50% interest in River

Village and its claims and liabilities could not be assigned or transferred to JS II or River West

without their consent, which was never procured.

2.  *Lack of Capacity.*

    a.  On or about May 6, 2005, in a lawsuit then-captioned River Village I LLC v.

    Kinsella Investments, Ltd., No. 04 CH 07598, filed in the Chancery Division of

    the Circuit Court of Cook County, the Court (Hon. Julia Nowicki) held that under

    the pertinent operating agreement of River Village, a lawsuit by the LLC against

    its members (in that case, the membership entities controlled by Kinsella and

    Diamond), is a "major decision" that requires approval of a majority of interest of

    the members of the LLC, which was lacking in that case because Snitzer and

    Snitzer LLC controlled 50% of the membership interest and had not obtained

    consent of Kinsella and Diamond.

    b.  Based on that finding, Judge Nowicki dismissed claims that had been filed in the

    name of River Village, while permitting the claims to be asserted in an amended

    pleading brought by Snitzer and Snitzer LLC individually or derivatively.

-65-

AA158

-66-

particular, the Operating Agreements provide:

5.      *Contractual Limit of Liability.*  Each of the Operating Agreements of River Village, River West and JS II bars claims against the managers of the LLCs for mere negligence.  In them.

4.      *Lack of Jurisdiction.*  Snitzer incorporates the previous affirmative defense. Counts I and II are being asserted in Debtors' name when they are personal claims of Kinsella and Diamond and not property claims of the bankruptcy estate.  The Court lacks jurisdiction over them.

3.      *Judicial Estoppel.*  Snitzer incorporates the previous affirmative defense.  Kinsella and Diamond have acted as managers of Debtors since being appointed by Judge Nowicki in June 2005, and in that capacity have managed Debtors in this bankruptcy.  As previously alleged, Kinsella and Diamond successfully argued to Judge Nowicki that managing members of the Debtor LLCs lacked authority to cause the LLCs to sue another member of the LLC without the consent of a majority in interest of the members because such lawsuits would be "major" decisions under the pertinent operating agreements.  Under the doctrine of judicial estoppel, Kinsella and Diamond are estopped from causing the Debtors to sue Snitzer.

c.      The claims Debtors now assert against Snitzer and Snitzer LLC in the Counterclaim purport to be claims of River Village.  Pursuant to the River Village operating agreement and the holding of Judge Nowicki, River Village lacks authority to sue Snitzer and Snitzer LLC without their consent, and they have not provided the consent.  If and to the extent the claims asserted by Debtors are legitimately made on behalf of River Village West or JS II, they are barred for the same reason.

AA159

-67-

Each Manager shall perform his duties as Manager in, a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, wilful misconduct or a wrongful taking by the Manager.

Snitzer denies that he engaged in conduct that would constitute fraud, deceit, gross negligence,

wilful misconduct or wrongful taking.  Pursuant to the foregoing provision, if and to the extent

that Debtors establish that Snitzer acted negligently or otherwise in a culpable manner that does

not amount to fraud, deceit, gross negligence, wilful misconduct or wrongful taking, their claims

are barred.

6.     *Release.*  Paragraph 12 of the June 2004 Memorandum of Understanding provides

(underscoring in original):

The undersigned hereby agree to release, acquit and forever discharge Thomas Snitzer, his associates, agents, employees, servants, successors, executors, administrators, assigns and all other related persons, businesses, firms, corporations, associations or partnerships, of and from any and all known claims, actions, rights, damages liabilities, costs and/or expenses whatsoever which the undersigned now has, on account of, or in any way growing out of, the management of River Village I LLC, River Village West LLC or JS II LLC as of the date [of] signature, including but not limited to, claims related to allegations of malfeasance, breach of fiduciary duties, negligence and/or mismanagement by Thomas Snitzer in his duties as Manager of River Village I LLC or River Village West LLC, or agent for JS II LLC.

Pursuant to this release, the claims asserted in the Counterclaim are released, discharged and

barred  to the extent they are based on acts occurring prior to the June 2004 Memorandum of

Understanding.

7.    *Failure to Mitigate Damages.* If and to the extent Snitzer breached any duties that render him liable to any of the Debtors, Debtors had a duty to mitigate any damages that may have proximately resulted from Snitzer's alleged misconduct. Debtors failed to mitigate damages by spending sums well in excess of what was required to address any injury caused by Snitzer's misconduct, or otherwise failed to take action to minimize or eliminate such damage. By way of example, Kinsella and Diamond caused Debtors to pay contractors far more than what was reasonable to address putative warranty claims for which they now seek to hold Snitzer liable. Additionally, if, for example, homes were built in violation of warranty provisions in contracts between home purchasers and River Village or of requirements of the City, the duty to mitigate would require Debtors to pursue claims against those contractors or other professionals retained by River Village that were responsible for such violations.

8.    *Business Judgment and/or Fairness.* Snitzer did not personally benefit, profit or engage in self-dealing with respect to any of the conduct alleged in the Counterclaim. His decisions were within the scope of the business judgment rule and that rule bars the claims against him. Alternatively, if and to the extent any conduct is found to have constituted self-dealing (which Snitzer denies), any such conduct was fair to the Debtors and is not actionable on that basis.

9.    *Waiver.* Any claims based on the allegations of paragraphs 205-208, concerning Snitzer's alleged breach of fiduciary duties regarding environmental litigation, were waived by Debtors, pursuant to their agreement and agreed motion to the Court approving the transfer of the rights to such environmental litigation to Snitzer, which was approved by the Court on April 12, 2007. See Answer to ¶206 above.

-68-

AA160

AA161

## THIRD PARTY CLAIMS FOR EQUITABLE SUBORDINATION AND OTHER RELIEF

Plaintiffs Thomas A. Snitzer ("Snitzer") and Snitzer Family LLC ("SFLLC"), by their attorneys Miller Shakman &Beem LLP, for their Third Party Claim for Equitable Subordination and Other Relief ("Complaint") against Kinsella Investments L.P., John J. Kinsella, Diamond Family, L.L.C. and Sid Diamond (collectively, "Kinsella and Diamond"), state as follows:

### Preliminary Statement

1.      This Complaint is filed to because Kinsella and Diamond have breached contractual and fiduciary duties to Snitzer and SFLLC, and engaged in gross negligence and willful misconduct in managing the affairs of Debtors, causing them to incur millions of dollars of damage and warranting an equitable subordination of Kinsella and Diamond's claims to repayment of capital to the equity interests of Snitzer and SFLLC.

### Parties

2.      Third Party Plaintiff Thomas A. Snitzer is an Illinois resident with extensive experience as a real estate developer. At all relevant times he was a member of two Illinois limited liability companies, River Village I, LLC ("River Village") and River Village West, LLC ("River Village West"), and from approximately early July 2004 to the present he was a member of a third Illinois limited liability company, JS II, LLC ("JS II") (collectively, the three entities will be referred to as the "LLCs" or "Debtors"), all of which have their principal place of business in Illinois and are involved in the business of residential real estate development.

3.      Third Party Plaintiff SFLLC is an Illinois limited liability company with its principal place of business in Illinois. Thomas Snitzer is the manager of SFLLC. SFLLC is a

-69-

AA162

member of River Village, River Village West and JS II.

4.      Together, Thomas Snitzer and SFLLC own 50% of the total membership interests in each of River Village, River Village West and JS II. Alternatively, if SFLLC does not own any membership interest in JS II, Snitzer owns 50% of the total membership interests in JS II.

5.      River Village has four members. They are: Thomas Snitzer, SFLLC, Diamond Family L.L.C. and Kinsella Investments, L.P. Prior to June 2005, Thomas Snitzer was the manager of River Village.

6.      River Village West has four members. They are: Thomas Snitzer, SFLLC, Diamond Family L.L.C. and Kinsella Investments, L.P. Prior to June 2005, Thomas Snitzer was the manager of River Village West.

7.      JS II has four members. They are: Thomas Snitzer, SFLLC, John J. Kinsella and Diamond Family L.L.C. At certain times, prior to June 2005, Thomas Snitzer managed JS II.

8.      Third Party Defendant Kinsella Investments, L.P. is a Delaware limited partnership and a 30% member of River Village and River Village West. Kinsella Investments, L.P. does business in Illinois.

9.      Third Party Defendant John Kinsella is a limited partner and the general partner and/or manager of Kinsella Investments, L.P. John Kinsella is an Illinois resident and a 30% member of JS II.

10.     Third Party Defendant Diamond Family L.L.C. is an Illinois limited liability company and a 20% member of River Village, River Village West and JS II. Diamond Family, L.L.C. does business in Illinois.

11.     Third Party Defendant Sid Diamond is an owner and principal of Diamond

-70-

AA163

Family, L.L.C. and the manager of Diamond Family, L.L.C. Sid Diamond is an Illinois resident.

## Jurisdiction

12.     This Court has core jurisdiction to hear and determine this Third Party Claim pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), 157(b)(2)(A) and 157(b)(2)(O). Should this Court determine that it does not have core jurisdiction, this Court has "related to" jurisdiction pursuant to 28 U.S.C. §157(c)(1), and Snitzer consents to the entry of final orders by this Court.

## Background

13.     River Village was the developer of Chicago's largest single family home development, called Bridgeport Village-Phase I ("Bridgeport Village"). Bridgeport Village's first phase consists of 115 single family homes located in Chicago's Bridgeport neighborhood, near Racine and 34th Street on the Eastern Edge of the South Branch of the Chicago River.

14.     The award winning development was successful under Snitzer's management and was poised to be very profitable to its investors. At the time of Snitzer's ouster by the Circuit Court in June 2005, approximately 106 of the 115 homes had been sold, with 84 homes completed and occupied. Another 16 homes were in various stages of construction, 6 of which were completed and ready for occupancy.

15.     The Bridgeport Village project's success under Snitzer's management had also caused the value of the homes to rise along with its profitability. The average selling price of the first 10 homes sold (in 2002) was approximately $469,000 without upgrades. Since then prices had increased dramatically. The average selling price of the last 10 homes sold (in late 2004 and early 2005) was approximately $963,000 without upgrades.

16.     Bridgeport Village was and remains a first class, beautiful residential

-71-

AA164

development. Under Snitzer's management, it received numerous awards and endorsements, including:

    a.    Awarded Best City of Chicago Project for three consecutive years 2002, 2003 and 2004 by the Chicago Association of Homebuilders. Bridgeport Village is the only project ever to have received this award more than once;

    b.    Awarded Best City Development for 2003 by the Chicago Sun Times;

    c.    Awarded Best City Development for 2003 by New Homes Magazine;

    d.    Described as Best City Residential Development by 11th Ward Alderman James Balcer at a committee meeting.

    17.    In addition to managing River Village's development of Bridgeport Village, Snitzer caused River Village, West, through its nominee, JS II, to acquire several valuable commercial properties in Bridgeport at favorable prices for potential future residential development. In addition to the property on which Bridgeport Village-Phase I is being built, Snitzer caused River Village West and JS II to acquire other nearby properties known as the "Iron Street Property" (AAA and Acme) and the "Holsum Property." Snitzer also caused River Village, River Village West and JS II to file environmental litigation against People's Gas that resulted in late 2005 in the acquisition by JS II, at no net cost, of an option to buy the "Gray Property" at $17 per square foot after Peoples cleans it up. One of Debtors' advisers recently testified that the estimated value to Debtors of the Gray Property option is $1-2 million.

    18.    River Village is governed by an Operating Agreement entered into and agreed to by all of its members including Third Party Defendants in or about June 1998.

    19.    River Village West is governed by an Operating Agreement entered into and agreed to by all of its members including Third Party Defendants in or about January 2002.

-72-

AA165

-73-

20.     Prior to approximately July 2004, JS II was governed by an Operating Agreement entered into and agreed to by all of its members in September 1997. The JS II Operating Agreement was amended by a Memorandum of Understanding entered into in about July 2004 ("MOU"), pursuant to which among other things, Snitzer and SFLLC became members of JS II and Snitzer became the manager of JSII effective July 2004.  A true and correct copy of the MOU is attached to Snitzer's Proof of Interest (Dkt. 188) as Exhibit I.

21.     On June 23, 2005, the Circuit Court of Cook County (Judge Nowicki), entered an order that found in relevant part that Snitzer became a member of JS II pursuant to the MOU, but that the membership status of SFLLC and the extent of Snitzer's rights and responsibilities as a member were ambiguous.  A true and correct copy of the June 23, 2005 Order is attached to Snitzer's Proof of Interest as Exhibit 3.

22.     The Illinois Limited Liability Company Act ("Act") provides that members of a limited liability company such as River Village, River Village West and JS II may enter into an operating agreement which shall control the management and operation of the company, except as otherwise specifically provided in the Act.  805 ILCS 180/15-5.

**Kinsella and Diamond's Obligations as**
**Managers per the June 23, 2005 Order and Illinois Law.**

23.     Pursuant to Judge Nowicki's order of June 23, 2005 in the Circuit Court, Kinsella and Diamond were authorized to replace Snitzer and were thereby given managerial authority over the LLCs as specified therein.

24.     In assuming and exercising managerial authority over the LLCs, Kinsella and Diamond were obligated to exercise that authority in a manner consistent with the operating

AA166

agreement of each LLC, with the Illinois Limited Liability Company Act and with the June 23, 2005 Order.

25. At all relevant times, Kinsella and Diamond owed fiduciary duties to the LLCs and to Snitzer of loyalty, due care and good faith and fair dealing.

**Kinsella and Diamond Have Improperly Commingled Assets of the LLCs**

26. The Debtors are separate and distinct Illinois limited liability companies.

27. While Snitzer functioned as manager, the separate LLCs observed corporate formalities that included maintaining separate accounts and not commingling funds and assets. On occasion, when funds were advanced from one LLC to another (as occasionally happened between River Village and River Village West), the advances were properly booked as loans from one entity to the other.

28. The three LLCs were intended to serve and, in fact, under Snitzer's management historically and reasonably served, separate functions, as explained in the next several paragraphs.

29. River Village functioned as the operating entity for the development and sale of homes in Bridgeport Village Phase I.

30. River Village West was formed in or about 2002 and functioned as the operating entity for the acquisition and management of industrial rental properties.

31. JS II was formed in or about 1997 in connection with a prior development (Dearborn Village) in which Snitzer, Kinsella and Diamond were members (directly or through entities they controlled). Snitzer was manager of the Dearborn Village development. He controlled 50% of the membership interests in Dearborn Village LLC, which developed that project, and Kinsella and Diamond collectively controlled a 50% membership interest in that entity.

-74-

AA167

-75-

32.    In connection with Dearborn Village, JS II functioned as a mere nominee for the benefit of Dearborn Village, LLC, the separate LLC that developed Dearborn Village.

33.    Regarding the Dearborn Village development, JS II held legal title to the Dearborn Village LLC property as a nominee, but the assets, liabilities, profits and losses were all recorded on the books of Dearborn Village LLC and tax returns were filed for that LLC, and not for JS II.

34.    Kinsella and Diamond knew about and consented to the foregoing course of dealing at Dearborn Village.

35.    Consistent with the course of dealing that Snitzer, Kinsella and Diamond established with respect to Dearborn Village, prior to Snitzer's ouster from management in June 2005, JS II functioned as a nominee for River Village and River Village West.

36.    In the capacity of nominee, consistent with the prior course of dealing at Dearborn Village, JS II had held legal title to certain of the properties for the benefit and use of River Village or River Village West. However, River Village or River Village West was in each case the real party in interest with respect to ownership of such properties.

37.    Consistent with economic reality and the course of dealings and understandings of the parties, while Snitzer was manager, capital contributions, income and expenses flowed, respectively, through River Village or River Village West, but not JS II, and those entities filed federal income tax returns accurately reflecting this reality, while JS II, as a mere nominee, did not.

38.    Specifically, at all times from the beginning of the Bridgeport Village Phase I until Snitzer's ouster from management in June 2005, River Village operated and acted as the developer for the Bridgeport Village-Phase I project, with Snitzer as manager, and with the knowledge and agreement of Kinsella and Diamond. Kinsella and Diamond were aware that all of the projects costs,

AA168

-76-

revenues and expenses were recorded on the books and records of River Village, the books and records of the development were maintained by River Village, all of the home sale contracts were between River Village and the buyers, all of the project staff were hired, employed and managed by River Village and all of the income was recorded as income of River Village.

39.    Additionally, Kinsella and Diamond contributed $2.5 million to River Village in connection with the development of Bridgeport Village (which contributions were later repaid), and they contributed approximately $5 million to River Village West in connection with that entity's acquisition of the "Iron Street" and "Holsum Properties."

40.    Prior to Snitzer's removal as manager, Kinsella and Diamond contributed no capital to JS II in connection with Bridgeport Village, the acquisition of property in Bridgeport or the activities of River Village or River West.

41.    Since taking over management from Snitzer in June 2005, Kinsella and Diamond have not been observing corporate formalities and have improperly commingled (and have stated that they intend to continue commingling) funds and assets of the separate LLCs.

42.    In particular, Kinsella and Diamond have used revenues from River Village West's industrial properties to pay for expenditures of River Village to perform work on Bridgeport Village Phase I.

43.    Additionally, Kinsella and Diamond used the equity from River West's industrial properties as collateral for loans whose proceeds were used to pay for expenditures of River Village to perform work on Bridgeport Village Phase I.

44.    Kinsella and Diamond also started using JS II as an operating company and have purported to have that company assume liabilities of River Village, without the consent of Snitzer.

AA169

-77-

45.     Additionally, Kinsella and Diamond are proposing that the Court approve a substantive consolidation of the Debtors, pursuant to which proceeds of the sale of River Village West's (or, in their view, JS II's) industrial properties would generate cash to pay for or reimburse expenditures on Bridgeport Village for the benefit of River Village.

46.     Snitzer has objected and continues to object to commingling of assets and revenues between or among the entities, including any plan to use any proceeds from the sale of River Village West's (or JS II's) industrial properties to pay for obligations of River Village.

47.     Even under Kinsella and Diamond's erroneous accounting practices instituted after they assumed management control in June 2005, their actual and intended commingling of assets would be improper. The tax returns prepared and filed under their management since June 2005 reflected (properly) income and losses from Bridgeport Village Phase I on River Village's tax return. However, the return for 2005 reflected (improperly) income and losses from the industrial properties on JS II's tax return (rather than River Village West's return). Upon information and belief, JS II had not previously filed a tax return, including for the year 2004. Regardless of whether the industrial properties' income should be shown as that of JS II or River Village West, Kinsella and Diamond's IRS filings on behalf of the entities correctly reflect that the assets and operations of Bridgeport Village Phase I are distinct from and should be recorded on the books of a separate corporate entity than those of the industrial properties. The assets, liabilities, profits and losses from Bridgeport Village and the industrial properties should not be commingled.

48.     The use of assets or revenues of one of the venture LLCS (e.g., River Village West or of JS II) to pay for obligations of another venture LLC (e.g., River Village), in disregard of the LLCS' separate corporate existence, would, at a minimum, constitute a "major decision" that requires

AA170

-78-

a majority vote of the members of each affected LLC, and would require accounting to reflect a liability of the venture receiving such a benefit in favor of the entity granting the benefit.

49.     Snitzer never voted for or approved of Kinsella and Diamond commingling assets between or among the LLCs without reflecting the obligations that are created thereby by virtue of their respective separate existences. Commingling is injurious to JS II and River Village West.

50.     To the extent Kinsella and Diamond have commingled assets or revenues in such a fashion, they have intentionally violated the Operating Agreements of the LLCs and have breached fiduciary duties to Snitzer and to the LLCs.

**Kinsella and Diamond Were Grossly Negligent in Placing the Debtors into Bankruptcy Because they Grossly Overspent Funds at Bridgeport Village, Were Inept at Selling Homes and Lots, and Failed to Honor Obligations to Return and/or Contribute Capital to River Village, Thereby Creating Liquidity Problems that Were Avoidable.**

51.     For at least a year prior to the filing of this Bankruptcy, Kinsella and Diamond repeatedly claimed that "the venture" was in a financial crisis

52.     In fact, upon information and belief, "the venture" as a whole was not in a financial crisis. Rather, only River Village had experienced any significant cash flow shortfalls.

53.     As a member of River Village, River Village West and JS II, Snitzer is entitled to discovery and a thorough and accurate accounting to determine the extent of the alleged "crisis," its causes, and its solutions.

54.     Upon information and belief, the "crisis" that Kinsella and Diamond allege precipitated this bankruptcy resulted, in fact, from gross management errors by Kinsella and Diamond and by their failure to fulfill obligations under the River Village operating agreement to capitalize that entity adequately.

AA171

55.    Neither Kinsella nor Diamond had experience managing a large residential real estate development.

56.    Kinsella is a retired advertising executive.

57.    Diamond is in the business of manufacturing children's products.

58.    Section 1.084(d) of the River Village Operating Agreement provides: "Notwith-standing any provision of this Agreement or as provided in the [LLC] Act, Snitzer Family L.C.C. [sic] and Thomas Snitzer shall have no obligation to make additional capital contributions."

59.    Section 1.084(e) of the River Village Operating Agreement provides: "To the extent that the Company requires additional capital contributions, Kinsella Investments L.P. and Diamond Family L.C.C. [sic] shall make additional contributions to the capital of the Company in an amount not expected to exceed Eight Million Five Hundred Thousand Dollars ($8,500,000.00)."

60.    Pursuant to Section 1.084(e), in or about 1999 and 2000, Kinsella and Diamond made capital contributions (directly or through entities they respectively controlled) to River Village totaling approximately $2.5 million.

61.    Specifically, in or about 1999 Kinsella and Diamond contributed $900,000 and $600,000 respectively in capital to River Village.

62.    In or about 2000 Kinsella and Diamond respectively contributed additional capital of $600,000 and $400,000.

63.    The 1999 and 2000 capital contributions were paid to River Village, not JS II. These funds, along with funds borrowed from financial institutions, were used to defray project costs of Bridgeport Village, Phase I.

-79-

AA172

64.    Section 1.08₄(a) of the River Village Operating Agreement provides: "A Member shall not receive out of the Company's property any part of its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them."

65.    Prior to his removal as manager of River Village, in 2004 and early 2005, Snitzer caused River Village to return all of Kinsella and Diamond's $2.5 million Capital Contribution to them, in payments of $1 million and $1.5 million.  He did so with the expectation and belief that continued strong sales and profits would enable River Village to retire imminently the remaining Phase I project bank debt (which had been reduced from about $16 million to about $1 million) and meet other liabilities of River Village.  Kinsella and Diamond accepted these returns of capital without objection.

66.    Because of the City of Chicago's shutdown of Bridgeport Village in 2005 (and again from time to time thereafter while Kinsella and Diamond were managing River Village), and because of management mistakes and the development inexperience of Kinsella and Diamond, River Village completed homes at a very slow pace, had lost sales, was slow at generating new sales, and had thereby not generated sufficient revenues to meet legitimate expenditures or to repay remaining Phase I project debt.  Additionally, since taking over management in June 2005, Kinsella and Diamond have caused River Village (or JS II for the benefit of River Village) to make unnecessary and excessive expenditures, exacerbating a cash shortfall.

67.    Despite River Village's requirement for capital to complete Bridgeport Village from 2005 to the present, Kinsella and Diamond have repeatedly refused to restore their previous capital contributions or to make additional capital contributions.  Instead, upon information and belief, they

-80-

AA173

-18-

have made what they characterize as "loans," in an aggregate amount that is substantially less than their prior capital contributions.

68.     Section 1.053 of the River Village Operating Agreement enumerates certain decisions that "require the affirmative vote of all of the members of the company." Among such decisions requiring unanimity is a decision "[t]o borrow money for the Company from banks, other lending institutions, *the Managers, Members, or affiliates of the Managers or Members . . .*" (Emphasis added.)

69.     Contrary to Section 1.053, Kinsella and Diamond never obtained Snitzer's vote with respect to their putative "loans" to River Village.

70.     Section 1.084(f) of the River Village Operating Agreement provides that Kinsella and Diamond may elect, upon approval of the Members, to make a loan to River Village in lieu of additional capital contribution, if funds are needed in excess of the $8.5 million sum set forth in Section 1.084(e). In purporting to "loan" funds to River Village without Snitzer's approval and without having contributed up to $8.5 million in capital, Kinsella and Diamond breached Section 1.084(f).

71.     If Kinsella and Diamond had contributed capital to River Village pursuant to their obligations to do so, the cash shortfall and putative "crisis" associated with River Village would have been substantially or fully resolved, or, at a minimum, substantially ameliorated.

72.     If Kinsella and Diamond had contributed capital to River Village pursuant to their obligations to do so, they could have avoided placing the Debtors into bankruptcy, which would have avoided the expenditure of several million dollars of administrative expenses, as well as the recent sale of the "Iron Street Property" at a distressed, as-zoned price of $12.50 per square foot.

AA174

73.    In refusing to contribute capital to River Village, Kinsella and Diamond were placing their personal interests above their fiduciary duties to River Village, River Village West, JS II and to Snitzer.

74.    Pursuant to Section 1.084 of the River Village Operating Agreement, Kinsella and Diamond are obligated to restore their capital contributions, at least in the amount of the $2.5 million contribution they had previously made, to River Village. Contrary to expectations that existed at the time the capital was returned in 2004 and 2005, sales revenue had not been sufficient to pay "all liabilities of the Company." Thus, the condition precedent to repayment of their Capital Contributions under Section 1.084 has not been met.

75.    By not restoring the $2.5 million in Capital Contributions to River Village, Kinsella and Diamond breached their obligations under the River Village Operating Agreement and breached their fiduciary duties to River Village and to Snitzer.

76.    As previously alleged, Section 1.084(e) requires Kinsella and Diamond to contribute up to $8.5 million "[t]o the extent that the Company requires additional capital contributions."

77.    Section 1.082 of the River Village operating agreement provides in relevant part that "[a] Member shall be required to make such additional Capital Contributions as shall be determined by Members owning a Majority Interest from time to time to be reasonably necessary to meet the expenses and obligations of the Company."

78.    Based on their own repeated declarations of a financial crisis and statements to the Bankruptcy Court of a need for cash for the operations of Bridgeport Village, Kinsella and Diamond have admitted that River Village "requires additional capital contributions" and that such capital is "reasonably necessary to meet the expenses and obligations of the Company."

-82-

AA175

79.     Contrary to the position Kinsella and Diamond have taken, Section 1.082 does not provide Kinsella and Diamond with unfettered discretion to override the capital contribution obligations of Section 1.084(e). Rather, reading the provisions together, the Operating Agreement obligated Kinsella and Diamond to contribute capital as "required," up to $8.5 million, with the precise amount that is "reasonably necessary" to be determined by a Majority Interest. Pursuant to the plain terms of the Operating Agreement, the duty of good faith and fair dealing implied by law in the Operating Agreement, and Kinsella and Diamond's fiduciary duties to the LLCs and to Snitzer, they had a duty to contribute up to an additional $8.5 million to River Village to the extent "reasonably necessary" to address its requirement for capital.

80.     By purporting to make insufficient "loans" instead of restoring capital, and by doing so without the affirmative vote of all members of River Village, Kinsella and Diamond have breached their duties under the River Village Operating Agreement and have breached their fiduciary duties to River Village and Snitzer.

**Management Errors and Claims of Operating Losses.**

81.     Before the City shut down Bridgeport Village for alleged building code and permit violations in January 2005, and the subsequent transfer of managerial authority to Kinsella and Diamond in June 2005, Bridgeport Village had been a financial success.

82.     At that time, the project bank debt had been reduced from $16 million to about $1 million and $2.5 million in capital had been returned to Kinsella and Diamond. Additionally, the inventory of completed and sold homes was large, totaling approximately $6 million, in addition to an inventory of nearly complete and sold homes.

-83-

AA176

-84-

83.     Because Snitzer had caused River Village to acquire the Bridgeport Village property at a favorable price and because of the substantial appreciation of residential land values from 1998-2005, including the substantial increase in average selling prices for Bridgeport Village homes (from about $469,000 for the first ten homes to about $963,000 for the last ten homes sold under Snitzer's management), River Village was poised to earn very large profits.  The favorable financial situation and size of the potential profits was such that the profits to River Village should have been large even after accounting for the damages to River Village caused by the City's shutdown and attendant delays.

84.     While the City's shutdown of Bridgeport Village in 2005 caused serious short-term cash flow problems for River Village (due to the delays caused in closing the sales of completed or nearly-completed homes), River Village was then, and should have thereafter been, in a position to be substantially profitable after the remaining homes were completed and sold.

85.     Based on financial data provided by Debtors in the bankruptcy, it appears Debtors are claiming that River Village will be liquidated at a net loss.

86.     Snitzer requires discovery and a complete accounting to determine how the Project degenerated from profitable to unprofitable under Kinsella and Diamond's management from June 2005 to the present.  Given the land costs, reasonable construction costs and market values of the homes, his knowledge of the condition of Bridgeport Village at the time of his removal in June 2005, and based upon his twenty years of experience as a residential real estate developer, Snitzer does not believe that River Village could have become unprofitable in the absence of gross mismanagement or waste of corporate resources by Kinsella and Diamond.

87.     Based on the incomplete disclosures and discovery he has received to date, Snitzer is informed and believes that Kinsella and Diamond made several serious and material management errors that have diminished the profitability of River Village. Full discovery and an accounting are required to determine the scope and extent of their errors and their impact. He presently believes that the errors include, without limitation, the following:

    a.    Hiring a new construction superintendent (Jay Barry), whom they terminated during 2006. Upon information, they terminated Barry due to their dissatisfaction with his performance. Snitzer requires discovery to determine the adequacy of Barry's performance and the reasons for Kinsella and Diamond's termination of him. Regardless of the reasons, however, the engagement and subsequent termination of an incompetent superintendent necessarily had disruptive and costly consequences.

    b.    Paying very large consulting fees to FCL Construction, a firm that, upon information and belief, is experienced in commercial construction but not residential construction. FCL's fees are two to three times higher than what was paid to Jay Barry or Snitzer's previous staff for similar services, and sometimes exceeded $150,000 per month. Upon information and belief, these fees were excessive and unreasonable for the scope of work to be performed.

    c.    Paying certain subcontractors excessive and unreasonable amounts to resolve their claims.

    d.    Paying certain subcontractors unnecessarily on a time and material basis, which inflated the costs associated with such work.

    e.    Failing to complete and submit in a timely fashion architectural and other drawings to the City of Chicago to resolve administratively certain of the technical issues the City had raised

-85-

AA177

AA178

-98-

to justify their shutdown of the project in January 2005. For example, in or about June 2006, even after a year of holding managerial authority, Kinsella and Diamond had not secured one approved plan from the City for the approximately 110 homes either occupied or sold and under construction, and their delays in obtaining such approvals continued thereafter.

     f.     Spending unnecessarily large sums on "warranty" or "punch list" work. Based on Snitzer's experience as a developer, the sums reported by Kinsella and Diamond may reflect that they have agreed to repair certain alleged problems in sold homes that were out of warranty or that were maintenance issues rather than construction defects for which River Village was responsible and/or they grossly overpaid for legitimate punch list or warranty work. Discovery is required to determine what these funds were spent on and whether such expenditures were proper. Alternatively, Kinsella and Diamond should be seeking reimbursement from the design professionals, contractors or material suppliers (and their insurers) who were responsible for the alleged problem.

     g.     Agreeing, upon information and belief, to the costly installation of "structural gates" to remedy an alleged structural issue raised by the City of Chicago. Kinsella and Diamond should either have contested the gates requirement as unreasonable (since the City is imposing the requirement at Bridgeport Village but not at approximately thirty thousand other similarly constructed homes in the City, and the City has admitted that the alleged structural problem poses no life or safety issues), or, alternatively, should be seeking reimbursement from the design professionals (and their insurers) who were responsible for the structural condition giving rise to the alleged problem.

AA179

h.     Kinsella and Diamond were grossly negligent with respect to the very slow pace with which River Village completed and sold homes after June 2005. Under Snitzer's management, River Village completed and sold homes at a much more rapid rate. Kinsella and Diamond's very slow progress, combined with the excessive expenditures to complete and build homes, unnecessarily exacerbated the liquidity problems of River Village.

i.     Kinsella and Diamond were grossly negligent with respect to their failure for over two years to sell undeveloped lots at Bridgeport Village to generate revenue for River Village.

**Equitable Subordination.**

88.     As set forth above, Kinsella and Diamond engaged in misconduct that injured the interests of Debtors and equity holders Snitzer and SFLLC. Their inequitable conduct included, without limitation, placing their own interests above those of Snitzer and the LLCs. By commingling assets and using JS II as an operating company for Bridgeport Village, when River Village had previously been the operating company, they were seeking to deprive Snitzer and SFLLC of their consent rights under the operating agreements and the LLC Act, since they were also contending that Snitzer and SFLLC had no voting rights in JS II or that, if Snitzer had such rights, he was outvoted 2-1 on "major decisions" (whereas they could not make such contentions with respect to River Village and River Village West). Additionally, by doing so they were also seeking to avoid their capital contribution obligations to River Village, to the detriment of River Village West and of JS II and of Snitzer and SFLLC.

89.     On account of Kinsella and Diamond's inequitable conduct, any equity interest held by them (including their return of capital) should be subordinated to all other equity interest holders (Snitzer and SFLLC) pursuant to section 510(c)(1) of the Bankruptcy Code.

-87-

AA180

-88-

90.    Further, as the managers or controlling persons of Kinsella Investments L.P. and

Diamond Family, L.L.C., respectively, Mr. Kinsella and Mr. Diamond dominated and controlled

those entities and they operated as their respective alter egos, with such unity of interest and

ownership that the separate personalities of those entities and Messrs. Kinsella and Diamond.

91.    The observance of a separate existence between Kinsella Investments L.P. and Mr.

Kinsella, and Diamond Family, L.L.C. and Mr. Diamond, would, under the circumstances, sanction

an injustice.

92.    Accordingly, any equity interest held by Kinsella Investments, L.P. and Diamond

Family, L.L.C. should be subordinated to Snitzer and SFLLC pursuant to section 510(c)(1) of the

Bankruptcy Code.

WHEREFORE, Snitzer and SFLLC respectfully request that the Court enter judgment in

their favor and against Kinsella and Diamond, equitably subordinate their interests in Debtors

(including their interest in return of capital) to those of Snitzer and SFLLC, and grant such other

relief as the Court deems just and proper.

Respectfully submitted,

THOMAS SNITZER AND SNITZER FAMILY LLC

By:    /s/Edward W. Feldman
       One of their attorneys

Marc O. Beem
Edward W. Feldman
**MILLER SHAKMAN & BEEM LLP**
180 N. LaSalle St., Suite 3600
Chicago, IL 60601
(312) 263-3700

AA181

## CERTIFICATE OF SERVICE

Edward W. Feldman, an attorney, certifies that on December 14, 2007 he caused service of the foregoing "**Thomas A. Snitzer and Snitzer Family LLC's Answer and Affirmative Defenses to Debtors' Counterclaim, and Third Party Complaint for Equitable Subordination**" on the parties of record by CM/ECF service as to registered filing users and by E-mail upon those parties that are not registered filing users.

Dated: December 14, 2007

/s/Edward W. Feldman
_____
Edward W. Feldman

AA182

## SERVICE LIST

Christopher J Lawhorn
cjlawhorn@bryanave.com

Adrian E Mazar
mazaresq@sbcglobal.net;
AdrianMazar@comcast.net

Mary Ann Murray
mmurray@bpp-chicago.com

William T Neary
USTPRegion11.ES.ECF@usdoj.gov

Peter J Roberts
proberts@shawgussis.com

Travis Rojakovick
trojakov@lordbissell.com;
docket@lordbissell.com;
slyons@lordbissell.com

Catherine L. Steege
Andrew J. Olejnik
csteege@jenner.com;
aolejnik@jenner.com

Steven B Towbin
stowbin@shawgussis.com

Esther E Tryban Telser
ettrybantelser@cityofchicago.org

Andrew E Weissman
andrew.weissman@dbr.com

Janice A Alwin
jalwin@shawgussis.com

Marc O. Beem
mbeem@millershakman.com;

William R. Brodzinski
wbrodzinski@mrirlaw.com

Jeffrey A Chadwick
jeffrey.chadwick@kattenlaw.com

Patrick A Clisham
pclisham@shawgussis.com

Blanca R Dominguez
bdominguez@bpp-chicago.com;
ggurgel@bpp-chicago.com

Brian M. Dougherty
bmd@esmh.com

Barry A Erlich
berlich@rb-llp.com

Edward W Feldman
efeldman@millershakman.com;

Allen J Guon
aguon@shawgussis.com

Forrest L Ingram
foringpc@aol.com

***Counsel for the City of Chicago***
Mark A. Limanni
mlimanni@cityofchicago.org

***Special Counsel to the Debtors***
Michael I. Rothstein
Henry H. Hess
Daniel Konieczny
mrothstein@tdrlawfirm.com
hhess@tdrlawfirm.com
dkonieczny@tdrlawfirm.com

Karen R. Goodman
kgoodman@shefskylaw.com

Andrew W. Worseck
aworseck@cityofchicago.org

***Counsel for the U. S. Trustee***
Richard Craig Friedman
Richard.C.Friedman@usdoj.gov

Keith W. Harrington
kharrington@dhwlawyers.com

John J. Vondran
jvondran@comcast.net

***Financial Advisors to the Debtors***
Patrick Cavanaugh
Greg Apathy
pcavanaugh@high-ridge.com
gapathy@high-ridge.com

***Legal and Financial Advisor to John Kinsella and Sid Diamond***
Rockney W. Hudson
hudson@hackhud.com

AA184

{5618 NOM A0190906S.DOC}

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ( | Chapter 11 |
|  | ( | Case No. 07-03856 |
| *J.S. II, L.L.C., et al.,* | ( | (Jointly Administered) |
|  | ( | Hon. Jacqueline P. Cox |
| Debtors. | ( | Hearing Date:  March 27, 2008 |
|  | ( | Hearing Time:  9:30 a.m. |

## NOTICE OF MOTION

TO:       See Attached Service List

**PLEASE TAKE NOTICE** that on **March 27, 2008 at 9:30 a.m.** or as soon thereafter as counsel may be heard, I shall appear before the **Honorable Jacqueline P. Cox** in Courtroom 619 of the United States Bankruptcy Court for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois, or in her absence, before such other Judge who may be sitting in her place and stead and hearing bankruptcy motions, and shall then and there present the **Debtors' Motion To Dismiss Third Party Complaint For Equitable Subordination Filed By Thomas A. Snitzer And The Snitzer Family LLC And For Related Relief**, a copy of which is attached and herewith served upon you, and shall pray for the entry of an order in conformity with that motion.

**AT WHICH TIME AND PLACE** you may appear if you so see fit.

Steven B. Towbin (#2848546)
Shaw Gussis Fishman Glantz
Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60610
(312) 276-1333

## CERTIFICATE OF SERVICE

Steven B. Towbin certifies that he caused to be served a true copy of the above and foregoing notice and attached pleadings upon the attached Service List by email on this 8th day of February, 2008.

/s/ Steven B. Towbin
_____

AA185

{5618 NOM A019906S.DOC}

# JS II, L.L.C. – Case No. 07-03856
## SERVICE LIST

*Counsel for the U.S. Trustee*
Richard Craig Friedman
Office of the U.S. Trustee
227 West Monroe Street, Suite 3350
Chicago, IL 60606
richard.c.friedman@usdoj.gov

*Counsel for American Chartered Bank*
Mary Ann Murray
Burke Burns & Pinelli, Ltd.
70 West Madison, Suite 4300
Chicago, IL 60602
mmurray@bbp-chicago.com

*Financial Advisors to the Debtors*
Patrick Cavanaugh
Greg Apathy
High Ridge Partners
140 South Dearborn
Chicago, IL 60603
pcavanaugh@high-ridge.com
gapathy@high-ridge.com

*Special Counsel to the Debtors*
Michael I. Rothstein
Henry H. Hess
Tabet DiVito & Rothstein LLC
209 South LaSalle Street, 7th Floor
Chicago, IL 60604
mrothstein@tdrlawfirm.com
hhess@tdrlawfirm.com

*Counsel for FCL*
Robert A. Eiden
Barry Erlich
Richmond Breslin LLP
233 South Wacker Drive, Suite 5775
Chicago, IL 60606
reiden@RB-LLP.com
berlich@RB-LLP.com

*Counsel for Moore*
Matthew J. Cleveland
Hogan Marren, Ltd.
180 North Wacker Drive, Suite 600
Chicago, IL 60606
mjc@hmltd.com

*Counsel for Thomas Snitzer and the Snitzer Family LLC*
Edward W. Feldman
Marc O. Beem
Miller Shakman & Beem LLP
180 North LaSalle Street, Suite 3600
Chicago, IL 60601
efeldman@millershakman.com
mbeem@millershakman.com

*Counsel for the Creditors' Committee*
Catherine L. Steege
Andrew J. Olejnik
Jenner & Block LLP
330 North Wabash Avenue
Chicago, IL 60611
csteege@jenner.com
aolejnik@jenner.com

*Counsel for Leventfeld Perlstein*
Richard Lauter
Leventfeld Pearlstein, LLC
2 North LaSalle Street, Suite 1300
Chicago, IL 60602
rlauter@lplegal.com

*Counsel for Edon*
Richard C. Jones Jr.
Jones & Jacobs
77 West Washington Street, Suite 2100
Chicago, IL 60602
rjones@jonesandjacobs.com

AA186

**Counsel for the City of Chicago**

Mark A. Limmani
Esther Tryban Telser
City of Chicago Law Department
30 North LaSalle Street, Suite 700
Chicago, IL 60602
mllimanni@cityofchicago.org
etrybantelser@cityofchicago.org

**Special Transactional Counsel**

John J. Vondran
P.O. Box 190
Winnetka, IL 60093
jvondran@comcast.net

**Legal and Financial Advisor to John Kinsella and Sid Diamond**

Rockney W. Hudson
Hackbarth & Hudson PC
20 North Wacker Drive, Suite 1520
Chicago, IL 60606
hudson@hackbud.com

Robert Stoval
Four Columns, Ltd.
1325 North Sandberg Terrace
Chicago, IL 60610
rls@fourcolumnsltd.com

**Counsel for Creditor ACME Refining**

Kenneth J. Otaviano
Jeffrey A. Chadwick
Katten Muchin Rosenmann LLP
525 West Monroe Street
Chicago, IL 60661
kenneth.ottaviano@kattenlaw.com
jeffrey.chadwick@kattenlaw.com

**Counsel for Builder's Material Source**

Edward C. Eberspacher
O'Hagan Spencer, LLC
One East Wacker Drive, Suite 3400
Chicago, IL 60601
teberspacher@ohaganspencer.com

**Counsel for Metz Baking Company**

Christopher J. Lawhorn
Bryan Cave LLP
211 North Broadway, Suite 3600
St. Louis, MO 63102
cjlawhorn@bryancave.com

**Counsel for Jose Ruiz and Sandra Ruiz**

Forrest L. Ingram
Forrest L. Ingram, P.C.
79 West Monroe Street, Suite 900
Chicago, IL 60603
fingram@fingramlaw.com

**Counsel for American Chartered Bancorp, Inc. d/b/a American Chartered Bank**

Blanca R. Dominguez
Burke Burns & Pinelli, Ltd.
70 West Madison Street, Suite 4300
Chicago, IL 60602
bdominguez@bbp-chicago.com

**Counsel for Rose Paving Co.**

Timothy W. Brink
Aaron C. Smith
Locke Lord Bissell & Liddell LLP
111 South Wacker Drive
Chicago, IL 60606
tbrink@lordbissell.com
asmith@lordbissell.com

Sid Diamond
c/o Rockney W. Hudson
Hackbarth & Hudson PC
20 North Wacker Drive, Suite 1520
Chicago, IL 60606
sidiamond2@aol.com

John Kinsella
c/o Rockney W. Hudson
Hackbarth & Hudson PC
20 North Wacker Drive, Suite 1520
Chicago, IL 60606
bpvkinsella@yahoo.com

***Counsel for M.F. Construction Contractors Company***

Brian M. Dougherty
Goldstein, Skrodzki, Russian,
Nemec and Hoff
835 McClintock Drive, 2nd Floor
Burr Ridge, IL 60527
bmd@gsrnh.com

***Counsel for South Branch, L.L.C.***

Karen R. Goodman
Shefsky & Froelich Ltd.
111 East Wacker Drive, Suite 2800
Chicago, IL 60601
kgoodman@shefskylaw.com

***Counsel for Watertight Exteriors, Inc.***

William R. Brodzinski
Mulherin Rehfeldt & Varchetto
211 South Wheaton Avenue
Wheaton, IL 60187
wbrodzinski@mrvlaw.com

***Counsel for Homeowners Association***

David Sugar
Arnstein & Lehr LLP
120 South Riverside Plaza, Suite 1200
Chicago, IL 60606-3910
dsugar@arnstein.com

AA188

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 07-03856 |
| JS. II, L.L.C., et al., | ) | (Jointly Administered) |
| | ) | Hon. Jacqueline P. Cox |
| Debtors. | ) | Hearing Date: March 27, 2008 |
| | ) | Hearing Time: 9:30 a.m. |

**DEBTORS' MOTION TO DISMISS THIRD PARTY COMPLAINT**
**FOR EQUITABLE SUBORDINATION FILED BY THOMAS A. SNITZER AND**
**THE SNITZER FAMILY LLC AND FOR RELATED RELIEF**

**Introduction**

JS. II L.L.C. ("JS II"), River Village West, L.L.C. ("RV West") and River Village I L.L.C. ("RV I," and together with JS II and RV West, the "Debtors") move this Court pursuant to Fed. Rule Bankr. 7012 and Fed. R. Civ. P. 12(b)(6)(1) and (6) to dismiss the Third Party Claims For Equitable Subordination And Other Relief (the "Complaint") filed by Thomas A. Snitzer ("Snitzer") and the Snitzer Family LLC ("SFLLC," and together with Snitzer, the "Snitzer Entities") against Kinsella and Diamond.[1] The grounds for this motion to dismiss include the following:

(a)  the Snitzer Entities lack standing to assert the claims set forth in the Complaint because those claims are derivative claims and not direct claims of the Snitzer Entities, and they have not been authorized to prosecute those claims on behalf of such Debtors' estates;

(b)  because the claims asserted in the Complaint are derivative claims and therefore property of the Debtors' chapter 11 estates, the Snitzer Entities' attempt to exercise control over them for Snitzer's personal benefit violates the automatic stay;

---

[1] Unless otherwise noted, capitalized terms used herein shall have the meaning ascribed to them in the Complaint. The terms "Kinsella" and "Diamond" are defined in the Complaint's introductory unnumbered paragraph.

(c)     to the extent that the claims being asserted in the Complaint relate to Kinsella's and Diamond's postpetition management of the Debtors' estates, the Snitzer Entities are asserting such claims in violation of the *Barton* doctrine; and

(d)     certain claims in the Complaint, such as the claim that Kinsella and Diamond are required to contribute additional capital to the Debtors, are barred by *res judicata* as they have previously been litigated and resolved by a final order of this Court.

From the outset of these chapter 11 cases, Snitzer has attempted to make them as burdensome and costly as possible to create negotiating leverage for Snitzer's personal benefit. From the contested hearing on the Debtors' postpetition financing arrangement with American Chartered Bank through the just-completed sale of the Iron Street Property, Snitzer has made baseless objections that this Court has overruled, but that have caused great expense to the estates and their creditors. The time has come for this Court to firmly put an end to Snitzer's costly and burdensome "scorched earth" tactics. Accordingly, in addition to dismissing the Complaint, the Debtors' request that the Snitzer Entities be ordered to reimburse the Debtors' estates for all costs and expenses, including the estates' reasonable attorneys' fees, caused by the Snitzer Entities' violation of the automatic stay and the *Barton* doctrine.

**Argument**

1.     On May 31, 2007 the Snitzer Entities filed their Proof of Interest [Dkt. No. 188]. On November 1, 2007, the Debtors filed their Objection and Counterclaims [Dkt. No. 311]. On December 14, 2007, the Snitzer Entities filed their Answer and Affirmative Defenses to the Counterclaims and combined that with "Third Party Claims For Equitable Subordination And Other Relief" [Dkt. No. 406], which is referred to herein as the Snitzer Entities' "Complaint." The Snitzer Entities' claims are set forth in 92 paragraphs on pages 69-88 of the Complaint.

2.     The "Preliminary Statement" in paragraph 1 of the Complaint states, in full, as follows:

AA190

This Complaint is filed to [sic] because Kinsella and Diamond have breached contractual and fiduciary duties to Snitzer and SFLLC, and engaged in *gross negligence and willful* [sic] *misconduct in managing the affairs of Debtors, causing them to incur millions of dollars of damage* and warranting an equitable subordination of Kinsella and Diamond's claims to repayment of capital to the equity interests of Snitzer and SFLLC.

*See* Complaint at ¶ 1, page 69 (emphasis added).

3.    While the Court may review each allegation of the Complaint, the Preliminary Statement by itself amply demonstrates why this Court should dismiss the Complaint and award the Debtors their attorneys' fees and other costs for responding. If the Snitzer Entities had direct, as opposed to derivative, claims against Kinsella and Diamond, this Court would not have jurisdiction to entertain them as the Snitzer Entities' putative direct claims would not be property of the Debtors' estates. However, because the claims asserted in the Complaint are derivative only and allege injuries to the Debtors that would be applicable to all creditors, the Snitzer Entities have no personal standing to assert them. Accordingly, the Court has no jurisdiction to hear the claims for that reason. Further, the Snitzer Entities have violated the automatic stay and the *Barton* doctrine by asserting claims against Kinsella and Diamond, including claims related to their management of the Debtors' estates, that are property of the Debtors' estates without prior authorization from this Court.

4.    The Complaint alleges three broad types of claims. First, the Snitzer Entities assert that the Debtors' assets have been commingled. *See* Complaint at pages 74-78. Next, the Snitzer Entities make claims that Kinsella and Diamond allegedly failed to fulfill their capital funding obligations to the Debtors and overspent the Debtors' funds. *Id.* at pages 78-83. Finally, the Snitzer Entities allege that Kinsella and Diamond made errors in their management of the Debtors that led to the Debtors' operating losses. *Id.* at pages 83-87. All of the alleged injuries are direct injuries to the Debtors, not direct injuries to the Snitzer Entities.

AA191

5.    The controlling legal principles that govern derivative claims of the type asserted in the Complaint are succinctly set forth in *In re Van Dresser Corp.*, 128 F.3d 945 (6th Cir. 1997):

> Property of a debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." "The commencement of the case" is the moment the debtor files for bankruptcy. And it is "well established that the interests of the debtor in property' include 'causes of action.'" A debtor's appointed trustee has the *exclusive* right to assert the debtor's claim. "If, on the other hand, a cause of action belongs *solely* to the estate's creditors, then the trustee has no standing to bring the cause of action."
>
> Whether a creditor has sole right to a cause of action is determined in accordance with state law. However, if the debtor could have raised a state claim at the commencement of the bankruptcy case, then that claim is the exclusive property of the bankruptcy estate and cannot be asserted by a creditor. "Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate."

*Van Dresser*, 128 F.3d at 947 (emphasis by the court) (citations omitted). *Accord In re Real Marketing Services, LLC*, 309 B.R. 783, 788 (S.D. Cal. 2004) (applying the *Van Dresser* derivative claim principles to a limited liability company in bankruptcy); *Finley v. Takisaki*, 2006 WL 1169794 at *3 (W.D. Wash. April 28, 2006) (same); *see also Gaia Offshore Master Fund, Ltd. v. Hawkins*, 2004 WL 2496142 at *2-*3 (N.D. Cal. Nov. 5, 2004) (explaining the two-prong test to determine if a claim is derivative or direct – (i) who suffered the harm, and (ii) who is entitled to the recovery).

6.    In a fruitless attempt to legitimize themselves as plaintiffs, the Snitzer Entities assert that the appropriate remedy for the harm allegedly done to the Debtors is that the Snitzer Entities should benefit by the equitable subordination of the Kinsella and Diamond equity interests. *See* Complaint at page 87-88. However, it is the substance of the Snitzer Entities'

AA192

{5618 MOT A019906\4.DOC 2}

5

claims that the Court must focus on to resolve this motion and not the patently inappropriate remedy sought by the Snitzer Entities. If an asserted claim in the Complaint allegedly causes an injury to one or more of the Debtors, then the claim is property of the Debtors' estates and derivative, as opposed to being personal to the Snitzer Entities. *Van Dresser*, 128 F.3d at 947, and other cases cited above in ¶ 5. Here, each claim in the Complaint is based on alleged direct injuries to the Debtors, not direct injuries to the Snitzer Entities. Accordingly, each claim asserted by the Snitzer Entities is a derivative claim that must be dismissed for the Snitzer Entities' lack of standing. *See, e.g., Chrysler Rail Transp. Corp. v. Indiana Hi-Rail Corp.*, 1996 WL 238788 at *3 (N.D. Ill. May 7, 1996) (dismissing plaintiff's claim for damages due to the undercapitalization of the corporate debtor because the claim was derivative in nature, *i.e.* a general claim applicable to all creditors, and therefore property of the corporate debtor's estate and not the plaintiff's direct claim).

7.      These principles apply to claims of breach of fiduciary duty, such as those asserted in the Complaint. As noted by the Seventh Circuit in *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339 (7th Cir. 1987), *cert. denied*, 485 U.S. 906 (1988):

> It has also long been held that rights of action against officers, directors and shareholders of a corporation for breaches of fiduciary duties, which can be enforced by either the corporation directly or the shareholders derivatively before bankruptcy, become property of the estate which the trustee alone has the right to pursue after the filing of a bankruptcy petition.

*Koch Refining*, 831 F.2d at 1343. Thus, the Snitzer Entities' characterization of the nature of their alleged claims as ones for Kinsella's and Diamond's alleged breach of fiduciary duty does not alter the outcome. Because the Debtors could have theoretically brought these claims against Kinsella and Diamond at the time the Debtors' cases were filed, at least for their prepetition conduct, the claims for breach of fiduciary duty are property of the Debtors' estates and cannot

be usurped by the Snitzer Entities for their personal benefit. 11 U.S.C. §§ 362(a)(3) and 541(a)(1), (6), and (7). *See Koch Refining*, 831 F.2d at 1343; *Van Dresser*, 128 F.3d at 947. As for Kinsella's and Diamond's postpetition conduct alleged in the Complaint, the *Barton* doctrine prevents the Snitzer Entities from pursuing those claims without prior leave of this Court. *See, e.g., In re Messina*, 2003 WL 22271522 at *10 (Bankr. N.D. Ill. Sept. 24, 2003) (dismissing claims against a chapter 7 trustee and his attorney based on a *Barton* doctrine violation), and other cases cited below at pages 10 and 11.

8.    The first claim made by the Snitzer Entities is that "Kinsella and Diamond Have Improperly Commingled Assets of the LLCs." *See* Complaint at pages 74-78, ¶¶ 26-50. The gist of the so-called commingling claim, however, is set forth in ¶ 48 and ¶ 49. Those paragraphs state, in full, as follows:

48.    The use of assets or revenues of one of the venture LLCs (e.g., River Village West or JS II) to pay for obligations of another venture LLC (e.g., River Village), in disregard of the LLCs' separate corporate existence, would, at a minimum, constitute a "major decision" that requires a majority vote of the members of each affected LLC, and would require accounting to reflect a liability of the venture receiving such a benefit in favor of the entity granting the benefit.

49.    Snitzer never voted for or approved of Kinsella and Diamond commingling assets between or among the LLCs without reflecting the obligations that are created thereby by virtue of their respective separate existences. Commingling is injurious to JS II and River Village West.

*See* Complaint at pages 77-78, ¶ 48 and ¶ 49 (emphasis added).

9.    Obviously, even assuming *arguendo* that there has been an improper "commingling" of assets, the adversely affected Debtor or Debtors would be the injured party or parties, not the Snitzer Entities, whose injury, if any, would be merely derivative of a particular Debtor's injury. The allegedly commingled or diverted assets belong to the Debtors, not to their

equity holders. *See, e.g., Real Marketing Services*, 309 B.R. at 788 ("With regard to limited liability corporations ("LLCs"), members of an LLC hold no direct ownership interest in the company's assets and therefore are not directly injured when the company suffers an improper deprivation of those assets.") Consequently, if a claim described as "improperly commingling" is legally cognizable, the claim would be property of the estate of the adversely affected Debtor, *see* 11 U.S.C 541(a)(1), (6), and (7), not a personal claim of the Snitzer Entities.

10.     Moreover, a close reading of the allegations in ¶¶ 36-39 reflect that no injury has in fact been caused by any of the so-called "commingling." If, as the Snitzer Entities contend, JS II was a mere nominee[2] for RV I and RV West, and the proceeds of the assets held by JS II for the benefit of RV I and RV West were used to satisfy creditors' claims against those entities or liens against those entities' property, how could those entities (or their equity holders) be injured? In short, the Complaint fails to allege any causal connection between the conduct complained of and any actual injury to the Debtors. In the absence of any real injury, mere allegations of "commingling" or a disregard of corporate formalities are legal nullities. *See, e.g., Steinberg v. Buczynski*, 40 F.3d 890, 892 (7th Cir. 1994) (claim dismissed for piercing the corporate veil for failure to observe corporate formalities when no injury to the corporation was alleged by the plaintiff). *See also Beltran v. Brentwood North Healthcare Center, LLC*, 426 F. Supp. 2d 827, 831 (N.D. Ill. 2006) (breach of fiduciary duty claim requires personal benefit and self-dealing by agent at expense of principal).

11.     This Court is not required to make factual determinations to dismiss the so-called "commingling" claim at this stage. What is clear from the Complaint's allegations is that any

---

2 The terms "alter-ego and "instrumentality" are more descriptive of the relationship governing the three Debtor entities than the more benign term "nominee" used in the Complaint.

AA194

AA195

injury allegedly caused by the supposed "commingling" could only be an injury to the Debtor entities themselves, not to the Snitzer Entities. The so-called "commingling" claim, to the extent it is even legally cognizable, obviously belongs to the Debtors, not to the Snitzer Entities. Consequently, the Snitzer Entities have no standing to bring the claim, despite their assertion that the appropriate remedy for the alleged injuries to the Debtors is the equitable subordination of the Kinsella and Diamond equity interests to those of the Snitzer Entities. *See, e.g., Matter of Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990) ("When a third party tries to assert an action still vested in the trustee, the court should dismiss the action."); *In re Aurora Home Services, Inc.*, 2000 WL 1468314 at *4 (N.D. Ill. Sept. 29, 2000).

12. A cursory review of the Complaint's allegations show that the so-called "commingling" claims are property of the Debtors' estates. *See* Vol. 4, NORTON BANKRUPTCY LAW AND PRACTICE, ¶61:7 at pages 61-34 and 61-35, and cases collected at n. 12 (Thompson/West Pub. 3d ed. 2008); Vol. 5 COLLIER ON BANKRUPTCY ¶541.08 [5] at pages 541-51 and 541-52, and cases collected at nn. 29-33 (Lexis Nexis/Matthew Bender Pub. 15th ed. 2000). The Snitzer Entities' use of the claims, which are property of the Debtors' estates, for their personal benefit is a direct and willful violation of the automatic stay, 11 U.S.C. §362(a)(3) (staying all judicial and non-judicial actions to exercise control over property of an estate). *See, e.g., Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1151-52 (5th Cir. 1987) (creditor violated § 362(a)(3) by prosecuting a veil-piercing claim that belonged to the debtor and was property of the debtor's estate); *Chrysler Rail Transp. Corp.*, 1996 WL 238788 at *2 (creditor violated automatic stay by prosecuting a veil-piercing claim that was a general claim applicable to all creditors and therefore property of the debtor's estate), and cases cited therein; *accord In re All American of Ashburn, Inc.*, 805 F.2d 1515, 1518 (11th Cir. 1986) ("... a suit for the recovery of

the diminution of the value of the stock caused by the tortious acts of either an officer or director or third person belongs to the corporation.").

13.    As this Court has held, acts taken in violation of the automatic stay are not merely voidable but void ab initio.  *In re Enyedi*, 371 B.R. 327, 334 (Bankr. N.D. Ill. 2007).  If the Snitzer Entities' assertion of claims that are property of the Debtors' estates is a void act, and the Snitzer Entities lack standing to bring the claims and have not been authorized by this Court to bring the claims, the claims should be dismissed.  *Perkins, supra*, 902 F.2d at 1258; *Finley v. Takisaki, supra*, 2006 WL 1169794 at *1; *Gaia Offshore Master Fund v. Hawkins, supra*, 2004 WL 2496142 at *1 (granting a motion to dismiss claims that were property of a debtor's estate and that the plaintiff had no standing to bring); *see also Real Marketing Services, supra*, 309 B.R. at 792 (affirming bankruptcy court's judgment on the pleadings and summary judgment against plaintiff for the unauthorized prosecution of claims owned by the debtor corporation).

14.    However, the dismissal of the commingling claim should not be the only remedy available to the Debtors.  The Debtors should not be required to bear the cost of remedying the Snitzer Entities' willful violation of the automatic stay.  Pursuant to 11 U.S.C. § 105(a) and § 362(a)(3), and this Court's power of contempt, the Snitzer Entities should be required to reimburse the Debtors for their reasonable costs and attorneys' fees incurred in remedying the Snitzer Entities' willful violation of the automatic stay.  *Enyedi*, 371 B.R. at 335, and cases cited therein.  *See also In re Hancock*, 192 F.3d 1083, 1086-87 (7th Cir. 1999) (affirming sanctions award for an attorney's improper sale of estate assets); *Matter of Volpert*, 110 F.3d 494, 500 (7th Cir. 1997) (applying § 105(a) as an alternative source of authority to impose sanctions for vexatious litigation).

AA197

10

{5618 MOT A019906.4.DOC 2}

15.     In addition to the Snitzer Entities' violation of the automatic stay, there has also been a violation of the *Barton* doctrine by the Snitzer Entities' assertion of claims against Kinsella and Diamond without prior leave of this Court. *See In re MarchFirst, Inc.*, 378 B.R. 563, 566-67 (Bankr. N.D. Ill. 2007) (the *Barton* doctrine applies to suits in the bankruptcy court filed without prior permission).

16.     The Complaint was obviously filed in retaliation for the Debtors' claims asserted against Snitzer for his willful misconduct and gross negligence in managing the Debtors' affairs. The retaliatory claims now being asserted by Snitzer are precisely the type of conduct that the *Barton* doctrine was designed to prevent. Parties that manage bankruptcy estates, whether they are trustees or corporate officers of chapter 11 debtors, are not to be subjected to personal claims without prior leave of the bankruptcy court where the case is pending. *In re Silver Oak Homes, Ltd.*, 167 B.R. 389, 394-95 (Bankr. D. Md. 1994) (*Barton* doctrine held to apply to suit against a chapter 11 debtor's president, attorney, and lender). *See also In re Stone*, 1998 WL 1819081 at *3 (Bankr. D.D.C. Nov. 4, 1998) (*Barton* doctrine held to extend to the United States Trustee and the United States Marshall in addition to the chapter 7 trustee); *In re Jasmine Networks, Inc.*, 2006 WL 3392062 at *2 (Bankr. N.D. Cal. Nov. 20, 2006) (holding that the *Barton* doctrine "extends [] to other persons appointed by the bankruptcy court, like debtors-in-possession and their court approved counsel. . . ."). No such leave was sought by the Snitzer Entities or granted by this Court. Accordingly, there has been a willful violation of the *Barton* doctrine that has caused the Debtors and their managers significant cost and distraction at a crucial time in these cases. This blatant attempt to intimidate Kinsella and Diamond and impose yet more administrative expense on the Debtors' estates is inexcusable. A failure to impose an appropriate sanction under these circumstances, where the conduct is so egregious, would be unfair to the

AA198

{5618 MOT A0199064.DOC 2}

Debtors and would encourage similar conduct by Snitzer and SFLLC in the future. Accordingly, this Court would be well within its discretion to impose appropriate monetary and other sanctions against the Snitzer Entities. *In re Byrd,* 2007 WL 1485441 at *12 (Bankr. D. Md. May 18, 2007) (citing *Allard v. Weitzman,* 991 F.2d 1236, 1241 (6th Cir. 1993) for the proposition that "a court may award damages to the trustee if it finds that a litigant violated the *Barton* Doctrine.").

17.    The two remaining claims by the Snitzer Entities suffer from the same fatal infirmities as the commingling claim. In paragraphs 51 through 80 of the Complaint, the Snitzer Entities allege that Kinsella and Diamond failed to make required capital contributions to the *Debtors* and that they supposedly made unauthorized loans to the *Debtors.* Again, there is no claim of direct injury to the Snitzer Entities from this conduct. Moreover, it is impossible for there to be any damage to the Debtors, or the Snitzer Entities for that matter, from the so-called unauthorized loans. The loan proceeds were necessary to pay the Debtors' accrued and ongoing expenses and there is no allegation to the contrary. Similarly, there is no allegation that the loan proceeds were not actually used to pay ongoing or accrued claims against or expenses of the Debtors. The alleged unauthorized loans resulted in nothing more than a mere substitution of creditors with no net detriment to the Debtors or the Snitzer Entities. If the loans were not made, the creditors whose claims were paid with their proceeds would have retained their claims. The Debtors could not be harmed by a substitution of creditors. In addition, the claims, whether held by Kinsella and Diamond or by third party creditors, would be entitled to priority over any equity interest held by the Snitzer Entities. Thus, the alleged "unauthorized" loan claim is a complete red herring entitled to no weight.

AA199

18.　　In addition, the doctrine of *res judicata* bars the Snitzer Parties' claims based on Kinsella's and Diamond's alleged failure to fulfill their obligation to properly capitalize the Debtors. The Snitzer Entities specifically raised that issue as one of their objections to the sale of the Iron Street Property. *See* Snitzer Entities' Objections dated November 5, 2007 (Dkt. No. 319) at pages 14-15. The Court's sale order, which was not appealed by the Snitzer Entities and is final, is entitled to res judicata effect. *See, e.g., Boyer v. Gildea,* 2005 WL 2648673 at * 4 (N.D. Ind. October 17, 2005) ("The important policy of favoring the finality of bankruptcy court orders approving the sales of debtor assets requires that bankruptcy orders be final judgments for *res judicata* purposes.") (citing *Met-L-Wood Corp.,* 861 F.2d 1012, 1017 (7th Cir. 1988). *See also In re High Voltage Eng. Corp.,* 379 B.R. 399, 401-02 (D. Mass. 2007); *In re Clinton Food Corp.,* 254 B.R. 523, 530-31 (Bankr. S.D.N.Y. 2000). "Under *res judicata,* a final judgment on the merits of an action precludes the parties or their privies from relitigating issues *that were or could have been raised* in that action." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (emphasis added). The Court's December 10, 2007 Sale Order (Dkt. No. 400) specifically overruled the objections of the Snitzer Entities "on the merits." *See* Order at page 7, ¶ P and 1, ¶ 2. The capital contribution claim is now *res judicata* and cannot again be raised by the Snitzer Entities in their Complaint.

19.　　One important purpose of the *res judicata* doctrine is to prevent the burden of serial litigation on the same claim. This is now the third time the Snitzer Entities have raised the capital contribution claim. The first time was in response to the Debtors' proposed financing arrangement. *See* Snitzer Entities' Limited Objection dated April 10, 2007 (Dkt. No. 100). In that instance, the Court allowed the Snitzer Entities to withdraw their objections without prejudice over the Debtors' objections. *See* Snitzer Entities' Withdrawal of Limited Objections

AA200

dated May 29, 2007 (Dkt. No. 184). As previously noted, the second time the capital contribution issue was raised was in opposition to the sale of the Iron Street Property. (Dkt. No. 319 at pages 14-15). The Snitzer Entities alleged that the Iron Street Property did not have to be sold at a "fire sale" price if Kinsella and Diamond would only contribute additional capital to the Debtors. *Id.* The Snitzer Entities did not seek to withdraw their objections in that instance, and a final sale order was entered after a full evidentiary hearing. *See* Sale Order, Dkt. No. 400, at page 7, ¶ 2. The issue is now *res judicata* and cannot be raised for yet a third time, particularly by the Snitzer Entities, which had a full and fair opportunity to litigate the issue in the Iron Street Property sale proceeding.

20. In addition, a claim for an alleged failure to fully contribute required capital is a claim that only the Debtors could bring because the Debtors would be the entities that would have been injured by the alleged default. *See, e.g., In re PurchasePro.com, Inc.,* 332 B.R. 417, 431-32 (Bankr. D. Nev. 2005) (chapter 11 trustee under liquidating trust could enforce stock subscription agreements for the benefit of the debtor corporation and its creditors); *In re PSI Indus., Inc.,* 306 B.R. 377, 389 (Bankr. S.D. Fla. 2003) (same); *see also Patton v. Bearden,* 8 F.3d 343, 349 (6th Cir. 1993) (partnership's right to compel contributions from its partners was property of the debtor's estate enforceable in bankruptcy). If the Snitzer Entities have a direct claim for a supposed failure of Kinsella and Diamond to contribute all of the capital they were required to contribute, then both the Snitzer Entities and the Debtors could recover for the same injury. Obviously, this would lead to a completely unworkable situation and is contrary to well-established Illinois law that prevents double recoveries. *See, e.g., Klier v. Siegel,* 200 Ill. App.3d 121, 127 (2d Dist. 1990). *Accord Van Dresser,* 128 F.3d at 948 (a corporation and a shareholder cannot both recover on the same claim). Only the Debtors have standing to bring such a claim.

AA201

Again, the Snitzer Entities' usurpation of the Debtors' claims for their personal benefit is a violation of both 11 U.S.C. § 362(a)(3) and the *Barton* doctrine.

21. The final claims made by the Snitzer Entities, Kinsella's and Diamond's alleged mismanagement of the *Debtors*, see Complaint at pages 83-87, ¶¶ 81-87(a)-87(i), are also claims that are property of the Debtors' estate. The injuries alleged were injuries to the *Debtors*, not their equity holders. Further, the claims made in ¶ 87(b), (c), (d), (e), (f), and (i) attack Kinsella's and Diamond's postpetition estate management, much of which has been pursuant to specific orders of this Court. Thus, not only do these allegations of mismanagement violate 11 U.S.C. § 362(a)(3), but they also transgress the *Barton* doctrine.

22. The Snitzer Entities' characterization of all the claims made in the Complaint as being personal to the Snitzer Entities because of supposed fiduciary duty violations and breach of contract is wholly unpersuasive. Again, as with the Snitzer Entities' other claims, if that were true, then there could be a double recovery by the Debtors and the Snitzer Entities for the same injury. This is contrary to well-established legal principles. *E.g.*, *Van Dresser*, 128 F.3d at 948 ("The plaintiff has cited no case for the proposition that a corporation and its shareholder can both recover fully for a single tortious action, and we conclude that none exists."). To allow the Snitzer Entities to proceed on these claims would open the door for every equity holder in every bankruptcy case to sue the debtor's management and directors under the guise of fiduciary duty violations for equitable subordination. This would lead to chaos, an unmanageable multitude of litigation, and the potential of double recoveries and inconsistent results in separate lawsuits for the same alleged wrongful conduct. That is why no bankruptcy court allows derivative claims to be made on a willy-nilly basis at the whim of individual equity holders. *Van Dresser*, 128 F.3d at 947. Further, because the claims made in the Snitzer Entities' Complaint are property of the

14

AA202

Debtors' estates, they cannot be brought without prior leave of this Court. *Perkins, supra,* 902

F.2d at 1258. As the *Perkins* court made clear, unauthorized claims such as those brought by the

Snitzer Entities in the pending Complaint should be dismissed. *Id.*

23. Here, though, more is required. Not only should the Complaint be dismissed, but

the Debtors should be made whole and reimbursed for all of their fees and costs in responding to

the Complaint. *Enyedi, supra,* 371 B.R. at 335; *Byrd, supra,* 2007 WL 1485441 at *12. The

Debtors and their creditors have had enormous administrative expenses imposed on the Debtors'

estates as a result of the Snitzer Entities' aggressive litigation tactics. This time, however, they

have gone too far. This type of conduct must be brought to an end.

WHEREFORE, the Debtors request the following relief:

(a)    dismissal of the Snitzer Entities' Complaint;

(b)    an award of all the Debtors' costs and attorneys' fees for the Snitzer Entities'
violation of the automatic stay and the *Barton* doctrine;

(c)    such additional monetary and non-monetary sanctions as the Court deems
appropriate to deter future conduct of this type; and

(d)    such other and additional relief as may be appropriate under the circumstances.

Respectfully submitted,

JS II, L.L.C., *et al.,*

Dated: February 8, 2008          By:  /s/ Steven B. Towbin
                                      Steven B. Towbin
                                      One of their attorneys

Steven B. Towbin
Shaw Gussis Fishman Glantz
Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL 60610
P: (312) 276-1333
F: (312) 275-0569

*Bankruptcy Counsel to Debtors*

AA203

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ( | Chapter 11 |
| | ( | Case No. 07-03856 |
| | ( | (Jointly Administered) |
| JS. II, L.L.C., *et al.*, | ( | Hon. Jacqueline P. Cox |
| | ( | Hearing Date: March 27, 2008 |
| Debtors. | ( | Hearing Time: 9:30 a.m. |

DEBTORS' REPLY IN SUPPORT OF
THEIR MOTION TO DISMISS THE SNITZER ENTITIES'
EQUITABLE SUBORDINATION COMPLAINT

**I. Introduction**

The Debtors[1] have moved to dismiss the Snitzer Entities' equitable subordination Complaint against Kinsella and Diamond on the following grounds:

(a)     the Snitzer Entities lack standing to assert the claims set forth in the Complaint (collectively, the "Claims," and each a "Claim") because those Claims are derivative claims and not direct claims of the Snitzer Entities, and they have not sought or been granted authority to prosecute derivative Claims on behalf of the Debtors' estates;

(b)     because the Claims are derivative and therefore property of the Debtors' chapter 11 estates, the Snitzer Entities' attempt to exercise control over the Claims for Snitzer's personal benefit violates the automatic stay effective under 11 U.S.C. § 362(a)(3);

(c)     to the extent that the Claims relate to Kinsella's and Diamond's postpetition management of the Debtors' estates, the Snitzer Entities are asserting such Claims in violation of the *Barton* doctrine; and

(d)     the Claim that Kinsella and Diamond are required to contribute additional capital to the Debtors is barred by *res judicata* as it has previously been litigated and resolved by a final order of this Court.

Each of these arguments remains compelling notwithstanding the Snitzer Entities' Response.

---

[1]   Unless otherwise indicated, capitalized terms used in this Reply have the meaning ascribed to them in the Debtors' original motion to dismiss filed February 8, 2008 as Docket No. 509 (the "Debtors' Motion").

AA204

## II. The Direct / Derivative Claim Issue

As demonstrated below the Snitzer Entities' Response fails to properly address the central issue before the Court: Are the claims asserted by the Snitzer Entities in the Complaint (the "Claims") derivative or direct claims? Instead, the Response focuses on abstract legal propositions that may be true as a general matter[2] but do not answer the critical question of whether the Claims are derivative in nature and therefore property of the Debtors' estate[3] or direct and therefore able to be prosecuted by the Snitzer Entities for their personal benefit. The applicable criteria to make that determination are set forth in the seminal case[4] on the issue as follows:

[2] The Debtors do not dispute that members of a limited liability company owe each other fiduciary duties, or that the Debtors' operating agreements are contracts, or that individual creditors have standing to bring an equitable subordination claim pursuant to 11 U.S.C. § 510(a) under appropriate circumstances unlike those of this case. These legal truisms, however, do not answer the primary question of whether the Claims asserted in the Complaint can be prosecuted by the Snitzer Entities for their personal benefit.

[3] "Such a suit is known as a derivative suit, and is an asset of the corporation – which means that if, as in this case, the corporation is in bankruptcy, the suit is an asset of the bankrupt estate." *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 589 (7th Cir. 2003) (citing 11 U.S.C. § 541(a)(1)); *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939); *Koch Ref. v. Farmers Union Cen. Exch. Inc.*, 831 F.2d 1339, 1343-44 (7th Cir. 1987); and *In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 604 (2d Cir. 1994)).

[4] Although *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) *en banc*), is a case involving a corporation and not a limited liability company, the principles set forth in *Tooley* apply with equal force here. The almost uniform application of corporate-law principles to limited liability companies is noted in Kalinberge, *Direct Versus Derivative and The Law of Limited Liability Companies*, 58 Baylor L. Rev. 63, 66 and cases cited in notes 5-9 (2006) as follows: "The data is overwhelming. Almost all LLC cases addressing the direct/derivative distinction follow rules developed in corporate-law cases." *See also Caparos v. Morton*, 364 Ill. App. 3d 159, 169, 845 N.E.2d 773, 783 (1st Dist. 2006) (applying Illinois corporate-law cases to resolve the issue of whether the claims asserted in that case were direct or derivative in a limited partnership context); *Golden Tee, Inc. v. Venture Golf Sch., Inc.*, 333 Ark. 253, 260, 969 S.W.2d 625, 629 (1998) (corporate-law cases apply to determine if a claim is direct or derivative in the context of a fraud, breach of contract and breach of fiduciary duty complaint by a limited partner against a general partner in a limited partnership context).

AA205

We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct. That issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders individually)?

\* \* \* \*

That is, a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 and 1039 (Del. 2004) (emphasis by the court). *Accord Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158, 160 (7th Cir. 1996) (applying Illinois law and citing with approval the American Law Institute's *Principles of Corporate Governance: Analysis and Recommendations* § 7.01 (1992), which comport with the criteria set forth in *Tooley*); *Caparos*, 364 Ill. App. 3d at 167, 845 N.E.2d at 781 ("To bring a direct claim, the plaintiff must allege an injury separate and distinct from that suffered by other shareholders, or an injury that involves a contractual right, such as the right to vote or the right of majority control, *that exists independently of any right of the corporation*." (emphasis added and citations omitted); *Sterling Radio Stations, Inc. v. Weinstine*, 328 Ill. App. 3d 58, 62, 765 N.E.2d 56, 60 (1st Dist. 2002) ("Whether an action is derivative or direct, however, requires a strict focus on the nature of the alleged injury, *i.e.*, whether it is to the corporation or to the individual shareholder that injury has been done.") (citing *Small v. Sussman*, 306 Ill. App. 3d 639, 644, 713 N.E.2d 1216, 1220 (1st Dist. 1999)); *Spillyards v. Abboud*, 278 Ill. App. 3d 633, 670, 662 N.E.2d 1358, 1363 (1st Dist. 1996) ("'Whether a cause of action is individual or derivative must be determined from the nature of the wrong alleged'

3

and the relief, if any, which could result if plaintiff were to prevail.'" (quoting from *Kramer v. Western Pac. Ind., Inc.*, 546 A.2d 348, 352 (Del. 1988)). These concepts are further delineated by the court in *Spillyards v. Abboud* as follows:

To have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege a special injury, either an injury which is separate and distinct from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation. In determining the nature of the wrong alleged, a court must look to the body of the complaint, not to the plaintiff's designation or stated intention.

*Spillyards v. Abboud*, 278 Ill. App. 3d at 670-71, 662 N.E.2d at 1363 (internal quotes, citations and footnote omitted). *Accord In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994 (Del. Ch. 2004):

Thus, it is fair to say that, under *Tooley*, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint. As this court recently said, [e]ven after *Tooley*, a claim is not direct simply because it is pleaded that way. . . . Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists.

*Syncor*, 857 A.2d at 997 (internal quotes, citation and footnote omitted). Consequently, rather than accept the Snitzer Entities' simplistic but incorrect "analysis" that looks at the *remedy* requested, the Court must instead examine the gravamen of the Claims in light of the principles established in *Tooley* and the Illinois cases that agree with *Tooley*. *See, e.g., Frank*, 83 F.3d at 160; *Caparos*, 364 Ill. App. 3d at 167, 845 N.E.2d at 781; *Sterling Radio Stations*, 328 Ill. App.

---

⁵ "The question whether a suit is derivative by nature or may be brought by a shareholder in his own right is governed by the law of the state of incorporation." *Kennedy v. Venrock Assoc.*, 348 F.3d at 589 (applying the law of Delaware, where the corporation was reincorporated). In this case, all of the Debtors are Illinois limited liability companies. Accordingly, Illinois law applies.

AA207

3d at 62, 765 N.E.2d at 60; *Small v. Sussman*, 306 Ill. App. 3d at 644, 713 N.E.2d at 1220; and *Spillyards v. Abboud*, 278 Ill. App. 3d at 670-671, 662 N.E.2d at 1363. In short, to determine if the Claims in the Snitzer Entities' Complaint are derivative or direct under *Tooley*, 845 A.2d at 1039, the following two issues must be addressed: (1) whether the alleged injury to the Snitzer Entities is "independent of any alleged injury to the [Debtors];" and (2) whether the Snitzer Entities "can prevail without showing an injury to the [Debtors]."

### III.  The Claims Asserted By The Snitzer Entities Are Derivative In Nature

The Debtors' Motion carefully specifies the particular paragraphs of the Snitzer Entities' Complaint that demonstrate beyond legitimate argument that the Claims asserted allege direct injury to the Debtors and not some sort of special injury that is unique to the Snitzer Entities in their alleged capacities as members of the Debtors, such as depriving them of any voting rights they allege to have as members of the Debtors. *See* Debtors' Motion at ¶ 2, 4, 8, 10, 17 and 21.

In summary, the Snitzer Entities' Claims consist of the following:

(a)     The *Debtors'* assets have been commingled, and creditors of one Debtor have been paid with assets of another Debtor (Complaint at pages 74-78);

(b)     Kinsella and Diamond have failed to comply with their obligations to provide capital to the *Debtors* and overspent the *Debtors'* funds (Complaint at 78-83); and

(c)     Kinsella and Diamond mismanaged the *Debtors'* business and assets both prior to and after the commencement of the Debtors' chapter 11 cases (Complaint at pages 83-87).

Nevertheless, the Snitzer Entities contend that these paradigmatic derivative Claims,[6] each of which alleges injury to the Debtors, and each creditor and equity holder indirectly as

---

[6] *Caparos*, 364 Ill. App. 3d at 168, 845 N.E.2d at 782 ("Proper derivative actions include claims for a general partner's mismanagement, negligence, diversion of assets, actions beyond authority, and failure to perform elements of an agreement.") (citations omitted).

stakeholders in the Debtors, are somehow personal to the Snitzer Entities and that the Snitzer

Entities "can prevail without showing an injury to the [Debtors]." *Cf. Tooley*, 845 A.2d at 1039.

The Snitzer Entities' contention in this regard is incorrect.

It is obvious that the Snitzer Entities have not alleged any Claim that is independent of

and separate from the rights of the Debtors. Simply put, there is no "special injury" alleged that

is "separate and distinct from that suffered" by all of the creditors of the Debtors and all of the

Debtors' equity holders equally. *Cf. Caparos*, 364 Ill. App. 3d at 167, 845 N.E.2d at 781;

*Spillyards v. Abboud*, 278 Ill. App. 3d at 670-71, 662 N.E.2d at 1363. For the Snitzer Entities to

contend otherwise is patently frivolous.

Instead of focusing on the underlying facts alleged and the Debtors' injuries supposedly

suffered by virtue of Kinsella's and Diamond's conduct as all apposite authority requires, the

Snitzer Entities focus on the requested *remedy* of equitable subordination. *See* Snitzer Entities'

Response at 1, 8. If that were the proper test, then every claim made by a disgruntled corporate

shareholder, partnership, partner or limited liability company member would prevail in every

case where the issue is the direct or derivative nature of the claim being asserted. All such

lawsuits request that the individual plaintiffs recover personally when a "direct" claim is alleged.

Obviously, however, each such claim does not succeed as a direct claim merely because the

plaintiff requests that a personal remedy be ordered. *See, e.g., Caparos*, 364 Ill. App. 3d at 169,

845 N.E.2d at 782 (refusing to find that limited partners stated direct claim for the general

partners' alleged breach of fiduciary duty); *Frank*, 83 F.3d at 161-62 (rejecting plaintiff's

contention that the direct/derivative claim distinction be abolished for close corporations because

if the action were deemed to be derivative, half the judgment proceeds could not be claimed by

the alleged wrongdoer).

7

The Debtors have no argument with the holding of *In re Vitreous Steel Products Co.*, 911 F.2d 1223 (7th Cir. 1990), and similar cases cited by the Snitzer Entities on page 9 of their Response to the effect that an individual creditor or equity holder has standing to bring an equitable subordination claim under appropriate circumstances, *i.e.* where the injury alleged is unique to the individual creditor or equity holder. The type of claim for equitable subordination that may be brought by a single creditor, however, must be based on a distinct and special injury to the individual creditor and not on a derivative claim that belongs to the chapter 11 debtor or the trustee. For example, in *Vitreous Steel* the basis of the equitable subordination claim was the defendant bank creditor's alleged fraud against the plaintiff creditor: "Count VI charged the Bank with fraud, and asked that its debt be equitably subordinated." 911 F.2d at 1230.

In contrast to the creditor-specific fraud claim in *Vitreous Steel*, the Claims alleged in the Snitzer Entities' Complaint would have resulted in injuries to the Debtors. If the Claims were valid, a proposition that is disputed, the Claims would enable the Debtors to recover for the benefit of their creditors first and the Snitzer Entities, as equity holders, last. *See Frank*, 83 F.3d at 161 ("Sometimes shareholders bring direct actions in order to deny other investors, particularly creditors, a share of the recovery. If the firm is insolvent, the recovery belongs to the creditors; and when the firm has debt but the equity interest retains value, it is much easier to award the recovery to the corporation and allow the funds to be distributed according to contracts and bankruptcy priorities than it is to attempt to value one party's claim as a stand-alone matter.") In this case, where the Debtors are in bankruptcy, it is clear that the alleged Claims can only be brought by the Debtors for the benefit of their creditors as *Frank* requires. *In re Van Dresser Corp.*, 128 F.3d 945, 947 (6th Cir. 1997); *accord Kennedy v. Venrock, supra*, n.3, 348 F.3d at 589 (derivative claims are property of the debtor's bankruptcy estate and may not be used

8

{5618 REP A020158.DOC}

for a creditor's or equity holder's personal benefit in violation of 11 U.S.C § 362(a)(3)). The Snitzer Entities, as equity holders (at best), cannot be permitted to highjack the Debtors' claims for their personal benefit and exercise control over property of the Debtors' estates in violation of 11 U.S.C. § 362(a)(3).

The Snitzer Entities also allege that the mere existence of an operating agreement somehow gives the Snitzer Entities a direct breach of contract claim against Kinsella and Diamond. *See* Response at 1, 10. But that cannot be the case. The Claims are not transformed from being derivative in nature to being direct claims merely because a contract exists between the Snitzer Entities, the Debtors, Kinsella and Diamond. *See Thomas v. Nat'l Can. Fin. Corp.*, 1995 WL 54473 at *2 (N.D. Ill. Feb. 7, 1995) (citing *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1336-37 (7th Cir. 1989), for the proposition that a party's direct contractual dealing with a lender does not give the party a right to sue the lender where the claim is derivative in nature). Every limited liability company and every partnership has an underlying agreement between the members or the partners. That does not mean that every alleged breach of the formation contract gives rise to a direct claim as opposed to a derivative claim.

For example, in *Golden Tee, supra*, a limited partner sued the general partner for breach of the partnership agreement to which both partners were parties. The court recognized that a breach of contract claim could be either a direct or derivative claim, "depending on which entity or party is primarily injured." 333 Ark. at 261, 969 S.W.2d at 629 (citing 4 ALAN R. BROMBERG & LARRY E. RIBSTEIN ON PARTNERSHIP § 15.04(h), at 15:37 (1997)). The court then analyzed the issue of whether the breach of contract claim was direct or derivative as follows:

6

{5618 REF A0201584.DOC}

AA211

The injuries that Golden Tee asserted under its breach-of-contract claims were loss of its initial investment, loss of future profits, and diminishment of the capital account. The first injury alleged, loss of Golden Tee's initial investment capital, is an injury inflicted on the Golf Partnership.

* * * *

By their express terms, the latter two claims seek redress of injuries inflicted directly on the Golf Partnership by any breach of the agreement. Although Golden Tee, as a limited partner, undoubtedly suffered injuries, they were indirect damages by way of injury to the Golf Partnership, not only to the individual partners. As such, the injury suffered was derivative, and the claims for breach of contract should have been brought in a derivative action.

333 Ark. at 261 and 262; 969 S.W.2d at 629 and 630 (citations omitted).

Illinois courts also follow this type of analysis. *Mid-State Fertilizer v. Exch. Nat'l Bank; Thomas v. Nat'l Can. Fin. Co.* The proper focus of the inquiry is not whether there is a contractual relationship between the parties, as is the case with every limited liability company and every partnership, but rather the nature of the injury alleged. *See, e.g. Caparos, supra,* 364 Ill. App. 3d at 167, 845 N.E.2d at 781 ("To bring a direct claim, the plaintiff must allege an injury separate and distinct from that suffered by other shareholders, or an injury that involves a contractual right, such as the right to vote or the right of majority control, that exists *independently of any right of the corporation.*") (emphasis added).

In this case, each Claim alleged by the Snitzer Entities, *i.e.*, commingling of the *Debtors'* assets, mismanagement of the *Debtors'* business and failure to provide the *Debtors* with capital, alleges an injury to the Debtors, not the Snitzer Entities. The fact that the Snitzer Entities may be parties to a contract with the Debtors, Kinsella and Diamond is not relevant to the nature of the injury alleged, which in turn controls whether the Claims are direct or derivative.

{5618 REF A020158A.DOC}

The same analysis applies to the Snitzer Entities' contention that the fiduciary relationship that admittedly exists among limited liability company members somehow gives them direct claims despite the fact that the alleged injuries are injuries to the Debtor and not the Snitzer Entities. *See* Response at 1, 11-12. *See, e.g., Caparos*, 364 Ill. App. 3d at 169-70, 845 N.E.2d at 781-82 (finding breach of fiduciary duty claim to be derivative based on the nature of the injury alleged); *Golden Tee*, 333 Ark. at 264-65; 969 S.W.2d at 630-31 (finding the breach of fiduciary duty claim to be derivative based on the nature of the injury alleged).

The three cases cited in support of the Snitzer Entities' argument at pages 10 and 11 of the Response are not at all helpful in resolving the primary issue before this Court. None of the three cases even addresses let alone resolves the issue of whether the claims being pursued in those cases were derivative or direct. While each case reiterates the undisputed principle that shareholders of closely held corporations owe each other and the corporation fiduciary duties under Illinois law, none of the cases involved claims of mismanagement of the corporation's assets and business or a failure of a shareholder to contribute capital to the corporation, which are the Claims at issue in this case. Importantly, none of the cases involved a corporation in bankruptcy or the rights of third-party creditors as the case before this Court does.

Indeed, *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215 (7th Cir. 1995), did not even involve a suit by one shareholder against another. "This diversity case requires us to consider whether a minority shareholder's duty of loyalty to a closely held corporation continues after he has been frozen out." *Id.* at 1217 (emphasis added, internal quotes omitted). *Visvardis v. Ferleger*, 375 Ill. App. 3d 719, 873 N.E.2d 436 (1st Dist. 2007), was a legal malpractice case that dealt primarily with pleading rules and motion practice under Illinois law. 375 Ill. App. 3d at 721, 873 N.E.2d at 439. And *Hagshenas v. Gaylord*, 199 Ill. App. 3d 60, 557 N.E.2d 316 (2nd Dist.

AA212

1990), the primary case relied on by the Snitzer Entities, was a case involving a fifty percent shareholder of a closely held corporation who diverted the corporation's business and employees for his own personal benefit to the detriment of the other shareholders.

Moreover, there was no discussion in *Hagshenas* about whether the claims were direct or derivative in nature. Further, in discussing the claims in that case, the *Hagshenas* court did so in the context of their being injurious to the corporation. *Id.*, 199 Ill. App. 3d at 71, 557 N.E.2d at 323 ("A partner owes a duty to exercise the highest degree of honesty and good faith in the dealings and in handling of business assets, thereby prohibiting enhancement of personal interests *at the expense of the interests of the enterprise*.") (emphasis added, citation omitted); *see also id.*, 199 Ill. App. 3d at 73, 557 N.E. 2d at 325 ("In his next issue, Bruce contests the court's findings that he breached his fiduciary duty *as an officer and director* prior to his resignation.") (emphasis added).

Consequently, none of the cases cited by the Snitzer Entities is helpful to the Court in this case where the issues and facts are markedly different than the facts of the cases cited in the Response. Accordingly, the authority relied on by the Snitzer Entities to support their contention that the Claims in this case are direct and not derivative may be disregarded by the Court.

In summary, the mere fact that the Snitzer Entities may have a fiduciary relationship with Kinsella and Diamond does not transform every perceived injury or misdeed from a derivative claim into a direct claim as the Snitzer Entities wrongly contend. Instead, as with all supposedly direct as opposed to derivative claims, the Court must examine the nature of the injury and whether the Debtors would be able to recover as a result of the injury alleged. If the Debtors "could have raised a state claim at the commencement of [their] bankruptcy case[s], then that claim is the *exclusive* property of the bankruptcy estate[s] and cannot be asserted by [the Snitzer

11

{5618 REF A020158A.DOC}

Entities.'" *In re Van Dresser Corp.*, 128 F.3d at 947 (emphasis added). *Accord Kennedy v. Venrock, supra*, n.3, 348 F.3d at 589 (derivative claims are property of the debtor's bankruptcy estate and may not be controlled by a creditor or equity holder for its personal benefit); *Chrysler Rail Transp. Corp. v. Ind. Hi-Rail Corp.*, 1996 WL 238788 at *2 (N.D. Ill. May 7, 1996) (citing *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987), *cert. denied*, 485 U.S. 906 (1998).

**IV.   The Snitzer Entities' Claims Violate The *Barton* Doctrine**

The Snitzer Entities deny that they have violated the *Barton* doctrine for three reasons:

(i)    the remedy sought is equitable subordination and not damages;

(ii)   the conduct complained of is entirely pre-petition conduct; and

(iii)  the suit was brought in the bankruptcy court and not some other forum, and *In re marchFirst, Inc.*, 378 B.R. 563 (Bankr. N.D. Ill. 2007), was wrongly decided and should not be followed by this Court.

*See* Response at 12-14.  The Debtors disagree on all three points for the reasons explained below.

To begin with, the Snitzer Entities and their attorneys ignore various allegations in their own Complaint that relate to Kinsella's and Diamond's post-petition conduct.  For example, paragraphs 41 through 45 are allegations that relate to post-petition conduct.  Paragraph 67 begins with the following sentence:

Despite River Village's requirement for capital to complete Bridgeport Village *from 2005 to the present*, Kinsella and Diamond have repeatedly refused to restore their previous capital contributions or to make additional capital contributions.

*See* Complaint at page 80, ¶ 67 (emphasis added).  Moreover, paragraph 72 of the Complaint claims that the alleged undercapitalization resulted in the recent sale of the Iron Street Property at a distressed price. Paragraph 78 bases the undercapitalization Claim, in part, on "statements to the Bankruptcy Court"

AA214

In addition, the Debtors' claimed mismanagement by Kinsella and Diamond asserted in paragraphs 87f, 87g, 87h, and 87i, all relate to or at least include post-petition conduct. Consequently, the Snitzer Entities' contention that the conduct complained of is all pre-petition conduct is belied by the Snitzer Entities' own Complaint.

The second of the Snitzer Entities' feckless defenses to the *Barton* doctrine claim is that because money damages are not sought, but only equitable subordination, the *Barton* doctrine should not apply. No authority is cited for this novel proposition, which the Court should take as a concession that none exists.

Indeed, the purpose of the *Barton* doctrine is to prevent the managers of a bankruptcy estate from being intimidated or distracted from their work in liquidating or otherwise administering the debtor's estate. *marchFirst*, 378 B.R. at 566 (citing *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998)). Whether a claim is legal or equitable in nature, the threat of intimidation or distraction is the same.

The whole point of the Snitzer Entities' equitable subordination claim is to transfer value from Kinsella and Diamond to the Snitzer Entities. *See* Complaint at page 88, the Snitzer Entities' Request for Relief. It matters little if the nature of the claim is legal or equitable in nature. The result is still the same – personal harm to Kinsella and Diamond and a benefit to the Snitzer Entities. Because the purpose of the *Barton* doctrine is to prevent that sort of groundless intimidation and distraction by disgruntled stakeholders such as the Snitzer Entities, the Court should disregard the Snitzer Entities' defense based on the nature of the remedy sought.

Finally, the Snitzer Entities assert that they are exempt from the *Barton* doctrine because the personal claims against Kinsella and Diamond are made in this Court and not in a different forum. This defense is also unavailing.

AA215

AA216

A similar argument was made in *marchFIRST* by CIT and rejected as follows:

> Here, CIT argues that such permission must be obtained only where a suit is to brought in a court other than the court where the trustee was appointed. CIT also requested that if such leave were necessary, it be granted instanter. *A careful reading of the Seventh Circuit's opinion in Linton leads this court to believe that the rule should apply regardless of the lawsuit's forum and particularly where, as here, suit is being brought during the pendency of the bankruptcy case. Regardless of the forum in which the lawsuit is brought, the concerns of the Seventh Circuit are present. There is the burden of defense. There is the threat of distraction. There is the concern that serving as a trustee will become a more irksome and expensive proposition. For these reasons, this court finds it reasonable to apply the requirement of requesting leave to sue a trustee to adversary proceedings brought in the appointing forum.*

*marchFIRST*, 378 B.R. at 566-67 (emphasis added).  As noted by Judge Schwartz in *marchFIRST*,

> Judge Squires also relied on the *Barton* doctrine in Fisher v. Berney *(In re Messina)*, 2003 WL 22271522 (Bankr. N.D. Ill. Sept. 29, 2003), to dismiss a claim brought against a trustee in the bankruptcy court. *marchFIRST*, 378 B.R. at 567 n.2.

The Debtors believe that Judge Schwartz's and Judge Squires' reasoning in *marchFIRST* and *Messina*, respectively, is sound and should be followed by this Court. The purpose of the *Barton* doctrine would be served if the Complaint were to be dismissed because the particular forum in which the offensive suit is filed is simply not relevant. The *Barton* doctrine has been interpreted to bar personal suits against persons charged with managing bankruptcy estates to avoid the intimidation and distraction caused by such litigation. The Complaint should therefore be dismissed and appropriate sanctions awarded against the Snitzer Entities.

**V.  Res Judicata Bars The Undercapitalization Claim**

Despite the Snitzer Entities' protest, even if the Snitzer Entities had standing to bring it, *res judicata* bars their Claim for equitable subordination based on Kinsella's and Diamond's alleged failure to properly capitalize the Debtors.  The Snitzer Entities' characterization of the

AA217

Seventh Circuit's decision in *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537 (7th Cir. 2003) ("*Qualitech*"), is distorted and their reliance on *Qualitech* is misplaced. *Qualitech* does not prevent this Court from applying the doctrine of *res judicata* to bar the Snitzer Entities' undercapitalization Claim. *See, e.g., In re Kmart Corp.*, 362 B.R. 361, 379 and n. 19 (Bankr. N.D. Ill. 2007) ("In light of the severable nature of proceedings before them, bankruptcy judges can be called upon to decide whether to give claim preclusive effect to one of their own prior orders.") (citing several cases and distinguishing *Qualitech* on its facts).

In *Qualitech*, the fact that the bankruptcy court heard the landlord's claim that ultimately wound up in the Seventh Circuit was not, by itself, dispositive of the *res judicata* issue as the Snitzer Entities incorrectly contend. *See, e.g., Kmart*, 362 B.R. at 379 n. 19. Instead, the Seventh Circuit found that (i) the request by the purchaser, New Qualitech, to construe its own sale order and grant new affirmative relief against the landlord, (ii) the district court's reversal of the bankruptcy court's decision, and (iii) the fact that the Seventh Circuit was not barred by *res judicata* were all factors that allowed the Seventh Circuit to proceed, notwithstanding the general rule of *res judicata*. *Qualitech*, 327 F.3d at 543. None of those factors are present in this case. Thus, as in *Kmart, supra*, 362 B.R. at 379 n. 19, *Qualitech* is not dispositive of the *res judicata* issue in this case.

Similarly, the Snitzer Entities' assertion that the claims are not identical and therefore *res judicata* is inapplicable is also mistaken. As explained in *Kmart*, the fact that the two claims have different legal bases does not prevent them from having a single core of operative facts, making the two seemingly separate claims share an identity for the purpose of *res judicata*:

The second requirement of claim preclusion is met by establishing the existence of an identity of causes of action. Such identity exists where there is a "single core of operative facts giving rise to a remedy." *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 913 (7th Cir.

AA218

16

{5618 REF A020158 4.DOC}

1993). This test is referred to as the "same transaction" test, or "operative facts" test. *See Energy Co-op*, 814 F.2d at 1230; *Pre-Press Graphics*, 300 B.R. at 908. Importantly, "[t]he fact that claims have different legal bases does not by itself create separate causes of action." *Id.* at 1231, n. 7.

*Kmart*, 362 B.R. at 381. *See also Henry v. Farmer City State Bank*, 808 F.2d 1228, 1233 (7th Cir. 1986) (state court foreclosure judgment barred a subsequent federal court RICO case by the borrower against the foreclosing lender); *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1016 (7th Cir. 1988) (§ 363(b) sale order barred subsequent fraud suit by the trustee against the debtor, the debtor's principal's law firm, two secured creditors and others); *Schlangen v. Resolution Trust Corp.*, 934 F.2d 143, 146-47 (7th Cir. 1991) (state court foreclosure decree barred subsequent suit by borrower for breach of contract, interference with prospective economic advantage and breach of fiduciary duty against the lender).

Thus, the issue of whether two claims share an identity has nothing to do with the legal theories of the claims or the nature of the remedy sought. Instead the focus of the Court's inquiry must be whether there is a common nucleus of facts that underlies both causes of action. Moreover, it is well-settled that *res judicata* applies to both claims and defenses. That point is made clear in *Schlangen* as follows:

> The rule is well-settled that a cause of action includes defenses that were or might have been offered against the claim. *Henry*, 808 F.2d at 1233-34. "A defendant [ ] may not relitigate a defense, which was available but not raised in a prior action, by making it the basis of a claim in a subsequent action against the original plaintiff which if successful would nullify the initial judgment."
>
> *Id.* at 1234.

*Schlangen*, 934 F.2d at 147. *Accord Whitaker v. Ameritech Corp.*, 129 F.3d 952, 956 (7th Cir. 1998) ("In Illinois, *res judicata* extends to all questions actually decided in a previous action as

well as to all grounds of recovery and *defenses* which might have been presented in the prior litigation.") (emphasis added) (applying Illinois state law principles of *res judicata*).

In the contested sale proceeding involving the Iron Street Property, the Snitzer Entities admittedly raised the defense that the sale of the Iron Street Property would not be necessary if only Kinsella and Diamond would honor their capital commitments to the Debtors. *See* Debtors' Motion at page 13, ¶ 19 and Snitzer Entities' Response to the Kinsella and Diamond Motion to Dismiss at pages 5-6. That defense, like the others raised by the Snitzer Entities, was overruled by this Court on the merits. The fact that the Snitzer Entities chose not to present evidence in support of their position is of no moment. The important fact is that the Snitzer Entities not only *could* have raised the defense of a lack of necessity to sell the Iron Street Property but in fact *did* raise that defense. Consequently, having previously raised the undercapitalization claim as a defense in the prior sale proceeding, the Snitzer Entities are now barred from raising the undercapitalization claim to obtain an affirmative recovery. *See Schlangen*, 934 F.2d at 147; *Henry*, 808 F.2d at 1233-34.

The current undercapitalization Claim relies on the exact same facts as the Snitzer Entities' defense to the sale of the Iron Street Property. Indeed, paragraph 72 of the current Complaint asserts that the alleged undercapitalization led to the sale of the Iron Street Property at a depressed price. Thus, contrary to the Snitzer Entities' denial, the current undercapitalization Claim is a thinly veiled attack on the order approving the sale of the Iron Street Property as the two claims are directly linked by the Snitzer Entities themselves in the current Complaint. It is impossible to conclude, as the Snitzer Entities invite the Court to do, that the undercapitalization defense in the Iron Street sale proceeding and the current equitable subordination Claim based on the same alleged undercapitalization do not have a common nucleus of operative facts. Indeed,

AA220

{5618 REF A020158A.DOC}

18

the Snitzer Entities themselves make no effort to distinguish the two separate sets of facts upon which the two claims are supposedly based. This lack of explanation is an admission by the Snitzer Entities that the two claims do not share a common nucleus of facts.

There is no doubt that the parties or their privies are the same in this proceeding as in the prior sale proceeding. Similarly, the Snitzer Entities concede that the sale order regarding the Iron Street Property is a final judgment on the merits. Given that the facts underlying the undercapitalization claim are precisely the same in this case as they were in the prior sale proceeding, there is an identity between the two claims. Accordingly, *res judicata* bars the current undercapitalization claim. *In re Chapman*, 132 B.R. 132, 145 (Bankr. N.D. Ill. 1991) (reciting the three requisite elements for *res judicata* to apply and collecting federal and Illinois cases on point).

**VI. Conclusion**

Through their Response, the Snitzer Entities attempt to gloss over the dispositive issues by making arguments that rely on legal principles that are inapposite when applied to the undisputed facts of this case. The Response makes no legitimate effort to explain why the Claims are direct and not derivative in nature ignoring the basic question of whether the Claims are based on injuries to the Snitzer Entities that are unique to the Snitzer Entities and distinct from the alleged injuries to the Debtors. Instead, the Response sets up straw man arguments that are dependent on the existence of a contractual and fiduciary relationship between the Debtors' member-owners, relationships that are entirely irrelevant to the issue of which entities or persons suffered from the alleged injury and which persons or entities, in this case the Debtors' creditors, would be entitled to recover if the Claims asserted had any merit.

The same is true of the Response's unavailing attempt to refute the *Barton* Doctrine and *res judicata* arguments set forth in the Motion to Dismiss. The Snitzer Entities either ignore controlling cases or suggest, without basis, that they have been wrongly decided.

In short, the Response is entitled to little if any weight. The Claims asserted by the Snitzer Entities are derivative in nature and must be dismissed. The Debtors also should be awarded their fees and costs in defending against the Claims that have been brought in violation of the automatic stay and the *Barton* doctrine.

Respectfully submitted,

JS II, L.L.C., et al.,

Dated: March 21, 2008

By: /s/ Steven B. Towbin
One of their attorneys

Steven B. Towbin
Shaw Gussis Fishman Glantz
Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL 60610
P: (312) 276-1333
F: (312) 275-0569

{5618 REP A020158.DOC}

19

AA221

AA222

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION



| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| JS II, LLC, *et al.*, | § | Case No. 07-03856 |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |
| THOMAS A. SNITZER AND SNITZER FAMILY LLC, | § | Hon. Jacqueline P. Cox |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| KINSELLA INVESTMENTS L.P., JOHN J. KINSELLA, DIAMOND FAMILY L.L.C. AND SID DIAMOND, | § | Adv. Case No. _____ |
| | § | |
| Defendants. | § | |

## COMPLAINT FOR EQUITABLE SUBORDINATION AND OTHER RELIEF

Plaintiffs Thomas A. Snitzer ("Snitzer") and Snitzer Family LLC ("SFLLC"), by their attorneys Miller Shakman &Beem LLP, for their Complaint for Equitable Subordination and Other Relief ("Complaint") against Kinsella Investments L.P., John J. Kinsella, Diamond Family, L.L.C. and Sid Diamond (collectively, "Kinsella and Diamond"), state as follows:

### Preliminary Statement

1.      This Complaint is filed because Kinsella and Diamond have breached contractual and fiduciary duties to Snitzer and SFLLC, and engaged in gross negligence and willful misconduct in managing the affairs of Debtors, causing them to incur millions of dollars of damage and warranting an equitable subordination of Kinsella and Diamond's claims to repayment of capital to the equity interests of Snitzer and SFLLC. This Complaint seeks no relief from Kinsella and Diamond for acts occurring after March 5, 2007. If and when Snitzer

AA223

does seek any such relief, Snitzer will seek prior Court approval pursuant to the Court's Opinion

of May 27, 2008 at 18.

<u>Parties</u>

2.      Plaintiff Thomas A. Snitzer is an Illinois resident with extensive experience as a

real estate developer. At all relevant times he was a member of two Illinois limited liability

companies, River Village I, LLC ("River Village") and River Village West, LLC ("River Village

West"), and from approximately early July 2004 to the present he was a member of a third

Illinois limited liability company, JS II, LLC ("JS II") (collectively, the three entities will be

referred to as the "LLCs" or "Debtors"), all of which have their principal place of business in

Illinois and are involved in the business of residential real estate development.

3.      Plaintiff SFLLC is an Illinois limited liability company with its principal place of

business in Illinois. Thomas Snitzer is the manager of SFLLC. SFLLC is a member of River

Village, River Village West and JS II.

4.      Together, Thomas Snitzer and SFLLC own 50% of the total membership interests

in each of River Village, River Village West and JS II. Alternatively, if SFLLC does not own

any membership interest in JS II, Snitzer owns 50% of the total membership interests in JS II.

5.      River Village has four members. They are: Thomas Snitzer, SFLLC, Diamond

Family L.L.C. and Kinsella Investments, L.P. Prior to June 2005, Thomas Snitzer was the

manager of River Village.

6.      River Village West has four members. They are: Thomas Snitzer, SFLLC,

Diamond Family L.L.C. and Kinsella Investments, L.P. Prior to June 2005, Thomas Snitzer was

the manager of River Village West.

2

AA224

7.   JS II has four members. They are: Thomas Snitzer, SFLLC, John J. Kinsella and Diamond Family L.L.C. At certain times, prior to June 2005, Thomas Snitzer managed JS II.

8.   Defendant Kinsella Investments, L.P. is a Delaware limited partnership and a 30% member of River Village and River Village West. Kinsella Investments, L.P. does business in Illinois.

9.   Defendant John Kinsella is a limited partner and the general partner and/or manager of Kinsella Investments, L.P. John Kinsella is an Illinois resident and a 30% member of JS II.

10.   Defendant Diamond Family L.L.C. is an Illinois limited liability company and a 20% member of River Village, River Village West and JS II. Diamond Family, L.L.C. does business in Illinois.

11.   Defendant Sid Diamond is an owner and principal of Diamond Family, L.L.C. and the manager of Diamond Family, L.L.C. Sid Diamond is an Illinois resident.

Jurisdiction

12.   This Court has core jurisdiction to hear and determine this Complaint pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), 157(b)(2)(A) and 157(b)(2)(O). Should this Court determine that it does not have core jurisdiction, this Court has "related to" jurisdiction pursuant to 28 U.S.C. §157(c)(1), and Snitzer consents to the entry of final orders by this Court.

Background

13.   River Village was the developer of Chicago's largest single family home development, called Bridgeport Village-Phase I ("Bridgeport Village"). Bridgeport Village's

3

first phase consists of 115 single family homes located in Chicago's Bridgeport neighborhood, near Racine and 34th Street on the Eastern Edge of the South Branch of the Chicago River.

14.     The award winning development was successful under Snitzer's management and was poised to be very profitable to its investors. At the time of Snitzer's ouster by the Circuit Court in June 2005, approximately 106 of the 115 homes had been sold, with 84 homes completed and occupied. Another 16 homes were in various stages of construction, 6 of which were completed and ready for occupancy.

15.     The Bridgeport Village project's success under Snitzer's management had also caused the value of the homes to rise along with its profitability. The average selling price of the first 10 homes sold (in 2002) was approximately $469,000 without upgrades. Since then prices had increased dramatically. The average selling price of the last 10 homes sold (in late 2004 and early 2005) was approximately $963,000 without upgrades.

16.     Bridgeport Village was and remains a first class, beautiful residential development. Under Snitzer's management, it received numerous awards and endorsements, including:

a.      Awarded Best City of Chicago Project for three consecutive years 2002, 2003 and 2004 by the Chicago Association of Homebuilders. Bridgeport Village is the only project ever to have received this award more than once;

b.      Awarded Best City Development for 2003 by the Chicago Sun Times;

c.      Awarded Best City Development for 2003 by New Homes Magazine;

d.      Described as Best City Residential Development by 11th Ward Alderman James Balcer at a committee meeting.

4

AA225

AA226

17.    In addition to managing River Village's development of Bridgeport Village, Snitzer caused River Village West, through its nominee, JS II, to acquire several valuable commercial properties in Bridgeport at favorable prices for potential future residential development. In addition to the property on which Bridgeport Village-Phase I is being built, Snitzer caused River Village West and JS II to acquire other nearby properties known as the "Iron Street Property" (AAA and Acme) and the "Holsum Property." Snitzer also caused River Village, River Village West and JS II to file environmental litigation against People's Gas that resulted in late 2005 in the acquisition by JS II, at no net cost, of an option to buy the "Gray Property" at $17 per square foot after Peoples cleans it up. One of Debtors' advisers recently testified that the estimated value to Debtors of the Gray Property option is $1-2 million.

18.    River Village is governed by an Operating Agreement entered into and agreed to by all of its members including Defendants in or about June 1998.

19.    River Village West is governed by an Operating Agreement entered into and agreed to by all of its members including Defendants in or about January 2002.

20.    Prior to approximately July 2004, JS II was governed by an Operating Agreement entered into and agreed to by all of its members in September 1997. The JS II Operating Agreement was amended by a Memorandum of Understanding entered into in about July 2004 ("MOU"), pursuant to which among other things, Snitzer and SFLLC became members of JS II and Snitzer became the manager of JS II effective July 2004. A true and correct copy of the MOU is attached to Snitzer's Proof of Interest (Dkt. 188) as Exhibit 1.

21.    On June 23, 2005, the Circuit Court of Cook County (Judge Nowicki), entered an order that found in relevant part that Snitzer became a member of JS II pursuant to the MOU, but

5

AA227

9

that the membership status of SFLLC and the extent of Snitzer's rights and responsibilities as a member were ambiguous. A true and correct copy of the June 23, 2005 Order is attached to Snitzer's Proof of Interest as Exhibit 3.

22.    The Illinois Limited Liability Company Act ("Act") provides that members of a limited liability company such as River Village, River Village West and JS II may enter into an operating agreement which shall control the management and operation of the company, except as otherwise specifically provided in the Act.  805 ILCS 180/15-5.

**Kinsella and Diamond's Obligations as**
**Managers per the June 23, 2005 Order and Illinois Law.**

23.    Pursuant to Judge Nowicki's order of June 23, 2005 in the Circuit Court, Kinsella and Diamond were authorized to replace Snitzer and were thereby given managerial authority over the LLCs as specified therein.

24.    In assuming and exercising managerial authority over the LLCs, Kinsella and Diamond were obligated to exercise that authority in a manner consistent with the operating agreement of each LLC, with the Illinois Limited Liability Company Act and with the June 23, 2005 Order.

25.    At all relevant times, Kinsella and Diamond owed fiduciary duties to the LLCs and to Snitzer of loyalty, due care and good faith and fair dealing.

**Kinsella and Diamond Have Improperly Commingled Assets of the LLCs**

26.    The Debtors are separate and distinct Illinois limited liability companies.

27.    While Snitzer functioned as manager, the separate LLCs observed corporate formalities that included maintaining separate accounts and not commingling funds and assets.

AA228

On occasion, when funds were advanced from one LLC to another (as occasionally happened between River Village and River Village West), the advances were properly booked as loans from one entity to the other.

28.    The three LLCs were intended to serve and, in fact, under Snitzer's management historically and reasonably served, separate functions, as explained in the next several paragraphs.

29.    River Village functioned as the operating entity for the development and sale of homes in Bridgeport Village Phase I.

30.    River Village West was formed in or about 2002 and functioned as the operating entity for the acquisition and management of industrial rental properties.

31.    JS II was formed in or about 1997 in connection with a prior development (Dearborn Village) in which Snitzer, Kinsella and Diamond were members (directly or through entities they controlled). Snitzer was manager of the Dearborn Village development. He controlled 50% of the membership interests in Dearborn Village LLC, which developed that project, and Kinsella and Diamond collectively controlled a 50% membership interest in that entity.

32.    In connection with Dearborn Village, JS II functioned as a mere nominee for the benefit of Dearborn Village, LLC, the separate LLC that developed Dearborn Village.

33.    Regarding the Dearborn development, JS II held legal title to the Dearborn Village LLC property as a nominee, but the assets, liabilities, profits and losses were all recorded on the books of Dearborn Village LLC and tax returns were filed for that LLC, and not for JS II.

7

AA229

8

34.    Kinsella and Diamond knew about and consented to the foregoing course of dealing at Dearborn Village.

35.    Consistent with the course of dealing that Snitzer, Kinsella and Diamond established with respect to Dearborn Village, prior to Snitzer's ouster from management in June 2005, JS II functioned as a nominee for River Village and River Village West.

36.    In the capacity of nominee, consistent with the prior course of dealing at Dearborn Village, JS II had held legal title to certain of the properties for the benefit and use of River Village or River Village West. However, River Village or River Village West was in each case the real party in interest with respect to ownership of such properties.

37.    Consistent with economic reality and the course of dealings and understandings of the parties, while Snitzer was manager, capital contributions, income and expenses flowed, respectively, through River or River Village West, but not JS II, and those entities filed federal income tax returns accurately reflecting this reality, while JS II, as a mere nominee, did not.

38.    Specifically, at all times from the beginning of the Bridgeport Village Phase I until Snitzer's ouster from management in June 2005, River Village operated and acted as the developer for the Bridgeport Village-Phase I project, with Snitzer as manager, and with the knowledge and agreement of Kinsella and Diamond. Kinsella and Diamond were aware that all of the projects costs, revenues and expenses were recorded on the books and records of River Village, the books and records of the development were maintained by River Village, all of the home sale contracts were between River Village and the buyers, all of the project staff were

AA230

hired, employed and managed by River Village and all of the income was recorded as income of River Village.

39.     Additionally, Kinsella and Diamond contributed $2.5 million to River Village in connection with the development of Bridgeport Village (which contributions were later repaid), and they contributed approximately $5 million to River Village West in connection with that entity's acquisition of the "Iron Street" and "Holsum Properties."

40.     Prior to Snitzer's removal as manager, Kinsella and Diamond contributed no capital to JS II in connection with Bridgeport Village, the acquisition of property in Bridgeport or the activities of River Village or River West.

41.     Since taking over management from Snitzer in June 2005, Kinsella and Diamond have not been observing corporate formalities and have improperly commingled (and have stated that they intend to continue commingling) funds and assets of the separate LLCs.

42.     In particular, Kinsella and Diamond have used revenues from River Village West's industrial properties to pay for expenditures of River Village to perform work on Bridgeport Village Phase I.

43.     Additionally, Kinsella and Diamond used the equity from River West's industrial properties as collateral for loans whose proceeds were used to pay for expenditures of River Village to perform work on Bridgeport Village Phase I.

44.     Kinsella and Diamond also started using JS II as an operating company and have purported to have that company assume liabilities of River Village, without the consent of Snitzer.

6

AA231

45.    Additionally, Kinsella and Diamond are proposing that the Court approve a substantive consolidation of the Debtors, pursuant to which proceeds of the sale of River Village West's (or, in their view, JS II's) industrial properties would generate cash to pay for or reimburse expenditures on Bridgeport Village for the benefit of River Village.

46.    Snitzer has objected and continues to object to commingling of assets and revenues between or among the entities, including any plan to use any proceeds from the sale of River Village West's (or JS II's) industrial properties to pay for obligations of River Village.

47.    Even under Kinsella and Diamond's erroneous accounting practices instituted after they assumed management control in June 2005, their actual and intended commingling of assets would be improper. The tax returns prepared and filed under their management since June 2005 reflected (properly) income and losses from Bridgeport Village Phase I on River Village's tax return. However, the return for 2005 reflected (improperly) income and losses from the industrial properties on JS II's tax return (rather than River Village West's return). Upon information and belief, JS II had not previously filed a tax return, including for the year 2004. Regardless of whether the industrial properties' income should be shown as that of JS II or River Village West, Kinsella and Diamond's IRS filings on behalf of the entities correctly reflect that the assets and operations of Bridgeport Village Phase I are distinct from and should be recorded on the books of a separate corporate entity than those of the industrial properties. The assets, liabilities, profits and losses from Bridgeport Village and the industrial properties should not be commingled.

48.    The use of assets or revenues of one of the venture LLCs (e.g., River Village West or JS II) to pay for obligations of another venture LLC (e.g., River Village), in disregard of the

10

AA232

11

LLCs' separate corporate existence, would, at a minimum, constitute a "major decision" that requires a majority vote of the members of each affected LLC, and would require accounting to reflect a liability of the venture receiving such a benefit in favor of the entity granting the benefit.

49.     Snitzer never voted for or approved of Kinsella and Diamond commingling assets between or among the LLCs without reflecting the obligations that are created thereby by virtue of their respective separate existences.  Commingling is injurious to JS II and River Village West.

50.     To the extent Kinsella and Diamond have commingled assets or revenues in such a fashion, they have intentionally violated the Operating Agreements of the LLCs and have breached fiduciary duties to Snitzer and to the LLCs.

**Kinsella and Diamond Were Grossly Negligent in Placing the Debtors into Bankruptcy Because they Grossly Overspent Funds at Bridgeport Village, Were Inept at Selling Homes and Lots, and Failed to Honor Obligations to Return and/or Contribute Capital to River Village, Thereby Creating Liquidity Problems that Were Avoidable.**

51.     For at least a year prior to the filing of this Bankruptcy, Kinsella and Diamond repeatedly claimed that "the venture" was in a financial crisis.

52.     In fact, upon information and belief, "the venture" as a whole was not in a financial crisis.  Rather, only River Village had experienced any significant cash flow shortfalls.

53.     As a member of River Village, River Village West and JS II, Snitzer is entitled to discovery and a thorough and accurate accounting to determine the extent of the alleged "crisis," its causes, and its solutions.

54.     Upon information and belief, the "crisis" that Kinsella and Diamond allege precipitated this bankruptcy resulted, in fact, from gross management errors by Kinsella and

Diamond and by their failure to fulfill obligations under the River Village operating agreement to capitalize that entity adequately.

55.    Neither Kinsella nor Diamond had experience managing a large residential real estate development.

56.    Kinsella is a retired advertising executive.

57.    Diamond is in the business of manufacturing children's products.

58.    Section 1.084(d) of the River Village Operating Agreement provides: "Notwith-standing any provision of this Agreement or as provided in the [LLC] Act, Snitzer Family L.C.C. [sic] and Thomas Snitzer shall have no obligation to make additional capital contributions."

59.    Section 1.084(e) of the River Village Operating Agreement provides: "To the extent that the Company requires additional capital contributions, Kinsella Investments L.P. and Diamond Family L.C.C. [sic] shall make additional contributions to the capital of the Company in an amount not expected to exceed Eight Million Five Hundred Thousand Dollars ($8,500,000.00)."

60.    Pursuant to Section 1.084(e), in or about 1999 and 2000, Kinsella and Diamond made capital contributions (directly or through entities they respectively controlled) to River Village totaling approximately $2.5 million.

61.    Specifically, in or about 1999 Kinsella and Diamond contributed $900,000 and $600,000 respectively in capital to River Village.

62.    In or about 2000 Kinsella and Diamond respectively contributed additional capital of $600,000 and $400,000.

12

AA234

13

63.     The 1999 and 2000 capital contributions were paid to River Village, not JS II. These funds, along with funds borrowed from financial institutions, were used to defray project costs of Bridgeport Village, Phase I.

64.     Section 1.08(4) of the River Village Operating Agreement provides: "A Member shall not receive out of the Company's property any part of its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them."

65.     Prior to his removal as manager of River Village, in 2004 and early 2005, Snitzer caused River Village to return all of Kinsella and Diamond's $2.5 million Capital Contribution to them, in payments of $1 million and $1.5 million. He did so with the expectation and belief that continued strong sales and profits would enable River Village to retire imminently the remaining Phase I project bank debt (which had been reduced from about $16 million to about $1 million) and meet other liabilities of River Village. Kinsella and Diamond accepted these returns of capital without objection.

66.     Because of the City of Chicago's shutdown of Bridgeport Village in 2005 (and again from time to time thereafter while Kinsella and Diamond were managing River Village), and because of management mistakes and the development inexperience of Kinsella and Diamond, River Village completed homes at a very slow pace, had lost sales, was slow at generating new sales, and had thereby not generated sufficient revenues to meet legitimate expenditures or to repay remaining Phase I project debt. Additionally, since taking over management in June 2005, Kinsella and Diamond have caused River Village (or JS II for the

benefit of River Village) to make unnecessary and excessive expenditures, exacerbating a cash shortfall.

67.     Despite River Village's requirement for capital to complete Bridgeport Village from 2005 to the present, Kinsella and Diamond have repeatedly refused to restore their previous capital contributions or to make additional capital contributions. Instead, upon information and belief, they have made what they characterize as "loans," in an aggregate amount that is substantially less than their prior capital contributions.

68.     Section 1.053 of the River Village Operating Agreement enumerates certain decisions that "require the affirmative vote of all of the members of the company." Among such decisions requiring unanimity is a decision "[t]o borrow money for the Company from banks, other lending institutions, the Managers, Members, or affiliates of the Managers or Members . . ." (Emphasis added.)

69.     Contrary to Section 1.053, Kinsella and Diamond never obtained Snitzer's vote with respect to their putative "loans" to River Village.

70.     Section 1.084(f) of the River Village Operating Agreement provides that Kinsella and Diamond may elect, upon approval of the Members, to make a loan to River Village in lieu of additional capital contribution, if funds are needed in excess of the $8.5 million sum set forth in Section 1.084(e).   In purporting to "loan" funds to River Village without Snitzer's approval and without having contributed up to $8.5 million in capital, Kinsella and Diamond breached Section 1.084(f).

14

AA235

AA236

71.     If Kinsella and Diamond had contributed capital to River Village pursuant to their obligations to do so, the cash shortfall and putative "crisis" associated with River Village would have been substantially or fully resolved, or, at a minimum, substantially ameliorated.

72.     If Kinsella and Diamond had contributed capital to River Village pursuant to their obligations to do so, they could have avoided placing the Debtors into bankruptcy, which would have avoided the expenditure of several million dollars of administrative expenses, as well as the recent sale of the "Iron Street Property" at a distressed, as-zoned price of $12.50 per square foot.

73.     In refusing to contribute capital to River Village, Kinsella and Diamond were placing their personal interests above their fiduciary duties to River Village, River Village West, JS II and to Snitzer.

74.     Pursuant to Section 1.084 of the River Village Operating Agreement, Kinsella and Diamond are obligated to restore their capital contributions, at least in the amount of the $2.5 million contribution they had previously made, to River Village. Contrary to expectations that existed at the time the capital was returned in 2004 and 2005, sales revenue had not been sufficient to pay "all liabilities of the Company." Thus, the condition precedent to repayment of their Capital Contributions under Section 1.084 has not been met.

75.     By not restoring the $2.5 million in Capital Contributions to River Village, Kinsella and Diamond breached their obligations under the River Village Operating Agreement and breached their fiduciary duties to River Village and to Snitzer.

76.     As previously alleged, Section 1.084(e) requires Kinsella and Diamond to contribute up to $8.5 million "[t]o the extent that the Company requires additional capital contributions."

15

AA237

77.     Section 1.082 of the River Village operating agreement provides in relevant part that "[a] Member shall be required to make such additional Capital Contributions as shall be determined by Members owning a Majority Interest from time to time to be reasonably necessary to meet the expenses and obligations of the Company."

78.     Based on their own repeated declarations of a financial crisis and statements to the Bankruptcy Court of a need for cash for the operations of Bridgeport Village, Kinsella and Diamond have admitted that River Village "requires additional capital contributions" and that such capital is "reasonably necessary to meet the expenses and obligations of the Company."

79.     Contrary to the position Kinsella and Diamond have taken, Section 1.082 does not provide Kinsella and Diamond with unfettered discretion to override the capital contribution obligations of Section 1.084(e). Rather, reading the provisions together, the Operating Agreement obligated Kinsella and Diamond to contribute capital as "required," up to $8.5 million, with the precise amount that is "reasonably necessary" to be determined by a Majority Interest. Pursuant to the plain terms of the Operating Agreement, the duty of good faith and fair dealing implied by law in the Operating Agreement, and Kinsella and Diamond's fiduciary duties to the LLCs and to Snitzer, they had a duty to contribute up to an additional $8.5 million to River Village to the extent "reasonably necessary" to address its requirement for capital.

80.     By purporting to make insufficient "loans" instead of restoring capital, and by doing so without the affirmative vote of all members of River Village, Kinsella and Diamond have breached their duties under the River Village Operating Agreement and have breached their fiduciary duties to River Village and Snitzer.

16

AA238

**Management Errors and Claims of Operating Losses.**

81.     Before the City shut down Bridgeport Village for alleged building code and permit violations in January 2005, and the subsequent transfer of managerial authority to Kinsella and Diamond in June 2005, Bridgeport Village had been a financial success.

82.     At that time, the project bank debt had been reduced from $16 million to about $1 million and $2.5 million in capital had been returned to Kinsella and Diamond. Additionally, the inventory of completed and sold homes was large, totaling approximately $6 million, in addition to an inventory of nearly complete and sold homes.

83.     Because Snitzer had caused River Village to acquire the Bridgeport Village property at a favorable price and because of the substantial appreciation of residential land values from 1998-2005, including the substantial increase in average selling prices for Bridgeport Village homes (from about $469,000 for the first ten homes to about $963,000 for the last ten homes sold under Snitzer's management), River Village was poised to earn very large profits. The favorable financial situation and size of the potential profits was such that the profits to River Village should have been large even after accounting for the damages to River Village caused by the City's shutdowns and attendant delays.

84.     While the City's shutdown of Bridgeport Village in 2005 caused serious short-term cash flow problems for River Village (due to the delays caused in closing the sales of completed or nearly-completed homes), River Village was then, and should have thereafter been, in a position to be substantially profitable after the remaining homes were completed and sold.

85.     Based on financial data provided by Debtors in the bankruptcy, it appears Debtors are claiming that River Village will be liquidated at a net loss.

17

AA239

18

86.     Snitzer requires discovery and a complete accounting to determine how the Project degenerated from profitable to unprofitable under Kinsella and Diamond's management from June 2005 to the present. Given the land costs, reasonable construction costs and market values of the homes, his knowledge of the condition of Bridgeport Village at the time of his removal in June 2005, and based upon his twenty years of experience as a residential real estate developer, Snitzer does not believe that River Village could have become unprofitable in the absence of gross mismanagement or waste of corporate resources by Kinsella and Diamond.

87.     Based on the incomplete disclosures and discovery he has received to date, Snitzer is informed and believes that Kinsella and Diamond made several serious and material management errors that have diminished the profitability of River Village. Full discovery and an accounting are required to determine the scope and extent of their errors and their impact. He presently believes that the errors include, without limitation, the following:

a.     Hiring a new construction superintendent (Jay Barry), whom they terminated during 2006. Upon information, they terminated Barry due to their dissatisfaction with his performance. Snitzer requires discovery to determine the adequacy of Barry's performance and the reasons for Kinsella and Diamond's termination of him. Regardless of the reasons, however, the engagement and subsequent termination of an incompetent superintendent necessarily had disruptive and costly consequences.

b.     Paying very large consulting fees to FCL Construction, a firm that, upon information and belief, is experienced in commercial construction but not residential construction. FCL's fees are two to three times higher than what was paid to Jay Barry or Snitzer's previous staff for similar services, and sometimes exceeded $150,000 per month. Upon

AA240

19

information and belief, these fees were excessive and unreasonable for the scope of work to be performed.

    c.    Paying certain subcontractors excessive and unreasonable amounts to resolve their claims.

    d.    Paying certain subcontractors unnecessarily on a time and material basis, which inflated the costs associated with such work.

    e.    Failing to complete and submit in a timely fashion architectural and other drawings to the City of Chicago to resolve administratively certain of the technical issues the City had raised to justify their shutdown of the project in January 2005. For example, in or about June 2006, even after a year of holding managerial authority, Kinsella and Diamond had not secured one approved plan from the City for the approximately 110 homes either occupied or sold and under construction, and their delays in obtaining such approvals continued thereafter.

    f.    Spending unnecessarily large sums on "warranty" or "punch list" work. Based on Snitzer's experience as a developer, the sums reported by Kinsella and Diamond may reflect that they have agreed to repair certain alleged problems in sold homes that were out of warranty or that were maintenance issues rather than construction defects for which River Village was responsible and/or they grossly overpaid for legitimate punch list or warranty work. Discovery is required to determine what these funds were spent on and whether such expenditures were proper. Alternatively, Kinsella and Diamond should be seeking reimbursement from the design professionals, contractors or material suppliers (and their insurers) who were responsible for the alleged problem.

AA241

g.     Agreeing, upon information and belief, to the costly installation of "structural gates" to remedy an alleged structural issue raised by the City of Chicago. Kinsella and Diamond should either have contested the gates requirement as unreasonable (since the City is imposing the requirement at Bridgeport Village but not at approximately thirty thousand other similarly constructed homes in the City, and the City has admitted that the alleged structural problem poses no life or safety issues), or, alternatively, should be seeking reimbursement from the design professionals (and their insurers) who were responsible for the structural condition giving rise to the alleged problem.

h.     Kinsella and Diamond were grossly negligent with respect to the very slow pace with which River Village completed and sold homes after June 2005. Under Snitzer's management, River Village completed and sold homes at a much more rapid rate. Kinsella and Diamond's very slow progress, combined with the excessive expenditures to complete and build homes, unnecessarily exacerbated the liquidity problems of River Village.

i.     Kinsella and Diamond were grossly negligent with respect to their failure for over two years to sell undeveloped lots at Bridgeport Village to generate revenue for River Village.

**Equitable Subordination.**

88.     As set forth above, Kinsella and Diamond engaged in misconduct that injured the interests of Debtors and equity holders Snitzer and SFLLC. Their inequitable conduct included, without limitation, placing their own interests above those of Snitzer and the LLCs. By commingling assets and using JS II as an operating company for Bridgeport Village, when River Village had previously been the operating company, they were seeking to deprive Snitzer and SFLLC of their consent rights under the operating agreements and the LLC Act, since they were

20

AA242

also contending that Snitzer and SFLLC had no voting rights in JS II or that, if Snitzer had such

rights, he was outvoted 2-1 on "major decisions" (whereas they could not make such contentions

with respect to River Village and River Village West). Additionally, by doing so they were also

seeking to avoid their capital contribution obligations to River Village, to the detriment of River

Village West and of JS II and of Snitzer and SFLLC.

89. On account of Kinsella and Diamond's inequitable conduct, any equity interest

held by them (including their return of capital) should be subordinated to all other equity interest

holders (Snitzer and SFLLC) pursuant to section 510(c)(1) of the Bankruptcy Code.

90. Further, as the managers or controlling persons of Kinsella Investments L.P. and

Diamond Family, L.L.C., respectively, Mr. Kinsella and Mr. Diamond dominated and controlled

those entities and they operated as their respective alter egos, with such unity of interest and

ownership that the separate personalities of those entities and Messrs. Kinsella and Diamond.

91. The observance of a separate existence between Kinsella Investments L.P. and

Mr. Kinsella, and Diamond Family, L.L.C. and Mr. Diamond, would, under the circumstances,

sanction an injustice.

92. Accordingly, any equity interest held by Kinsella Investments, L.P. and Diamond

Family, L.L.C. should be subordinated to Snitzer and SFLLC pursuant to section 510(c)(1) of the

Bankruptcy Code.

WHEREFORE, Snitzer and SFLLC respectfully request that the Court enter judgment in

their favor and against Kinsella and Diamond, equitably subordinate their interests in Debtors

AA243

(including their interest in return of capital) to those of Snitzer and SFLLC, and grant such other

relief as the Court deems just and proper.

Dated: June 26, 2008                                    Respectfully submitted,

THOMAS SNITZER AND SNITZER FAMILY LLC

By:    /s/Edward W. Feldman
       _____
       One of their attorneys

Marc O. Beem
Edward W. Feldman
**MILLER SHAKMAN & BEEM LLP**
180 N. LaSalle St., Suite 3600
Chicago, IL 60601
(312) 263-3700

22

AA244

**CERTIFICATE OF SERVICE**

Edward W. Feldman, an attorney, certifies that on June 26, 2008 he caused service of the foregoing "Thomas A. Snitzer and Snitzer Family LLC's Complaint for Equitable Subordination and Other Relief" on the parties of record by CM/ECF service as to registered filing users and by E-mail upon those parties that are not registered filing users.

Dated:    June 26, 2008

s/Edward W. Feldman
Edward W. Feldman

AA245

## SERVICE LIST

Christopher J Lawhorn
cjlawhorn@bryancave.com

Adrian E Mazar
imazares@sbcglobal.net,
AdrianMazar@comcast.net

Mary Ann Murray
mmurray@bpp-chicago.com

William T Neary
USTPRegion11.ES.ECF@usdoj.gov

Peter J Roberts
proberts@shawgussis.com

Travis Rojakovick
trojakov@lordbissell.com,
docket@lordbissell.com;
slvons@lordbissell.com

Catherine L. Siege
Andrew J. Olejnik
cstiege@jenner.com
aolejnik@jenner.com

Steven B Towbin
stowbin@shawgussis.com

Esther E Trybau Telser
etrybanielser@cityofchicago.org

Andrew E Weissman
andrew.weissman@dbr.com

Janice A Alwin
jalwin@shawgussis.com

Marc O. Beem
mbeem@millershakiman.com,

William R. Brodzinski
wbrodzinski@mrvlaw.com

Jeffrey A Chadwick
jeffrey.chadwick@kattenlaw.com

Patrick A Clisham
pclisham@shawgussis.com

Bianca R Dominguez
bdominguez@bpp-chicago.com,
ggurrel@bpp-chicago.com

Brian M. Dougherty
bmd@gsmb.com

Barry A Erlich
berlich@rb-llp.com

Edward W Feldman
efeldman@millershakiman.com,

Allen J Guon
aguon@shawgussis.com

Forrest L Ingram
foringpc@aol.com

Counsel for the City of Chicago
Mark A. Limanni
mlimanni@cityofchicago.org

Special Counsel to the Debtors
Michael I. Rothstein
Henry H. Hess
Daniel Konieczny
mrothstein@tdrlawfirm.com
hhess@tdrlawfirm.com
dkonieczny@tdrlawfirm.com

Karen R. Goodman
kgoodman@shefskylaw.com

Andrew W. Worseck
aworseck@cityofchicago.org
Counsel for the U. S. Trustee
Richard Craig Friedman
Richard.C.Friedman@usdoj.gov

Keith W. Harrington
kharrington@dhwlawyers.com

John J. Vondran
jvondran@comcast.net

Financial Advisors to the Debtors
Patrick Cavanaugh
Greg Apathy
pcavanaugh@high-ridge.com
gapathy@high-ridge.com

Legal and Financial Advisor
to John Kinsella and Sid Diamond
Rockney W. Hudson
hudson@hackhud.com